1           IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                  JACKSONVILLE DIVISION

3

4   TWYLA PRINDLE, individually
    and on behalf of a class of persons
    similarly situated,
5           Plaintiff,
    v.                              Case No. 3:13-cv-1349-J-34PDB
6   CARRINGTON MORTGAGE SERVICES,
    LLC,
7           Defendant.

8   _____

9   KIMBERLY CARMAN, individually
    and on behalf of a class of persons
    similarly situated,
10          Plaintiff,
    v.                              Case No. 3:14-cv-1224-J-34MCR
11  GREEN TREE SERVICING, LLC,
            Defendant.
12  _____

13                  **MOTION HEARING**
          BEFORE THE HONORABLE MARCIA MORALES HOWARD
14               UNITED STATES DISTRICT JUDGE

15

16                  Jacksonville Division
                    September 23, 2015
17                   Courtroom 10B
                      10:01 a.m.

18

19

20

21  OFFICIAL COURT REPORTER:

22      Cindy Packevicz, RPR, FCRR
        221 N. Hogan Street, #128
23      Jacksonville, FL  32202
        Telephone:  904.301.6843  Fax:  904.301.6847
24
          (Proceedings reported by stenography; transcript
25  produced by computer.)

```
 1

 2                      A P P E A R A N C E S

 3    COUNSEL FOR PLAINTIFF:

 4         JANET R. VARNELL, Esquire
           Varnell & Warwick, PA
 5         P.O. Box 1870
           Lady Lake, FL  32158
 6         Email: jvarnell@varnellandwarwick.com

 7         MAX H. STORY, Esquire
           Max Story, Esq.
 8         Suite 100
           328 2nd Avenue North
 9         Jacksonville Beach, FL  32250
           Email:  Max@storylawgroup.com
10


11
      COUNSEL FOR DEFENDANT:
12
           CELIA CHAPMAN FALZONE, Esquire
13         Akerman LLP
           Suite 3100
14         50 N Laura Street
           Jacksonville, FL  32202
15         Email:  Celia.falzone@akerman.com

16         LAWRENCE D. SILVERMAN, Esquire
           Akerman Senterfitt
17         1 SE 3rd Avenue, 25th Floor
           Miami, FL  33131
18         Email:  Lawrence.silverman@akerman.com

19         JOHN WILLIAM BUSTARD, Esquire
           Shutts & Bowen, LLP
20         201 S Biscayne Blvd, Suite 1500
           Miami, FL  33131
21         Email:  Jbustard@shutts.com

22

23

24

25
```

P R O C E E D I N G S

September 23, 2015                                    10:01 a.m.

\*   \*   \*   \*   \*

COURT SECURITY OFFICER:  United States District Court, in and for the Middle District of Florida is now in session.  The Honorable Marcia Morales Howard presiding.

Please be seated.

THE COURT:  All right.  We are here on two cases. 3:13-cv-1349-J-34PDB, which is *Twyla Prindle versus Carrington Mortgage Services*.

And Ms. Varnell and Mr. Story are here on behalf of Ms. Prindle.  And Mr. Silverman and Ms. Falzone are here on behalf of Carrington Mortgage Services.

I've combined the hearing because of the overlapping issues with 3:14-cv-1224-J-34MCR, which is *Kimberly Carman versus Green Tree Servicing, LLC*.

And once again, Ms. Varnell and Mr. Story are here for Ms. Carman.  And Mr. Bustard is here on behalf of Green Tree Servicing.

So we have -- I have too much paper up here.  Let me move things around a bit.

So the motion that we're here on in Prindle, I have Carrington's motion to dismiss the seconded amended complaint, which is Document No. 71.  There is a response in opposition at Document No. 73.  And there have been a number of notices of

1   supplemental authority.  I won't -- I won't catalog those.

2         And then in *Carman*, we are here on defendant's motion

3   to dismiss plaintiff's complaint, which is Document No. 7.

4   There is a response at Document No. 8.  And a reply with leave

5   of court at Document No. 19.

6         So those are -- excuse me, those are the motions.

7         Here's what -- the way I think we're going to

8   proceed.  We've got a lot of ground to cover, and I want to

9   make sure I hear from all of you.

10         What I'd like to just ask you to do is trust that

11   I've read everything that you have filed in the cases, and so

12   when I hear from you, I'd like for you to focus on your best

13   arguments, not just read to me from your filings.

14         The -- I'm going to start -- we're going to go back

15   and forth a little bit.

16         One thing that I think is no longer on the table in

17   the Prindle case is Carrington's lack of subject matter

18   jurisdiction argument on the basis of mootness with regard

19   to -- or by virtue of the unaccepted offer of judgment.  I

20   think we can all agree that that is now foreclosed by Stein; is

21   that right?

22         MR. SILVERMAN:  That's correct, Your Honor.  I mean,

23   it's up in the Supreme Court, but the Eleventh Circuit says no,

24   so for purposes of now, it's dead.

25         THE COURT:  Okay.  And I think that's the only thing

1   we all agree on, so...

2           All right.  So here's the way I want to do this.  I

3   kind of made -- laid out an agenda.

4           I'm going to hear from all of you with regard to the

5   FDCPA preclusion argument -- FDCPA, preclusion argument; then

6   I'm going to hear from all of you with regard to the FCCPA

7   preemption argument; then I will go to the 12(b)(6) argument on

8   the FDCPA; the 12(b)(6) arguments with regard to the FCCPA.

9           The -- there's a -- and I'm forgetting right now

10  which one it was in.  I'm inclined to say it's in Prindle.

11  There is a failure to comply with conditions precedent

12  argument.  I don't think it has much in the way of leg.  If I

13  need to hear from you on that, I'll hear from you on that.

14          And then last, we'll turn to the declaratory judgment

15  claim.

16          So let's -- with regard to the FDCPA claim -- and let

17  me -- before I start that, I want to clarify with Ms. Varnell,

18  in both Carman and in Prindle, in the actual substantive FDCPA

19  count, plaintiffs alleged that the defendant violates Section

20  1692e because it uses false, deceptive, or misleading

21  representations in connection with the collection of a debt.

22          And then the next paragraph is that the defendants

23  violate 1692e(2)(A) because they falsely represent the

24  character, amount, or legal status of the debt.

25          Are those both the same thing or are you just being

1   more specific that what they're doing is they're falsely --

2   they're falsely representing the character or legal status of

3   the debt because it's a debt that they can't enforce?

4           MS. VARNELL:  Your Honor, the -- no is the short

5   answer to the question.  They are two separate things.  Because

6   there are some nuances between Prindle and Green Tree, Carman

7   versus Green Tree case.  So...

8           THE COURT:  You make that -- those are identified

9   allegations in both.  They follow each other in both.  And so

10  what I'm trying to understand is exactly what -- what's the

11  difference between -- in Prindle, it's paragraphs 43 and 44.

12  And in Carman -- no, I'm sorry.  In Carman, it's 43 and 44, and

13  in Prindle, it's 23 and 24.

14          MS. VARNELL:  Let me see if I can give a short answer

15  to this.

16          They are misrepresenting the status and nature and

17  character of the debt in that the debt is a debt that is no

18  longer owed due to it being discharged in the bankruptcy

19  previously.

20          In contrast, the paragraph section that deals with it

21  being misleading or involving misrepresentations deals with

22  communications where the debt collector is suggesting that, you

23  know, if you're in bankruptcy, then -- or you had a discharge,

24  you don't need to pay this.  But then on other parts in a much

25  more conspicuous manner, they say you need to pay this now, and

1    each communication will have to be viewed in light of the --

2    the whole statement to determine whether or not it's actually

3    an attempt to collect the debt.

4            We believe that the communications were misleading

5    independent of whether or not it was just misrepresenting the

6    character of the debt and the legal status of the debt, because

7    they were confusing to the least-sophisticated consumer.

8            Does that help?

9            THE COURT:  Okay.  I understand your claim now.

10           So let me just -- all right.  Mr. Bustard, let me

11   start with you on the FDCPA claim, because you raise an

12   argument that is not raised in Prindle.  And it's one that I

13   don't think I agree with, so I just want to start with that.

14           You argue that the Court does not have subject matter

15   jurisdiction over this action because the bankruptcy court

16   alone has the power to enforce the discharge.

17           And I think -- I don't think you're really meaning to

18   argue that I don't have subject matter jurisdiction, because

19   the claim is brought under the Fair Debt Collection Practices

20   Act, pardon me -- yeah, under the Fair Debt Collection

21   Practices Act, which is a federal statute, so it seems that I

22   have original jurisdiction.

23           I think what you're meaning to argue is that the

24   FDCPA claim is precluded, but not that the Court does not have

25   the power to decide it.

1        Am I misunderstanding?

2        MR. BUSTARD:  You are, Your Honor.

3        I'm trying to argue that you don't have subject

4   matter --

5        THE COURT:  Okay.  You need to stand up when you're

6   speaking, please.

7        MR. BUSTARD:  The argument, Your Honor, is that you

8   don't have subject matter jurisdiction over these claims

9   because the underlying nature of this claim is that there's

10  been a violation of a discharge injunction.

11       And under the Eleventh Circuit of *Alderwoods*, the

12  Bankruptcy Court is the -- has exclusive jurisdiction to

13  determine whether there's been a violation and whether there

14  should be sanctions issuing from its violation of its own

15  discharge injunction.

16       There's a distinction between a judgment for money

17  and a judgment for an injunction, Your Honor.

18       And when it's an injunction, the law holds that the

19  issuing court has exclusive jurisdiction to decide any kind of

20  violation and what are the appropriate sanctions for that.

21       And merely because they have placed it under another

22  statute does not change the true nature of the case.  And

23  there's a couple cases on point.  I think it's the *Helman* cases

24  that I cited in my motion under clause briefs, Your Honor,

25  where just because -- the Court needs to take a look at the

1  true nature of the claim and not as how they phrased; it's

2  called artful pleading.  They brought it under the Fair Debt

3  Collection Practices Act claim, under the Florida Consumer

4  Collection Practices Act, and both of those claims necessarily

5  require a finding that there's been a violation of the

6  Bankruptcy Court's discharge injunction.

7        The case law holds that the discharge injunction

8  needs to be interpreted, and that the Bankruptcy Court has

9  exclusive jurisdiction to decide those matters.  And you can't

10 simply avoid that by bringing a claim -- for example, the one

11 case I also cited, Your Honor, was -- I think it was in the

12 context of a plaintiff trying to bring a claim and exclusive

13 jurisdiction was with -- I think the Court of clerks or

14 something like that, and they tried to bring it under the tort

15 rather than the contract action.

16        And you can't just -- because you characterize it

17 something different than what you really are trying to get at,

18 the courts have to look under that and determine what the true

19 nature is.  Again, it's very clear here that their claim

20 depends upon a finding of violation of discharge injunction.

21 And only the Bankruptcy Court could issue the discharge

22 injunction, which they've attached to their complaint, has the

23 jurisdiction to do that.

24        THE COURT:  How do you -- how do you square -- I saw

25 that *Helman* relied on that.  And in doing so, *Helman* cites the

1    Second Circuit case *Yaghobi* -- I don't know how to pronounce

2    that; it's Y-a-g-h-o-b-i.  But the Eleventh Circuit Court of

3    Appeals has rejected that.  Specifically rejected that.

4        They -- they point out that the Second Circuit fails

5    to recognize the grant of original jurisdiction in 28 USC,

6    Section 1334, and provides no explanation as to why 1334 would

7    not apply.  And so the Eleventh Circuit says:  Because we find

8    that the -- that statutory provision controlling, we consider

9    the Seventh Circuit's price decision more persuasive and join

10   in finding that the district courts have subject matter

11   jurisdiction to adjudicate -- in this case, it's 362H claims,

12   but that's also an injunction.

13       So how do you square your reliance on the absence of

14   jurisdiction with what the Eleventh Circuit has said?

15       MR. BUSTARD:  Well, Your Honor, the case that you

16   just cited -- what case were you reading from?

17       THE COURT:  *Lambert*, which is 460 -- pardon me, 426

18   F.3d 1342.  It's binding Eleventh Circuit precedent.

19       MR. BUSTARD:  Well, Your Honor, I think the

20   distinction there is the case that you cited was analyzing a

21   362 violation, which is the automatic stay, which is a statute.

22   524 is a discharge injunction.  So it's a different nature.

23       524 operates from an order of the court granting a

24   discharge as well as the injunctive relief of barring claims.

25       362, there has been no ruling or order from the

1   Court.  It's simply you file a bankruptcy action and

2   automatically there's a stay of any further proceedings.

3            In 524, it's all premised on a court's order.  So

4   it's an injunction granted by the court, as opposed to 362 is

5   statutory relief.

6            And that's the distinction between those two cases,

7   Your Honor.  In Alderwoods -- the case in Alderwoods was

8   essentially a party -- a plaintiff was trying to enforce a

9   discharge injunction in another court and the Eleventh Circuit

10  there held:  You have to go back to the Court that issued the

11  injunction order.

12            THE COURT:  Right.

13            MR. BUSTARD:  In 362 cases, you don't have an

14  injunction order.

15            THE COURT:  But ultimately in Alderwoods, what the

16  Court -- what the Eleventh Circuit ordered wasn't a transfer to

17  the Bankruptcy Court.  The Eleventh Circuit specifically made a

18  decision to transfer the case to the district court in

19  Delaware, and then says that the District of Delaware may --

20  not must -- but may refer it to the Bankruptcy Court pursuant

21  to that district's procedures.

22            So how is that square with the idea that it could

23  only go to the Bankruptcy Court?

24            And I'm reading from page 974 -- it's actually 973,

25  974.

1        MR. BUSTARD:  Bear with me, Your Honor.

2        THE COURT:  Sure.  It starts on 923 where they

3   consider whether it should be transferred to the Delaware

4   Bankruptcy Court, and they decline to do that.

5        Then they say:  Instead, we believe that transferring

6   the case to the United States District Court for the District

7   of Delaware would be more efficient.  And they go on and

8   discuss why.  Including that 28 USC, Section 1334, gives

9   district courts original jurisdiction over all civil

10  proceedings arising under Title 11, the Bankruptcy Code.

11       MR. BUSTARD:  Well, I think, Your Honor, in this case

12  I think they were arguing for a dismissal of the case rather

13  than transfer.  And the Eleventh Circuit was simply

14  transferring to a different district court with the

15  understanding that it would likely go to the Bankruptcy Court,

16  which was the Court that issued the discharge injunction.

17       THE COURT:  Well, if there's no subject matter

18  jurisdiction, the Court doesn't transfer.  If subject matter

19  jurisdiction is lacking, there's nothing to transfer.  It's

20  simply dismissal.

21       The Supreme Court in the Eleventh Circuit have

22  repeatedly said that once you determine there's no subject

23  matter jurisdiction, then the Court cannot act.  The Court has

24  no authority to do anything.

25       MR. BUSTARD:  Well, Your Honor, again, I think

1   this -- the Eleventh Circuit case here in *Alderwoods*, and I

2   think what they were talking about is not only -- exclusive

3   jurisdiction as well as the power.

4          So what the Eleventh Circuit found in *Alderwoods* was

5   that only the Court that issued that injunction really has the

6   power and exclusive jurisdiction to interpret its own orders

7   and injunctive relief.

8          It's kind of like if you issued an injunction order,

9   Your Honor, and another court -- they tried to enforce it

10  somewhere else, it would be improper, because another court

11  might find there was a violation of your injunction order, but

12  you may not.  And that's why they refer it back with exclusive

13  jurisdiction of power to interpret its own injunction order.

14         THE COURT:  Well, but what the -- it doesn't

15  necessarily have to come back to me.  It comes back to the

16  Middle District of Florida, which is what -- one of the things

17  that was clarified in *Alderwoods* and in *McClain*.

18         But what the Court in *Alderwoods* seems to be saying

19  is that in terms of going back to the Court that issued it,

20  that it would be sufficient to send it back to the district of

21  Delaware, not necessarily just to the bankruptcy court.

22         In any event, I'm going to go ahead and stop our

23  discussion on this issue because unless there's -- unless you

24  have a different argument other than relying on the *Helman* or

25  Alderwoods, because I simply -- I guess I just disagree with

1    your reading of those.  But if there's another argument, I'll

2    hear from you, but as to those two things, I'm prepared to

3    rule.

4           MR. BUSTARD:  That was the basis of the argument,

5    Your Honor.

6           THE COURT:  Okay.  So here's the problem that I see

7    with the lack of subject matter jurisdiction argument.

8           First of all, the plaintiff is the master of their

9    complaint.  Plaintiff has pled a claim under the Fair Debt

10   Collection Practices Act.

11          That -- by doing so, that gives this Court subject

12   matter jurisdiction under 28 USC, Section 1331.

13          Now, whether it actually states a claim or not or

14   whether that claim is precluded by the Bankruptcy Code, or is

15   better dealt with in the Bankruptcy Court, that would be a

16   different issue.

17          But whether -- whether there is subject matter

18   jurisdiction, I don't think that -- that that is even an open

19   issue.

20          Second, to the extent that it's -- that it is argued

21   that Alderwoods stands for the proposition that only the

22   Bankruptcy Court has the power to enforce it, I think that's a

23   misreading of Alderwoods.

24          The Eleventh Circuit in the Alderwoods case looked at

25   whether when after determining that this should go back -- that

1   this was an injunction issued by the Delaware Bankruptcy Court

2   and that it could not be enforced by a Florida court, the

3   Eleventh Circuit said the simplest option would be to remand

4   the case with the -- with the instruction that it be dismissed

5   without prejudice.  And the debtors presumably would turn to

6   the Delaware Bankruptcy Court for relief.

7            And instead, the Court determined that the case

8   should be transferred to the District of Delaware.  In doing

9   so, the -- the Eleventh Circuit stated that if the action was

10  characterized as an attempt to enforce the confirmation order's

11  discharge injunction, the debtor's complaint initiated a

12  proceeding under Title XI.  The Court goes on to point out that

13  the district courts have original jurisdiction of all

14  proceedings arising under Title XI.

15           And then it determined that the case should be

16  transferred to the District of Delaware.  And then as I pointed

17  out, specifically said that the United States District Court

18  for the District of Delaware may refer it to the Delaware

19  Bankruptcy Court.  It didn't say that it must go there.

20           And so I just don't find it persuasive to say that

21  only the Bankruptcy Court itself can look at the validity of

22  the discharge order.

23           And I'd also point out that you are framing this or

24  the defendants are framing this as an action to enforce the

25  bankruptcy discharge.  That's not the claim that the plaintiffs

1   are necessarily bringing.  Their claim is brought under the

2   Fair Debt Collection Practices Act.  And so for all of those

3   reasons, I disagree that the Court does not have subject matter

4   jurisdiction.

5        It might be easier if I didn't have subject matter

6   jurisdiction, but I'm confident that I have subject matter

7   jurisdiction.

8        So to the extent that Carrington -- I'm sorry, not

9   Carrington -- Green Tree argues otherwise that the motion to

10  dismiss is denied on the basis of subject matter jurisdiction.

11       All right.  Now, the preclusion argument, the cases

12   -- the *Randolph* case, which seems to be the leading case with

13  regard to the argument that these claims are not precluded,

14  deals with violations of the automatic stay, not with

15  violations of the discharge order.

16       And I guess my question is, is that a distinction

17  without a difference or does that matter to whether that -- the

18  analysis in *Randolph* is applicable?

19       And, Mr. Silverman, why don't I hear from you on

20  that.

21       MR. SILVERMAN:  Okay.

22       THE COURT:  I tell you what, why don't we do it this

23  way, give me your -- give me your strongest preclusion

24  arguments.

25       MR. SILVERMAN:  Thank you, Your Honor.

1        On the preclusion issue -- and as the Court is aware,

2    sometimes they use preemption in some of these cases when

3    they're talking about preclusion, but --

4        THE COURT:  In the federal claim, we're talking

5    preclusion; in the state claim, we're talking preemption.

6        MR. SILVERMAN:  Yeah.  And I think Judge Corrigan in

7    the Hernandez case, they're the same thing, but we're going to

8    at least talk about them accurately.  He corrects the other

9    courts.

10        We filed supplemental authority, the *Lovegrove* case

11    from Virginia, which was very useful because it was, I think,

12    the best attempt to synthesize the cases.

13        As the Court knows, there's four court of appeals

14    cases.  Two of them find in favor of preclusion; two of them

15    find against preclusion.

16        We've got the *Simmons* case from the Second Circuit,

17    *Walls* from the Ninth; *Simon* from the Third; *Rudolph* [verbatim]

18    from the Seventh.

19        *Walls*, as the Court is aware, is a post-discharge

20    case.  As the Court noted on *Randolph*, it is an automatic stay

21    case.

22        From a perfectly academic exercise, does that

23    distinction determine preclusion?  I don't think legally it

24    does.

25        I think the usefulness is that it explains, as they

1   go through in *Lovegrove*, why it is that preclusion should

2   apply.

3           But to answer the question that you put forth, is

4   that an automatic distinguishing characteristic academically

5   that one of them is under an automatic stay and one of them is

6   under the post-discharge, I don't think that that's -- that's a

7   purely -- as a pure legal analysis, that's not one of the

8   elements of preclusion.

9           However, as they go through in the *Lovegrove* case,

10  the post-discharge case, you can best explain why it should be

11  precluded by looking at what we are looking at in Prindle,

12  which is a post-discharge analysis.

13          Which is that I cannot consistently comply with

14  524(j) and at the same time comply with the FDCPA as it has

15  been pled -- or as the plaintiff argues that I should be

16  complying with it.

17          I have an in rem interest, and I need to send the

18  notice, which under 524(j) says I should, and they're saying

19  that I shouldn't.

20          Our best argument is what's laid out in *Lov*engood,

21  which is -- I'm sorry, *Lovegrove*.

22          THE COURT:  *Lovegrove*.  Well, let me ask you

23  something, though, about what you just said.  That you can't

24  comply with the FDCPA as it's been interpreted and still

25  exercise the rights that you have over the collateral.

1        MR. SILVERMAN:  As they argue that it should be
2   interpreted.
3        THE COURT:  Because, you know, in reading all these
4   cases, I've found -- or I've read through a number of decisions
5   where courts have looked at an actual mortgage statement that
6   is sent, and looking at the language that's in that mortgage
7   statement, they find that it doesn't violate the FDCPA.
8        For example, because it specifically says:  This is
9   not an attempt to collect a debt; because it specifically says
10  you don't have to make a payment; because it specifically says
11  this is for information purposes only.
12       Whereas yours, arguably -- oh, that reminds me.  The
13  record -- does anybody have a copy of this mortgage statement,
14  what this mortgage statement looks like?
15       MS. VARNELL:  There were some attached -- I'm sorry.
16  There were some attached to the revised second amended
17  complaint, along with the other communications that are at
18  issue, Your Honor.
19       THE COURT:  Well, the reason I'm asking that is
20  because you argue throughout that there's a payment coupon, and
21  I don't know if maybe the statement is actually legal size and
22  you only copied letter-size, but I don't see a payment coupon.
23       MR. SILVERMAN:  Again, I have -- I don't have a
24  payment coupon as part of my copy.  They filed the front and we
25  filed the back.

1          THE COURT:  You filed the back.

2          Is there -- see, the bottom of the -- the bottom of

3    what's attached to the complaint -- and I'm -- where's my

4    complaint -- here it is -- says:  Please detach this -- the

5    coupon portion of this payment.  But in the record that you

6    have, I don't see a coupon portion of a payment.

7          MS. VARNELL:  Do you want me to address --

8          THE COURT:  Well, I mean, just answer -- I just want

9    an answer to that question.

10          MS. VARNELL:  I am not in a position to answer

11   directly, but I think the fact that it includes a reference to:

12   Detach Payment Coupon, you know, one can reasonably infer that

13   there was a payment coupon attached.

14          THE COURT:  Well, it says -- okay.  But you would

15   agree that it would be important for me to know what that

16   coupon says?

17          MS. VARNELL:  Your Honor, I do agree.  When I am

18   given an opportunity to completely argue, what I would point

19   out to the Court is that the Eleventh Circuit has told us that

20   that is something that's an issue for the trier of fact.  And

21   there will come a stage in this litigation where you are

22   evaluating the exact language of each of the documents just

23   like Judge Corrigan did in --

24          THE COURT:  Okay.  Well, I have to determine whether

25   it states -- whether your complaint states a claim that's

1   plausible, and part of that requires me to know what -- what

2   the statement says.  And you're arguing that it -- that it -- I

3   mean, I'm asking a simple question of whether there's --

4   whether there is a payment coupon attached or not.  And if

5   there is, why on earth wouldn't you give me a full copy of the

6   document?

7          MS. VARNELL:  Because we did not have it, Your Honor.

8   We only have testimony from our client, and we only have the

9   remainder without the payment coupon.  Because you may recall,

10  Your Honor, that our client did send in a tremendous amount of

11  money over the course of several years.

12         THE COURT:  I think there was -- they dispute whether

13  it was tremendous or not.

14         MR. SILVERMAN:  I think -- I don't believe she sent

15  it in response to the statement; she sent it in response to the

16  modification.  But again, that's -- to answer your question, I

17  affirmatively don't know whether there's a coupon attached.  I

18  don't have the originals.  I only have what's in...

19         THE COURT:  Okay.  But going back to the question or

20  what I was saying is, you're saying it's not possible to comply

21  as they are interpreting the FDCPA, but there are a number of

22  decisions that have found that by altering the information that

23  is set forth in the mortgage statement, you can comply.

24         MR. SILVERMAN:  And, again, there is -- there's --

25  there is a little -- there's a case that supports virtually

1    every point that either side could make.

2            But in terms of what's a statement, we know we get

3    the boilerplate language in these cases, oh, statements are not

4    an attempt to collect the debt.  Then we have some other things

5    like:  Well, a due date would be something that would go above

6    and beyond a statement, which every statement has to contain a

7    due date, because under 524, you're supposed to tell them what

8    their status is and when the amount is going to go up.  That's

9    required.

10           So depending on how you rule on the 12(b)(6), which

11   part of a statement -- when we use capital S Statement, some of

12   the cases say:  Well, statement's not -- then Judge Corrigan

13   says:  Well, you've added some things.

14           And those are some things that were in the statements

15   that other judges have found were just a statement.

16           And so it's not -- it's not clear enough to -- there

17   is no bright line, and we're sitting here as Carrington in

18   which --

19           THE COURT:  What is it about 524(j) that requires

20   these statements?

21           MR. SILVERMAN:  Under 524(j), when there's an in rem

22   interest that the lender keeps, they need to keep the borrower

23   informed regarding the status of how much is owed and what's --

24   and what's due.

25           So --

1        THE COURT:  But 524(j) doesn't require those

2    statements.

3        MR. SILVERMAN:  It does.  You need -- under 524,

4    two-fold, number one, under TILA, I would need to provide

5    copies of the statement.  But under 524(j) -- and, again, I

6    thought we cited that in our papers -- there is obligation that

7    since this is an in rem property interest that we maintain that

8    is not discharged, we would need to keep the borrower updated

9    on that.

10        THE COURT:  524(j) says:  Subsection A2 does not

11    operate as an injunction against any act by a creditor that is

12    the holder of the secured claim if the creditor retains a

13    security interest in real property; such act is in the ordinary

14    course of business between the creditor and the debtor; and

15    such act is limited to seeking or obtaining periodic payments

16    associated with a valid security interest.

17        That doesn't require it.  That just says that it's

18    excepted from the discharge.

19        MR. SILVERMAN:  Well, it says that it's specifically

20    allowed.  And then we got -- if you're telling me that's not

21    specifically allowed in the FDCPA, that's an express conflict.

22        In addition, TILA makes us send the statement.

23    That's different -- that's a different preclusion argument.

24        THE COURT:  Ms. Prindle, did you-all acquire or did

25    Green Tree -- I don't recall the distinction.  Did Prindle have

1  a relationship with Green Tree before going into bankruptcy or

2  did Green Tree acquire the servicing rights after?

3         MR. SILVERMAN:  We're Carrington.

4         THE COURT:  Oh, sorry.

5         MR. SILVERMAN:  There would be -- for the purposes of

6  the motion to dismiss, we are not arguing that we are not a

7  debt collector.  I believe that it was --

8         THE COURT:  No, that's not -- I'm actually looking at

9  the -- if it was in the ordinary course of business between the

10  creditor and the debtor.

11         Was there a relationship before with -- was there, in

12  the ordinary course of business before, between this debtor and

13  Carrington?

14         MR. SILVERMAN:  Carrington acquired the servicing

15  rights after -- I believe after the bankruptcy.  But when you

16  talk about ordinary course of business, that would -- as a

17  servicer, this would be something that the lender -- that the

18  securing party would need to do on a regular basis.

19         I believe when they're talking about ordinary course

20  of business, they're talking about as opposed to a one-off

21  demand or something like that.  That seems to indicate that

22  they were talking about a statement.

23         And, again, the 524(j) specifically makes those

24  statements legal, if you want to call it that, in the context

25  of a discharged debtor.

```
 1          And without more -- and the question is how much
 2   more, we'll talk about that under 12(b)(6), which is what part
 3   of these statements goes beyond the pale, and whether that
 4   meets the definition when the other courts have blessed the
 5   statement.
 6          And so for the purposes of 524, kind of getting to
 7   our best case, I would make the argument that is set forth in
 8   Lovegrove.  They make the analysis, obviously we think it's
 9   great -- it's an analysis that favors my client.
10          THE COURT:  Of course.
11          MR. SILVERMAN:  But, again, in terms of just, you
12   know, you can't compare words to, you know, word count, but as
13   opposed to some of the other cases that we see that presume it,
14   it actually analyzes the -- you know, the four pending Court of
15   Appeals cases, and attempts to synthesize them comes up with a
16   single -- you know, with a rule that makes sense, especially in
17   the context of claim based on the post -- post-discharge claim.
18          So on the 524, really nothing that I'm going to say
19   that they didn't say in Lovegrove.
20          THE COURT:  All right.  Then let me hear from
21   Ms. Varnell.
22          MR. BUSTARD:  Your Honor, I --
23          THE COURT:  I will.  I'm going to hear from her and
24   then I'm going to hear from you.
25          MR. BUSTARD:  Okay.
```

```
1              THE COURT:  Go ahead.

2              MS. VARNELL:  I think the one most important argument

3    that the plaintiff would want to advance that might assist the

4    Court in this analysis is that their entire premise rests upon

5    524(j).

6              524(j) of the Bankruptcy Code applies for a

7    particular circumstance where an individual files for a Chapter

8    7 bankruptcy.  They still reside within the home and they are

9    up to date on all of their payments and remain up to date

10   throughout the bankruptcy.

11             That is not the circumstance that we have here.

12   That's why it was not affirmatively pled; in fact, it was

13   contrary allegations within the complaint.

14             And I know it's difficult to analyze, and it's not

15   something that we briefed for the Court, but we do not believe

16   that they can rely on 524(j) at all.

17             THE COURT:  I'm not hearing any argument that wasn't

18   briefed.  Because there was an awful lot briefed, and I've read

19   it all.  And if you-all didn't brief it, it's not before me.

20             MS. VARNELL:  Right.  No.  Well, it was -- they -- we

21   don't believe that it's necessary to -- to advance that

22   argument in order to prevail on the motion to dismiss.

23             So -- but I was trying to clarify, I think, to assist

24   on this particular analysis since it was of interest to the

25   Court, over, you know, whether or not they could or couldn't or
```

Cindy Packevicz, RPR, FCRR              904.301.6843

1   had to send mortgage statements.

2          You know, I don't -- I don't believe that they fully

3   briefed within their --

4          THE COURT:  Okay.  Why don't we get back to -- tell

5   me why *Lovegrove*'s analysis is not --

6          MS. VARNELL:  I would turn --

7          THE COURT:  -- not persuasive.

8          MS. VARNELL:  I'm sorry.  I would just ask this Court

9   to consider the opinion of the Bankruptcy Court judge here

10  within the Middle District, *In Re Wynne*, where he was faced

11  with FDCPA and FCCPA claims, and the Court specifically went

12  through the analysis of jurisdiction over FDCPA claims, and he

13  said:  Look, I don't really have jurisdiction over these

14  particular violations that are alleged here, because they don't

15  arise under the bankruptcy.  They are post-petition activity.

16  And the plaintiff is specifically claiming them under these

17  two separate statutes.  And that has been fully briefed before

18  the Court, so I won't belabor and re-quote everything from the

19  *In Re Wynne* opinion.

20         THE COURT:  But he didn't -- he didn't say that if it

21  had been brought as a violation of the discharge injunction

22  that he wouldn't have had the authority to address that.

23         MS. VARNELL:  He didn't, you're right, Your Honor.

24  But this claim was not brought as a violation of a discharge

25  injunction.  Nothing in our complaint suggests that we're

1    asking for relief in accord with that discharge injunction.

2            THE COURT:  Well, no.  Because you couldn't get

3    damages, and you can get damages under the FDCPA.

4            MS. VARNELL:  Correct.

5            THE COURT:  So, I mean, that -- there's no question,

6    I understand that that's how you've pled it, and that's what I

7    was telling them.

8            But the question is, is that a permissible way to

9    plead it?  I mean, can you plead around what the -- what

10   Congress framed as the remedy for a violation of the discharge

11   order by dressing it in other clothing, which is by bringing it

12   as an FDCPA claim?

13           MS. VARNELL:  We've cite -- I'm sorry, Your Honor.

14           THE COURT:  No, go ahead.

15           MS. VARNELL:  We've cited within our brief a number

16   of cases to suggest that even the United States Supreme Court

17   has said that there's no reason to believe that Congress would

18   want to do away with protections that they specifically passed

19   for people that are being subject to debt collection activity.

20           There's nothing in Chapter 11 of the Bankruptcy Code

21   that suggests that it's completely preemptive and does away

22   with all of the protections that are afforded to debtors under

23   the FDCPA and the FCCPA.

24           And if you considered the case that we sent in our

25   supplemental authority, the *Gooden* case, also a Judge Corrigan

1   opinion, you know, he is dealing specifically with violations

2   that -- for a formerly bankrupt debtor that are of the FDCPA.

3            So, you know, I -- you know, there are courts

4   routinely within this district and other districts within the

5   state of Florida and within other district courts throughout

6   the Eleventh Circuit that are all dealing with claims that are

7   routinely proffered by debtors looking for protection under the

8   FDCPA.

9            So while the Eleventh Circuit has not specifically

10  ruled, we know in *Crawford* that they declined to rule on that

11  unfortunately.  I think that it -- that *Crawford* did give us

12  some indication that the -- that the Eleventh Circuit intends

13  that there be protections afforded out over and above the

14  Bankruptcy Code to debtors.

15           So I'll rely upon the cases that we fully briefed at

16  this point.  I don't want to restate everything I've already

17  argued.

18           THE COURT:  Okay.  All right.  Go ahead, Mr. Bustard.

19           MR. BUSTARD:  Your Honor, I think you just asked the

20  question, I think, is a key issue in this case, and I'm going

21  to suggest that I disagree with Mr. Silverman a little bit in

22  that I think it's a key distinction that the *Randolph* case did

23  involve a 362 violation and this case involves a 524 violation.

24           The *Crawford* case that opposing counsel just cited,

25  that's a case that did not involve a 524 violation.

1      THE COURT:  It was a proof of claim.

2      MR. BUSTARD:  Correct.  So in this case, as I think

3 you've just suggested, Congress did come to the conclusion that

4 they were not going to allow a private right of action of

5 damages for a violation of 524 discharge injunction.

6      In the case of *Pertuso versus Ford Motor Credit*

7 *Company*, it's a Sixth Circuit case, deals in depth with this

8 issue and finds that basically what Congress did was at one

9 point they amended the Bankruptcy Code to allow for damages for

10 a 362 violation, and at the same time, they amended 524 but did

11 not allow it.

12      And the Sixth Circuit there said that was a

13 significant distinction.  They were amending both sections and

14 they added a claim under 362 to allow for punitive damages and

15 other types of damages, and they didn't do the same for 524.

16      The conclusion is that Congress specifically wanted

17 discharge injunction -- this kind of ties in a little bit with

18 my subject matter jurisdiction argument -- Congress intended

19 for any kind of violation of a discharge, 524, to be determined

20 by the Bankruptcy Court, and that that was the exclusive remedy

21 for that.  And that the FDCPA, if you were to proceed with this

22 case, would be in direct conflict with the Bankruptcy Code and

23 Congress' intent to have 524 discharge injunction violations

24 determined by the Bankruptcy Court as sanctions or whatnot that

25 they do not allow damages.  Many courts have held that there's

1   no private right of action.  I believe I've cited to some, Your

2   Honor.  Ninth Circuit, *Barrientos versus Wells Fargo*, 633 F.3d

3   1186.  Another case, no private right of action.

4           THE COURT:  Which case is that?

5           MR. BUSTARD:  *Barrientos versus Wells Fargo Bank*, 633

6   F.3d 1186.

7           THE COURT:  I'm not sure I remember that one.

8           MR. BUSTARD:  There's language in there that

9   specifically reasons that Congress did not intend for

10  enforcement of a discharge order to be left to any other judge

11  than the bankruptcy judge who issued the order.

12          Congress became convinced that relegating a discharge

13  bankrupt to other courts with indication of a discharge

14  resulted so often in the loss of the intended benefit and

15  frustration of the objective of the federal legislation, that

16  jurisdiction determining the effect of the discharge was given

17  to the Bankruptcy Court.

18          So there was a very distinct decision by Congress to

19  distinguish between 524 and 362, and therefore it is a

20  meaningful distinction that distinguishes the *Randolph* case

21  from all of this and also the *Crawford*.  Again, not involving a

22  524 alleged violation.

23          And opposing counsel keeps suggesting, well, that's

24  not how we pled the claim.  But in order to prove their claim

25  against my client, Green Tree, they have to prove that -- you

1    know, what was false about the statement, what was misleading
2    about the statement, the mischaracterization was that the debt
3    had been discharged in bankruptcy, and that's the underlying
4    basis for the entire Fair Debt Collection Practices Act claim.
5            If they don't prove that, then they don't have a Fair
6    Debt Collection Practices Act claim.  They're seeking damages
7    and damages are not allowed under the Bankruptcy Code for a
8    violation of 524 discharge injunction.
9            THE COURT:  Is there a dispute as to whether that was
10   discharged in bankruptcy?
11           MR. BUSTARD:  Your Honor, that's for something -- I
12   don't think that's here before us today.  I think that's an
13   issue for the bankruptcy judge to decide.
14           THE COURT:  I mean, what --
15           MR. BUSTARD:  I mean, I'm not making the argument.
16           THE COURT:  -- what their argument is is that the
17   statements themselves are misleading.  Part of that is because
18   the debt -- the underlying debt was discharged, but it's that
19   the way the -- the way the communications read suggests that
20   they should be making payments.
21           MR. BUSTARD:  When you say "part of it," it's my
22   understanding that's the only argument they have is that
23   because it's allegedly discharged by the Bankruptcy Court's
24   discharge injunction.  I'm not aware of any other basis that
25   they've articulated that it's misleading for any other reason

1   than that it was allegedly discharged.

2          I mean, I understand they have those two different --

3   you asked earlier in the case --

4          THE COURT:  Sure.

5          MR. BUSTARD:  Again, as I read the compliant, it's

6   strictly -- it's misleading; it's mischaracterizing because

7   this debt has been allegedly discharged by a discharge

8   injunction by the Bankruptcy Court.

9          THE COURT:  All right.  Give me a moment.

10          Looking at the analysis in *Randolph*, where -- I

11   recognize that Randolph was a -- was a -- the violations were

12   362 violations as opposed to 524, but that wasn't what the

13   *Randolph* court based its decision on.

14          What the *Randolph* court based its decision on was the

15   fact that the debt collector could comply with its obligations

16   under either statute, and therefore they weren't in conflict,

17   that they could coexist.

18          And why isn't that analysis the same with regard to

19   the discharge injunction, that is, that you can send the notice

20   that you -- that's accepted under 524(j), that you are

21   permitted to send, and at the same time comply -- or not

22   violate the Fair Debt Collections Practices Act such that

23   they're not in conflict and they can coexist?

24          MR. BUSTARD:  Well, again, Your Honor, I believe that

25   the issue here is that there is an irreconcilable conflict

1   between the Bankruptcy Code 524 and the Fair Debt Collection

2   Practice Act and the remedies that are permitted.

3         THE COURT:  Okay.  But other than the -- I mean, I've

4   heard your argument on the remedies.  And other than that --

5   other than the remedies, why can't they coexist?

6         MR. BUSTARD:  In the specific context of the monthly

7   statements at issue here?

8         THE COURT:  Yes, sir.

9         MR. BUSTARD:  Well, I think that would adopt the

10  argument of Mr. Silverman, that these monthly statements are

11  permitted under the Bankruptcy Code, and they're alleging that

12  they're -- that they somehow violate the Fair Debt Collection

13  Practice Act by sending them.

14        THE COURT:  Well, but -- okay.  But they are

15  allowing -- they are alleging that they are prohibited not

16  simply because they were sent, but because the contents of them

17  is misleading.  Because it has a -- it states an amount due, it

18  has a due date, it attaches a payment coupon.  Depending on

19  which one we're looking at, in some of them there's a -- a

20  penalty after date.  And their argument is that the

21  least-sophisticated consumer would get that in the mail and

22  think:  Oh, wow.  I have to pay this.

23        The same mortgage statement could be sent that didn't

24  have those things, as we've seen in a number of cases, I think,

25  that -- well, I know there was a couple by Judge Moody, and I

1    can't even remember the others right now off the top of my

2    head.

3              But if you can comply with both the FDCPA and the

4    Bankruptcy Code, why does the Court have to find that the --

5    any FDCPA claim is precluded by the Bankruptcy Code entirely

6    other than the remedies portions?

7              I understand your argument on the remedies, and you

8    have a good point on that, but I'm just trying to understand if

9    there's any other reason.

10             MR. BUSTARD:  Your Honor, I think it's -- for me,

11   it's primarily the remedies issue.  I think with regard to the

12   monthly billing statements at issue here, the contention that

13   these violated -- when they say it's misleading to the

14   least-sophisticated consumer, when there's security, here we

15   have the security and the mortgaged property which survives the

16   bankruptcy, any request for payment is not misleading.  It's

17   the truth.  They have to pay money or they're going to be

18   foreclosed on their house.

19             And the Bankruptcy Code mandates that you give the

20   party the opportunity to retain their house, even though the

21   underlying personal liability has been discharged.  That they

22   have to be -- because you have a security interest in the

23   mortgaged property that you can foreclose on, you have to give

24   them notice of the right to continue to make payments so

25   they're not foreclosed out of their home.

1   THE COURT:  Okay.  Let me look at one other thing
2   before we move on.
3       All right.  Ms. Varnell, let's talk about the FCCPA
4   claim, because the idea that the FCCPA claim gives a state law
5   remedy that Congress -- it is a -- it's a different thing under
6   the law if Congress passes two federal statutes and then you
7   simply look at whether they can coexist, but whether the state
8   can create a remedy that conflicts with the Bankruptcy Code, I
9   think, is of greater concern to me.
10      So why -- why should the state be able to make
11  unlawful what Congress -- or provide a remedy where Congress
12  opted not to?
13      MS. VARNELL:  In order to accept their argument as
14  true, Your Honor, you would have to believe that Congress
15  intended to allow a debt collector who has been subject to a
16  discharge order and told not to try to ever collect this debt
17  personally from a debtor again, enjoys greater protection, in
18  fact, carte blanche, to violate federal and state laws.
19      And so where they cannot present anything within
20  Chapter 11 that said that -- that -- that debt collectors that
21  are subject to a discharge injunction are not subject to all of
22  the other requirements of state and federal law that cover debt
23  collectors, I don't think that this Court should even be
24  considering that.
25      There is no -- there is no basis for believing that

```
1    Congress intended to completely --
2            THE COURT:  Well, aren't you taking it a step too
3    far?  Because it's not -- it's not saying that Congress is
4    somehow protecting the debt collectors or giving them carte
5    blanche, it's just that Congress made a decision about what the
6    ramifications of violating a discharge order would be.
7            So it's not that debt collectors couldn't do anything
8    at all, it's that if they violate the discharge, Congress made
9    a choice when -- when they decided whether there would be
10   remedies under 362 and whether there would be remedies under
11   524, and they didn't make a remedy under 524.
12           MS. VARNELL:  That's right.  But, Your Honor, it all
13   comes back to how this Court views the complaint that is before
14   it.
15           We have not asked for any relief subject to 524 in
16   any way, shape, or form.  We have just asked for this Court to
17   look independently at debt collection activity and determine
18   whether or not it violates the FCCPA.
19           So, you know, at the end of the day, it is up to this
20   Court to determine whether or not you want to follow your
21   sister courts that have entertained FCCPA claims for --
22           THE COURT:  Or the ones that haven't.
23           MS. VARNELL:  Right, exactly.  I know that -- but
24   again, I take this Court back to this consideration.
25           Isn't what you're doing -- you have to buy into their
```

1   premise that I am seeking relief under the discharge

2   injunction?

3           I am the master of my complaint as the plaintiff, I

4   have chosen to say I would like for this Court to evaluate

5   whether or not they have broken these laws with regard to this

6   conduct, and I am not -- you know, there are a number of

7   benefits that we could have enjoyed had we decided to seek

8   relief under the discharge injunction.

9           There was a fantastic order from the chief judge of

10   the Middle District of the Bankruptcy Court that nailed them

11   with about $150,000 worth of damages for pretty much the same

12   exact conduct that occurred with Ms. Prindle.

13           And you may recall, Your Honor, that two years ago

14   when I first filed Prindle, this court actually had a case in

15   front of it, *Burgess versus Bank of America*.

16           THE COURT:  Not me.

17           MS. VARNELL:  It wasn't.

18           THE COURT:  No way.  I can't hear Bank of America

19   cases.

20           MS. VARNELL:  Oh, okay.  Well, then it wasn't you,

21   okay.

22           THE COURT:  I think that was Judge Corrigan.

23           MS. VARNELL:  I'm so sorry.

24           So that was a case where we as the plaintiffs --

25   although we originally filed in the District Court, the law was

1   really not very well developed, so we made the decision to move

2   to transfer it and to cast those claims for relief under the

3   discharge injunction.

4           But with regard to this complaint, Ms. Prindle has

5   come to this Court asking for relief under these consumer

6   protection statutes, and there is nothing within Title XI

7   that -- in the discharge statute 524, that interferes or

8   reduces or says it's going to eliminate or consume all of the

9   consumer protection mechanisms that are available to a debtor.

10          You know, I'm going to take this Court's caution and

11  only argue things that I think are really going to be helpful.

12          So let me see if I got my -- what I think my best

13  case that would help the Court to trudge through this.

14          THE COURT:  So the argument is that the Bankruptcy

15  Code carefully balances the rights of the debtors and the

16  creditors.  And in doing so, the argument is that Congress

17  determined what the remedy should be for the discharge

18  injunction.  And why should -- why should the state be able to

19  upset that apple cart by allowing money damages?

20          MS. VARNELL:  Okay.  So my direct best response to

21  that is this is not -- the Bankruptcy Court does not have

22  jurisdiction, I believe, over a court -- if you look at the *In*

23  *Re Wynne* case, you have the Bankruptcy Court in the Middle

24  District saying I do not have jurisdiction over this

25  post-discharge collection activity, where they specifically

1   came to the court and said look at -- we'd like an FDCPA claim

2   and we'd like an FCCPA claim.

3          And in *In Re Wynne*, the judge said, this is -- does

4   not arise under, it doesn't impact, it does not deal with any

5   of these activities.  It's not going to impact the bankruptcy

6   estate in the Chapter 7 case.  What you have are debt

7   collection violation claims, and those are post-petition

8   activity that I do not have jurisdiction over.

9          So I would just ask the Court to go back and consider

10  the reasoning in *In Re Wynne*.

11         THE COURT:  Okay.

12         MS. VARNELL:  Thank you.

13         THE COURT:  So Mr. Silverman, tell me first, are

14  you-all relying on field preemption or conflict preemption?

15         MR. SILVERMAN:  Your Honor, the -- we had cited the

16  *Helman* cases which had relied on field preemption.

17         THE COURT:  Yeah.  But you know what concerned me

18  about the *Helman* cases is that part of their analysis is they

19  rely heavily on that -- I can't pronounce it -- the *Yaghobi*

20  decision, which the Eleventh Circuit, I think, has rejected.

21         MR. SILVERMAN:  Again, we had -- wasn't complete.  We

22  had cited the *Helman* cases.  The -- I think Judge Corrigan said

23  it best in *Hernandez*, I believe it's Footnote 6.  Is that the

24  same -- it's the same analysis ultimately on the preemption

25  side as it is on the preclusion side.

```
 1              The preclusion cases have occasionally said
 2     preemption, and vice versa.  Where if it is such that there is
 3     a full -- again, it's the flip side of that coin, which is that
 4     if the federal -- if you find that the federal landscape is
 5     such that these claims cannot be brought outside of bankruptcy,
 6     then that directly implies that as a field preemption that this
 7     is an area that's completely covered by bankruptcy.
 8              THE COURT:  All right.  Well, let's say
 9     hypothetically -- so, okay, then what you're telling me is that
10     if I find the FDCPA claims are not precluded, then I should
11     find that the FCCPA claims go forward as well?
12              MR. SILVERMAN:  Again, the Helman cases say no, if
13     you don't like that -- if you go solely with the Lovegrove
14     analysis, which then Judge Corrigan would say that:  Well, the
15     same analysis on preemption.
16              So I don't -- certainly, I purchase from the other
17     angle, which is that the -- the state claims cannot --
18     certainly cannot survive if the federal claims do not survive.
19              The flipside, which is if you rule that the federal
20     claims do survive, there is a separate preemption that we had
21     noted -- I believe it was Footnote 9 of our motion.  Again, I
22     had mentioned earlier in my arguments TILA, which is that
23     what's supposed to be in these statements is specifically set
24     forth in TILA.  And that is -- we cited it in our motion, but
25     it is 12CFR 1026.41.
```

```
 1          THE COURT:  Hold on one second.  Let me find one
 2   thing.  Because I know you keep referring to Footnote 6 in
 3   Judge Corrigan's order, and I know I read it, but I'm
 4   remembering it differently, so I'm trying to find my copy of
 5   it.
 6          It might be on my desk.
 7          Can you give Ms. Wiles the cite.  I want to print it.
 8          MR. SILVERMAN:  Oh, I'm sorry, Your Honor.
 9          THE COURT:  It's Hernandez?
10          MR. SILVERMAN:  Yeah, Hernandez is 2015 WL 2094263.
11   And on the Westlaw, it would be page 707.
12          THE COURT:  Okay.  I've got a copy of it sitting on
13   my desk.  It's downstairs -- upstairs.  Upstairs.
14          MR. SILVERMAN:  Again, it sets forth -- first he
15   talks about the fact that, you know, you're talking about
16   preempt, but you really mean implicitly repealed, then he goes
17   into the this-is-that discussion.  But for the purposes of --
18          THE COURT:  But what he -- what Judge Corrigan says
19   in the Hernandez case, basically he -- once he determined that
20   the FDCPA claim wasn't precluded, he determined that there
21   wasn't any reason to preclude the FCCPA claims.  And so they --
22   they go together.  I wasn't necessarily viewing it the same
23   way, but if that's what you're --
24          MR. SILVERMAN:  Again, from a field preemption
25   perspective, the Court -- you know, again, there's lots of
```

1   cases that talk about that bankruptcy law, you know, takes over

2   the field.  And, again, we've cited those cases.

3        If you find that it's a more discrete issue than

4   that -- and I had noted that Judge -- that that was another --

5   Judge Corrigan had specifically in his -- for his purposes, not

6   addressed the separate analysis of the state claim because he

7   felt that he was just going to carry on the same analysis.

8        THE COURT:  The -- a lot of the field preemption

9   claims deal with things occurring during the bankruptcy, like

10  the filing of preemptive claims.  And it -- I don't have any

11  problem, and, in fact, I am, in another order, addressing the

12  fact that I -- I do think that the -- or I am prepared to hold

13  that the -- that an FDCPA claim premised on the filing of a

14  proof of claim, even a stale proof of claim, which is permitted

15  by the Bankruptcy Code and which sets up a framework to deal

16  with that, is preempted.

17       And there are -- there are a number of cases that

18  find FCCPA claims for filing of a proof of claim or for

19  violations of the stay to be preempted based on the careful

20  balance of Congress in setting up the Bankruptcy Code.

21       But where -- where that -- and that works for me in

22  terms of field preemption, arguably.

23       Where I stumble on that analysis is when we're

24  talking about post-discharge action.  And I -- it's harder --

25  I'm not as certain that I see the cases that say field

1    preemption, particularly the *Helman* case I have problems with

2    for the reason that I indicated, but it's not as clear to me

3    that in the post-discharge context that there's field

4    preemption, and so I guess that's why I would ask how is

5    there --

6            MR. SILVERMAN:  On the issue side, it's fairly

7    simple, which is under 524(j), I get to send statements.  I

8    have that right to send that to discharge debtors if I maintain

9    the in rem interest.

10           And what that statement says is specifically required

11   by 12-CFR-1020640, which is the TILA, which includes you have

12   to tell them the payment date; you have to tell them when it's

13   due; you have to tell them the penalties.  That's what I'm

14   supposed to do.

15           And so between those two things, I get to send the

16   statement, and TILA specifically requires what the statement

17   says.  It can't say otherwise.  That's the issue preclusion --

18   issue preemption.

19           THE COURT:  Okay.  Hold on a sec.  All right.

20           MR. SILVERMAN:  That -- I think I've used some of my

21   12(b)(6) time too, because that was a lot of the same -- I

22   won't regurgitate that again.

23           THE COURT:  Okay.

24           MR. BUSTARD:  Your Honor, may I have a minute?

25           THE COURT:  Yes.

1          MR. BUSTARD:  To address the preemption or the

2     Florida Consumer Collection Practices Act.  Your Honor, the

3     *Hernandez* case that everyone keeps talking about, Footnote 6 --

4     and I think this is where Judge Corrigan got the decision wrong

5     as to the preemption argument on the Fair -- the Florida

6     Consumer Collection.

7          He didn't really do the preemption analysis.  He kind

8     of just, you know, bootstrapped that claim into the Fair Debt

9     Collection Practices Act analysis.  There is a different

10    analysis and standards for preemption versus preclusion.  And

11    as he cites, there's three types of preemption: express

12    preemption, field preemption, and conflict preemption.

13         Now, opposing counsel has argued:  Well, there's

14    nothing in the Bankruptcy Code that has express preemption.

15         Well, that's not the only thing that's out there.

16    And then she said her best argument is that the Bankruptcy

17    Court doesn't have subject matter jurisdiction.

18         But that doesn't really address the preemption

19    argument.  The preemption argument that Green Tree would like

20    to make is two-fold.  One is the conflict preemption; we've

21    already addressed that in the context of the Fair Debt

22    Collection Practices Act claim.  But also field preemption.

23    And I would direct your attention, Your Honor, to the Sixth

24    Circuit decision of *Pertuso versus Ford Motor Credit Company*,

25    233 F.3d 417.

1      This is a case where it was post-discharge conduct.

2  Plaintiffs alleged conduct in violation of 524.  And in this

3  case, the Sixth Circuit found that there was field preemption.

4  And they cite -- they say:  The pervasive nature of Congress's

5  bankruptcy regulation can be seen just by glancing at the code.

6      And it states that a mere browse to the complex

7  detail and comprehensive provisions of a lengthy Bankruptcy

8  Code demonstrates Congress's intent to create a whole system

9  under federal control which is designed to bring together and

10 adjust all the rights and duties of creditors and debtors

11 alike.

12     There is a provision, 524, that talks about

13 postdischarge conduct in the sense that you're not supposed to

14 do certain things, there's an injunction against going forward.

15 Bankruptcy Code does cover this.  There is field preemption

16 with regard to all matters between debtors and -- bankrupt

17 debtors and creditors, and the like, and therefore there is

18 field preemption in this case.

19     And the Sixth Circuit expressly held that in *Pertuso*

20 *versus Ford* Motor Credit Corporation.

21            THE COURT:  Okay.  Thank you, sir.

22            MS. VARNELL:  Can I raise one case?

23            THE COURT:  Yes.  Of course.

24            MS. VARNELL:  One.  As cited in our responsive brief

25 in opposition to *Prindle*, we pointed the Court to the Eighth

1   Circuit -- the Eighth Circuit decision in *Sears and Roebuck*

2   *versus O'Brien* where the Court squarely addressed whether state

3   laws were -- that were predicated on letters being sent to

4   debtors and whether or not those are preempted.

5           And I think that the analysis there is instructive

6   for this Court.  The reason that the Eighth Circuit held that

7   there was no preemption, not field preemption and not issue

8   preclusion, was because, A, Sears could not claim that it was

9   impossible to comply with both the federal and state law; B,

10  that there was no reason to conclude that Sears was being

11  impeded in the pursuit of any of its federal bankruptcy rights;

12  and C, the state law did not present any obstacle to the full

13  enjoyment of Sears' federal rights.

14          So I would request that the Court consider that

15  analysis here.

16          THE COURT:  Okay.

17          MS. VARNELL:  Thank you.

18          THE COURT:  And one of the reasons I asked to see the

19  *Hernandez* decision was because -- and maybe, Mr. Silverman, I'm

20  misunderstanding what you're saying, it was because I didn't

21  remember Footnote 6 to say what -- what I'm understanding you

22  to say, which is that the question with regard to preemption or

23  preclusion is the same thing.  And there is a difference in the

24  analysis of the court, as I understand it, when you're looking

25  at whether one federal statute impliedly repeals, which the

1    courts then call it preclusion, another statute, and that's a

2    very high standard.

3            Preemption, which is what we talk about when we talk

4    about whether a state law that arguably conflicts with a

5    federal law preempts it, is a different, and I believe, lesser

6    standard.  But I -- I'm understanding you to say that they're

7    the same thing, and that's not what --

8            MR. SILVERMAN:  I don't necessarily agree.  Again,

9    the last sentence of Judge Corrigan's decision seems like he

10   sort of punts on.

11           THE COURT:  Okay.  Well, I won't tell him you said

12   that.

13           MR. SILVERMAN:  Well -- but the point is -- and,

14   again, I agree with my colleague on my side of the room

15   regarding the differences in the preemption.  But, again, I

16   want to address, again, what Judge Corrigan in the last

17   sentence says basically:  Well, nobody said anything, so we're

18   not going to -- you know, he does sort of punt on it at the

19   end.

20           I'm not saying I agree with it, but...

21           THE COURT:  All right.  Let's see where we are.

22   Where's my little agenda?

23           MR. SILVERMAN:  I think we're up to 12(b)(6).

24           THE COURT:  Yeah, I think we are.

25           So with regard to -- all right.  Looking at the

1    12(b)(6) arguments in Prindle -- I'm not going in order -- the

2    failure of the conditions precedent, I indicated earlier, I

3    don't -- I don't see how that can apply to the FDCPA or FCCPA

4    claims, particularly because I don't see how you cure what

5    you've already done.

6              So is that -- do I need to hear from you on that?

7              MR. SILVERMAN:  I just -- again, if I can convince

8    you otherwise, which is that the simple answer is that I just

9    won a case like this.

10             And, again, it was not part of the brief, which is in

11   *Hill* -- and we'll file a motion for supplemental authority --

12   in *Hill versus Nationstar*, Judge Dimitrouleas, down in the

13   Southern District of Florida, dismissed a RICO claim on

14   postforeclosure, we're charging the drive-by inspection fees.

15   And we moved to dismiss saying:  You'd need to complain to us

16   first.

17             And this is after we'd already imposed them.  And he

18   said:  Yeah, that's what it says.

19             We -- as a servicer, we have standing.  They just

20   didn't respond to that argument.

21             Now, again, from a pleading perspective, it's Rule 9,

22   you can generally plead compliance with conditions precedent,

23   but they didn't even do that.  I mean, obviously that's -- that

24   may be a without-prejudice issue.  Which, again, doesn't move

25   the ball that much forward for what we have at 1:30, but it --

1    I would note -- again, they don't plead compliance with the

2    conditions precedent.  We noted the mortgage has a notice

3    requirement.

4           That's our argument.  And, again, there -- we just

5    won a case like this on behalf of another servicer.

6           So that's that issue.  I can hand out copies or

7    whatever the Court -- on that case.

8           THE COURT:  Sure.  You can give Madam Deputy copies.

9    If it's supplemental authority, that's fine.

10          MR. SILVERMAN:  Yes.

11          THE COURT:  The statute of limitations, if -- I

12   guess, Ms. Varnell, you'd agree that only -- the only

13   communications in the one-year statute of limitations under the

14   FDCPA would be the letter demanding payment of taxes, the loan

15   modification package, and the last mortgage statement; right?

16          MS. VARNELL:  Your Honor, I believe that there were

17   subsequent mortgage statements as well.  But as for what's

18   attached to the complaint at the time of the filing of the last

19   revised second amended complaint, that would be correct.

20          THE COURT:  Okay.

21          MS. VARNELL:  However, I believe that there have been

22   continuing communications.

23          THE COURT:  Okay.  And -- and the -- and then the

24   FCCPA claim would go all the way back to the September 26,

25   2011, intent to foreclose letter; is that right?

1    MS. VARNELL:  Yes, Your Honor.

2         Your Honor, if necessary, maybe I need to put on the

3    record, though, that I object to the handing of supplemental

4    authority in a case that I haven't had a chance to look at with

5    regard to the condition precedent argument that he just argued.

6         I mean, I know better than to argue with you when I

7    think you know the law very well, but I just want to have on

8    the record that I object to the submission of this during the

9    middle of the argument, and that the -- and I want to state

10   that the FDCPA does not contain any such requirement for such

11   an allegation in --

12        THE COURT:  Well, you opted not to respond to their

13   failure of conditions precedent argument in your brief.

14        MS. VARNELL:  I --

15        THE COURT:  I mean, I could I almost consider that --

16   that -- as you're not disputing that.  I didn't.  In fact, I

17   made the argument for you.

18        But -- so I guess to the extent that you're saying

19   you didn't have an opportunity to respond to the failures

20   condition precedent, you had an opportunity, you opted not to.

21   And we -- the submission of supplemental authority, if it's

22   truly supplemental, is permitted.

23        So I'll be glad to -- you can -- if you want to

24   review it and address it, I'll certainly let you do that.  But

25   I don't think there's a valid basis to object to its submission

1  altogether.

2          All right.  Let me see where I am here.

3          All right.  Mr. Bustard, in Carman's motion -- in the

4  motion to dismiss in the Carman case, you argued that the Court

5  doesn't have subject matter jurisdiction, and you argued that

6  the FDCPA claim is precluded by the Bankruptcy Code.  And those

7  were the only arguments that you made with regard to that

8  claim; correct?

9          MR. BUSTARD:  With regard to Fair Debt Collection

10  Practices Act?

11          THE COURT:  Yes, sir.

12          MR. BUSTARD:  I believe so, Your Honor.

13          THE COURT:  Okay.  That's what I have, so I just

14  wanted to make sure.

15          Ms. Varnell, I have to say that in the Carman motion,

16  you made a statement that -- or in response to the Carman

17  motion, you made a statement that I found curious, and I

18  want -- you are arguing -- and this is at pages 4 and 5 --

19  about whether the FDCPA and FCCPA claims can exist outside the

20  bankruptcy case.  And you're citing two other cases, saying

21  that they don't -- that those claims don't relate to the

22  bankruptcy case.

23          And then you make the curious statement:  Other

24  Middle District courts currently reviewing the precise claims

25  advanced in this case have also denied motions to dismiss based

1   on the argument advanced here, and you cite to me in Prindle.

2   And I did not rule on the sufficiency of those claims at that

3   hearing.  And I went back and looked at the realtime.  That

4   statement is exceedingly misleading.

5           MS. VARNELL:  My apologies, Your Honor.  That clearly

6   was an error.  I knew that we had gone through an entire motion

7   to dismiss hearing, and I recall being in front of Your Honor

8   and arguing on a motion to dismiss at the prior date, which I

9   think Mr. Silverman recalls coming here, but you're correct,

10  you did not issue a ruling on that basis, and I should not --

11          THE COURT:  Well, we didn't even -- I didn't even

12  hear argument on that basis.

13          What happened at that hearing was you agreed to

14  dismiss Count One.  You-all had apparently talked about that

15  before I came in, and you agreed to dismiss it.

16          What we heard argument on and what I ruled on was the

17  mootness argument, which we had extensive oral argument on, was

18  whether the offer of judgment -- the unaccepted offer of

19  judgment would moot the claim.  And then the argument was about

20  whether the complaint stated a claim, because it was

21  arguably -- the defendant was interpreting the claim -- the

22  complaint as alleging that the statements had only been sent to

23  the attorney, and they were saying that that failed to state a

24  claim.  And you convinced me that there were other statements

25  or that you were at least -- alleged there were other

1   statements that had been sent to her, and so I denied the

2   motion without prejudice on that.

3           And then you -- then they asked for a more definite

4   statement, and I ruled on that.

5           You should not be representing to anyone that I ruled

6   that these claims can go forward, because I hadn't ruled on

7   that issue.

8           MS. VARNELL:  My apologies, Your Honor.  That -- it

9   was not my intent to try to mislead this Court about --

10          THE COURT:  Well, I guess I'm more concerned that

11  that representation -- if you make that representation to me, I

12  look at it and say:  No, that's absolutely not what I did.  And

13  that's fine, I know that I didn't do that.

14          But what I'm saying is you should not be representing

15  to -- until I rule today one way or another, you shouldn't be

16  representing to -- in any other filing that I ruled on these

17  arguments here today, because I have not done so.

18          And if you were uncertain about what we ruled on in

19  that hearing, the proper course of action would have been to

20  get a transcript and look at it before making that

21  representation.

22          MS. VARNELL:  I agree, Your Honor.  My apologies.  I

23  will point out to the Court that they have advanced the

24  preemption arguments in the several motions to dismiss that

25  have been filed that were --

1    THE COURT:  But I didn't rule on it.  I didn't reject

2    them.  What you're saying here is that I denied motions to

3    dismiss based on the arguments advanced here.  And I didn't.  I

4    did not rule.  These arguments weren't what I ruled on last

5    time.

6    MS. VARNELL:  I agree, Your Honor.  I did not attempt

7    to mislead Your Honor about your previous rulings.  I

8    apologize.  That is not my intent.

9    THE COURT:  All right.  Let's talk about the failure

10   to state a claim argument.

11   Mr. -- well, Ms. Varnell, let's talk about the loan

12   modification package.

13   MS. VARNELL:  Which case are we on, Your Honor,

14   Prindle or Green Tree?

15   THE COURT:  Well, there's only 12(b)(6) argument in

16   Prindle.

17   MS. VARNELL:  Okay.

18   THE COURT:  Mr. Silverman, you were saying that TILA

19   requires you to send those statements, and TILA requires a due

20   date, and TILA requires penalties, but -- and I just -- I had

21   forgotten this, that's only if the debtor actually individually

22   still -- for the portion of the debt that's still owed, for the

23   portion of the debt that's not discharged, isn't it?

24   MR. SILVERMAN:  Again, the section of TILA, which I

25   had mentioned -- let's break it down.  Number one, it mentions

1   bankruptcy only to the extent that you don't have to send the

2   statement while somebody is in a Chapter 11.  It specifically

3   says that.

4           Outside of that, what we are looking -- what we are

5   relying on TILA for is -- it doesn't -- TILA doesn't well

6   describe when you send statements.  TILA says:  If you're going

7   to send a statement, it has to say all of these things.

8           Our -- we have a right under the Bankruptcy Code to

9   send the statement.  It's at 524(j).  We have an in rem

10  interest.  We have the right to do that.

11          If I send something called a statement, TILA says the

12  periodic statement shall include, and it's got payment due

13  dates, amounts of late payments, all of the things that they're

14  complaining about.

15          THE COURT:  But if there's -- if they don't owe -- if

16  they don't have any personal liability, they don't have a

17  payment due date.

18          MR. SILVERMAN:  Well, you would still have a due date

19  as it comes to the capitalization and interest on your -- if

20  you're going to redeem.  The amount that you owe me continues

21  to rise under my security interest.  You don't owe it, I can't

22  make you pay it, but in order to redeem your security interest,

23  that still continues.

24          The scope applies to a closed-end consumer credit

25  transaction secured by a dwelling, unless an exemption applies,

1    and this is not that exemption.  A closed-end consumer

2    transaction is referred to as a mortgage loan for the purposes

3    of this section.  For ease of reference, we're talking about

4    the mortgage now, not the loan.

5            But in order -- if I send you a statement, what the

6    statement looks like is dictated by TILA.

7            And so in terms of what you're complaining about in

8    the statements -- and, again, the primary case that counsel has

9    relied upon to turn a statement into a collection activity in

10   this case is Judge Corrigan's *Gooden* case.  And, frankly,

11   looking at the *Gooden* case, that is a bad facts case where you

12   had a naughty servicer who ignored repeated attempts from

13   the -- from the -- from the borrower, hey, the number's wrong.

14   Hey, you can't foreclose against me.

15           And Judge Corrigan did attempt to address and

16   distinguish the one -- whichever *Helman* case you cited --

17   there's two of them.  But he did attempt to do that.

18           But when you're talking about the *Gooden* case where

19   he talked about:  Well, you're also asking for things like a

20   payment date, that's not -- again, that was -- I think that's

21   dicta in the Gooden case.  We rely, as we put in our papers, on

22   the *Helman* -- both *Helman* cases, *Boringer*, the same issue on a

23   10(b)5.  And, again, like many of the cases in this FDCPA

24   context, you could find a district court case that supports

25   virtually everything on both sides of arguments.  We know that.

```
1              THE COURT:  What about the Eleventh Circuit?
2              MR. SILVERMAN:  The Eleventh Circuit has not spoken
3    as to these issues as to whether you have to send a statement,
4    whether -- what's supposed to be in the statement.  They have
5    set forth analysis about whether -- some things they have
6    addressed, which is, if I put the mini-Miranda language in a
7    piece of paper, where it says, you know, this is an attempt to
8    collect a debt, does that mean it constitutes a claim?  No, it
9    doesn't.
10             They have not addressed the legal effect of the
11   bankruptcy disclaimers that we have put in.
12             Courts have gone both ways on that, as Your Honor is
13   probably aware from the cited cases, but that has not been
14   tested.  We do know what has been tested, just because I put
15   the mini-Miranda language in, which is required by TILA, that
16   doesn't mean that I'm automatically conceded to be a -- this is
17   a debt-collection activity.
18             THE COURT:  What about the Pinson decision?
19             MR. SILVERMAN:  Well, again, we saw the Pinson
20   decision, which is unpublished decision.
21             Bear with me for one second, Your Honor.
22             THE COURT:  Not binding, but is considered as
23   persuasive authority.
24             MR. SILVERMAN:  It is.  And -- hold on.
25             THE COURT:  The Eleventh Circuit there said:  The
```

1    demand for payment need not be expressed.  There may be an

2    implicit demand for payment, where the letter states the amount

3    of the debt, describes how the debt may be paid, provides the

4    phone number and address to send payment, and expressly states

5    that the letter is for the purpose of collecting a debt.

6           And the -- the Eleventh Circuit is citing to a prior

7    Eleventh Circuit decision that was published for that, the

8    *Caceras* decision.  And why wouldn't -- why wouldn't all of

9    those things be true of the mortgage statement that is

10   attached?

11          And I'm looking at the June -- at the last one, the

12   June 27, 2013, it has -- it has a payment date.  It has the

13   amount.  It describes how it should be paid.  It -- I think it

14   provides -- yeah, it says -- gives a phone number to call

15   customer service.  Talks about -- gives them an additional

16   instruction as to how they can pay if they want to create draft

17   payments to give peace of mind for the, quote, monthly mortgage

18   payments.

19          And while you are correct that the -- that simply

20   saying that the -- that I'm a debt collector and this is to

21   collect a debt by itself wouldn't -- wouldn't make it

22   collection activity here, when I put all of those together,

23   wouldn't the *Pinson* decision suggest that this is in connection

24   with the collection of a debt?

25          MR. SILVERMAN:  The *Pinson* decision, obviously we

1 | start with the standard, which nobody disputes, which is that
2 | you've got to look at the intent of the communication.
3 |        We've cited a half dozen or more cases that talk
4 | about the specific concept, a regular bank statement sent for
5 | only informational purposes is not an action in connection with
6 | the collection of a debt.
7 |        So you have to -- you have to synthesize those
8 | two things.  What in there is not in a regular bank statement?
9 | Regular bank statement is specifically set forth in TILA as to
10 | what's supposed to be in your regular bank statement.
11 |        Is there anything more than that, that would be --
12 | that would be a pretty good indication of the test.
13 |        You've got to balance the -- we know that things sent
14 | for informational purposes and things sent for a mixed purpose,
15 | where there's a primary informational component -- this is a
16 | bank statement.  And what's in it -- and, again, I don't want
17 | to belabor the point, this is what -- this is the summary of
18 | what TILA says has to be in it, the amount due, payment due
19 | date, amount of late fee.
20 |        THE COURT:  But they're --
21 |        MR. SILVERMAN:  All of that is in the contact
22 | information, partial payment information, how are you supposed
23 | to send the payment.  I have to send this -- I'm entitled to
24 | send this to you, and I have to put in the things that, if
25 | you're going to pay me, this is how we do it.

1          And you couple that with the *Pinson* specific --

2     *Pinson* does not address the specific applicability of a

3     bankruptcy disclosure.  That's -- of our bankruptcy, we've

4     got -- both *Helman* cases are bankruptcy disclosure cases.

5     That's an element that's simply not part of *Pinson* and doesn't

6     move the *Pinson* analysis.

7          I want to make -- at the very beginning, I want to

8     make an important point, which is that both *Helman* cases and

9     the *Boringer* case are dismissals with prejudice on motions to

10    dismiss.

11         They are -- these issues can be addressed with

12    prejudice on a motion to dismiss, and they are on the motion --

13    and they are with prejudice on the basis that they are not debt

14    collection activity or that they're informational.  These are

15    standards that are available at this procedural juncture.  I

16    want to make sure I didn't miss that.

17         Because, again, the *Gooden* case that Judge Corrigan

18    issued is a summary judgment opinion.

19         But on this -- it's an available motion to dismiss,

20    and, you know, we should be having this discussion.

21         But you take *Pinson*, what's in the set, what's in --

22    you have an informational document, what in -- and, like I

23    said, I think it's a fairly noncontroversial fact, the, quote,

24    a regular bank statement, whatever that is, is an informational

25    nondebt-collecting document.  The question is what else did you

1    put in there?

2          And I present to the Court, we didn't put anything

3    else in there other than what's required by TILA, plus we -- we

4    gave you the disclaimer, said:  Hey, more importantly, if you

5    don't owe this, this is informational purposes.

6          So on that basis.

7          THE COURT:  Of course.  But you know they don't owe

8    it, so why do you say if?  If you are -- you'd say if you are

9    discharged, which leaves the debtor to determine whether that

10   was really discharged, when in the face of getting a statement

11   from you that says:  Hey, you owe this.

12         So why -- if I'm looking at it from the viewpoint of

13   the least-sophisticated consumer, not as a lawyer, why isn't

14   that misleading?

15         MR. SILVERMAN:  The least-sophisticated consumer -- I

16   don't believe there's a case that finds that the

17   least-sophisticated consumer who has received a Chapter 7

18   discharge doesn't know that they've received a Chapter 7

19   discharge.

20         Again, the specific language of the disclaimer is

21   that if you've got one of these, this is for informational

22   purposes.

23         I'm not their lawyer.  I can't tell them the effect

24   of what this means.

25         They under -- again, I have the right to do this

1    under other law, you know, I'm -- if they want to redeem, and,

2    in Ms. Prindle's case, again, this is foreshadowing for this

3    afternoon, someone who had not abandoned in the bankruptcy, but

4    had indicated, you know, and had reached out to us for a

5    modification, because, again, that's part of the four corners

6    of this complaint, that she applied for a modification.  At

7    that point, that's someone who you would want to tell:  Oh, by

8    the way, if you want to keep your house, this is how much you

9    owe.

10         So, again, this comes back to the question, is it

11   debt-collecting activity?  And that's a test that *Pinson* starts

12   with.  But once we're in a post-Chapter 7 discharge with a

13   bankruptcy disclaimer, the cases that apply that, the *Helman*

14   cases apply that and explain why that that becomes -- that's

15   not as a matter of law for the purposes of a motion to dismiss

16   a collection of a debt.  That is why in the *Boringer* case, the

17   Court makes the same determination.

18         THE COURT:  I'm looking at just -- this is Judge

19   Corrigan's *Hernandez versus Dyck-O'Neal* decision, which is

20   Westlaw -- 2015 WL 2094263, and he's -- he's citing to the

21   Eleventh Circuit -- this is the easiest place for me to put my

22   hands on it -- that the purpose of the least-sophisticated

23   consumer standard is to ensure that the FDCPA protects all

24   consumers, the gullible as well as the shrewd.  And he goes on

25   to quote the Eleventh Circuit:  But that's -- a false statement

1    may be obviously false to those who are trained and

2    experienced, does not change its character nor take away its

3    power to deceive others less experienced.

4         Like the June 4 letter, he says:  The letter in

5    *LeBlanc* contains the words:  This is an attempt to collect a

6    debt, and any information will be used for that purpose.

7         And the Court ultimately held that the nature of the

8    letter was best left to the jury.

9         The -- he -- and I guess -- in looking at the

10   mortgage statement, at least, you've got disclaimers that are

11   on the back of the page.  There are -- they're not on the front

12   of the page where you're asking for payment.  It's not part of

13   the special message where you tell them they can set up their

14   monthly mortgage payment.

15        You've got a loan, a current payment due date, a

16   current payment amount, and it describes how much.  The amount

17   of the debt.  It says how it can be paid.

18        MR. SILVERMAN:  Your Honor, if I may briefly

19   interrupt.  The letters -- the correspondence in the *Hernandez*

20   case are letters.  They are collections letters.  They're not

21   bank statements.

22        If you look -- if you turn to the first page, it

23   talks about the nature of what these claims were.

24        It was an actual attempt to -- and they actually sued

25   for -- to try to collect that deficiency.  That's not what

1    we're talking about.

2           THE COURT:  Well, what I was referring you to,

3    though, was the -- your -- your premise that no Chapter 7

4    debtor wouldn't think they've been discharged.  And then the --

5    what I was intending to read from was the whole purpose of the

6    least-sophisticated consumer standard is to be able to address

7    communications, not just that you would think somebody -- it

8    doesn't -- even if it's obviously not accurate, its

9    least-sophisticated consumer is gullible and thinks:  Oh, wow,

10   they're sending me this notice, and it says I have to pay, then

11   it would apply.

12          MR. SILVERMAN:  And again, Your Honor, this is a

13   specific collection notice.  They're sending them a collection

14   demand and then putting in a disclaimer at the bottom.

15          We're talking about bank statements, which the case

16   law talks about is for informational purposes, that has that

17   same language in the back.

18          So we're not -- again, you've got -- again, the

19   standard from *Pinson* is you've got to look at the nature of the

20   communication.

21          Now, we're -- what we're talking about here is not

22   claims for demand, and that's a claim for demand that actually

23   preceded an actual attempt to collect that debt.

24          Your Honor, again, the first couple paragraphs, this

25   is what -- these are collections notices.  And to the extent

1    that you can distinguish me sending a collections notice with a

2    threat, that actually turned into a lawsuit that had

3    boilerplate on the back, versus me sending your statement to

4    you, which I'm allowed to do and has been recognized as an

5    informational, those -- I believe that, again, your -- the

6    premise as to when the bankruptcy disclaimer would be given its

7    logical effect would be different in those two cases.

8                THE COURT:  Hold on one second.

9                Go ahead, sir.

10               MR. SILVERMAN:  And again, those -- those are demand

11   letters.  We're talking about account statement.  Our account

12   statements don't include a "you owe" or "you must pay," or any

13   of those things.

14               Our account statements -- again, I don't want to

15   regurgitate because that's pretty well set forth in the briefs

16   as to the parties as to what is and what is not in the account

17   statements.  But they are not certainly what is referenced in

18   the *Hernandez* case, which is an actual collections attempt.

19               THE COURT:  Why isn't -- there are other -- there are

20   other mortgage statements where my colleagues in this district

21   have found them -- and I referenced this earlier -- said they

22   weren't debt collection activity, but they distinguished them,

23   because they specifically say:  This is for informational

24   purposes only, and because they say this isn't -- we're not

25   trying to collect a debt.  Why isn't the failure -- if I'm

1  applying -- recognizing that I'm at a motion to dismiss stage,

2  I'm required to construe the allegations of the complaint in

3  the light most favorable to the plaintiff, and I'm required to

4  apply the least-sophisticated consumer standard, why doesn't

5  the absence of those things result in an inability for me to

6  find, as a matter of law, that these are not misleading?

7          MR. SILVERMAN:  And, again, I had to start at the

8  beginning of this, which is there's cases on both sides.  That

9  specific finding was made by Judge Ryskamp; was made in the

10  second *Helman* case by Judge Rosenberg; made in the *Boringer*

11  case by Judge Altonaga.  Those are all three finding these

12  statements to be -- very, very similar statements to be

13  inactionable as a matter of law to the point where a motion to

14  dismiss with prejudice was granted.

15          And so the finding in the context of a demand letter,

16  if there's a question as to what -- how you would interpret a

17  demand letter that acts as a -- in the four corners of the

18  complaint resulted in an improper collections case, I believe

19  that you can find that on an account statement when -- there

20  are a plethora of cases that we've cited that specifically talk

21  about the fact that account statements are -- are

22  informational.  And when we've shown without opposition -- and,

23  again, we noted it in the brief, our statement says exactly

24  what TILA says it's supposed to say.

25          And, again, I don't want to use up -- I said that an

1    hour ago as well on the preemption issue.

2              THE COURT:  Okay.  Hold on one second.

3              Yeah, I thought so.  In *Helman*, the -- Judge Ryskamp

4    quotes -- the monthly mortgage statement, he quotes the monthly

5    statement included the following language:  This statement is

6    sent for informational purposes and is not intended as an

7    attempt to collect, assess, or recover a discharged debt from

8    you.  If this account is active or has been discharged in a

9    bankruptcy proceeding, be advised that this communication is

10   for informational purposes and is not an attempt to collect

11   upon a debt.

12             Now, your -- let's see, where's the motion?

13             MR. SILVERMAN:  The bankrupt standard is page 18 of

14   our motion to dismiss.

15             THE COURT:  I'm looking at the actual --

16             MR. SILVERMAN:  Okay.

17             THE COURT:  -- Exhibit C, which is Doc. 71-3, page 2

18   of 4.

19             So plaintiffs' response to that is that it's

20   boilerplate, it's buried on the second page, and it's not

21   sufficient to overcome the overall import of the face of the

22   document.

23             So respond to that.

24             MR. SILVERMAN:  First -- and, again, I don't know --

25   Your Honor is reading the notice is actually in two different

1  places, because it's in the bankruptcy notice and then the

2  mini-Miranda part also notes that the -- where it says it's an

3  attempt to collect a debt that's required by the FDCPA and does

4  not imply that we are attempting to collect money from anyone

5  who has discharged the debt under the bankruptcy laws.

6          Just for completeness on our part, it's in

7  two different places.

8          THE COURT:  Sure.

9          MR. SILVERMAN:  And so the purpose, again, a

10 number -- there are courts that have found this to be within

11 the definition of an informational notice.

12         There are courts -- there's courts that have found it

13 to be outside that basis.  There certainly is precedent, and we

14 believe appropriate, that you can do that in a motion to

15 dismiss.  That the nature of this on a statement is different

16 than on the demand letters that we saw in the *Hernandez* case.

17         And if the answer is that it survives and has to go

18 to a trial on that question, then that's something that I'm

19 going to raise again at 1:30, because that's not -- because

20 that is certainly an individualized issue, because it's not

21 going to be -- because, again, the context of each of those

22 bankruptcies and those notices is a class issue, but we're a

23 couple hours early.

24         THE COURT:  Well -- yeah.  Who knows if we're going

25 to -- I don't know if we're actually going to get to class

1    certification today.  I may have bitten off a little more than

2    I can chew.

3            Speaking of which, I will let you have lunch.

4            MR. SILVERMAN:  And, again, that would be a -- from

5    the warning -- this has been a Planes, Trains, and Automobiles

6    trip for me.  I pretty much drove here when my flight was

7    canceled at 11:00 last night.

8            THE COURT:  I'm sorry.

9            MR. SILVERMAN:  No, no, no.  This is the job.  No, my

10   point was, if you think that we're going to get to the point

11   where we're going to defer any portion of the class cert, you

12   know, and you know that now from a logistics basis, that would

13   be a very useful piece of information.

14           THE COURT:  Well, I -- I don't know.  But I guess my

15   thought would be if I'm -- if I'm not getting to it, it's

16   because we're still talking about this subject.  It's not that

17   you'd be leaving earlier.

18           MR. SILVERMAN:  And, again, the many things, you

19   know, we -- you know, this has been a case that we've gotten

20   this far without a discovery motion, without any of those kinds

21   of issues.  And so, you know, we talk about these things on a

22   fairly academic level and it would certainly, to the extent --

23   you know, from our perspective, to the extent that some of

24   these things are resolved or to the extent that some of these

25   things are open issues, that makes the class issue either much

1   simpler, because there is certainly context depending on what

2   your ruling is, you know, I would concede off the record

3   regarding, you know, there are certain kinds of FDCPA cases

4   that get certified, period -- you know, there's nothing you can

5   do about that.

6           There are others that are individualized, and some of

7   these issues are significant components of that.

8           THE COURT:  Okay.  Well, it's my intention to try and

9   resolve as much as I can today.

10          MR. SILVERMAN:  Okay.

11          THE COURT:  And we'll see where that ends up.  Okay.

12          MR. SILVERMAN:  So that was the statements.  You

13  know, I don't know if your Court's preference is to start with

14  the statement, and then get into some of -- and to do them

15  one --

16          THE COURT:  Can I interrupt you?

17          MR. SILVERMAN:  Yes.

18          THE COURT:  Because there was something you just said

19  that confused me.  And that was that if -- and I haven't looked

20  ahead at this issue --

21          MR. SILVERMAN:  Yeah.

22          THE COURT:  -- so I'm asking this on a blank slate.

23          But if the mortgage -- if -- if I conclude, one, that

24  the FDCPA claim is not precluded; and, two, that I can't say as

25  a matter of law that the mortgage statement, when viewed

1    through the lens of the least-sophisticated consumer, could not

2    be viewed as misleading, if that's my conclusion, you said, if

3    I understood you correctly, then that's going to raise other

4    issues when we get to class certification.

5           And my question to you on that is, I guess, why?  And

6    I say that because -- and, again, I hadn't looked at this

7    issue, but it's not an individual -- it's not a question of

8    whether they were actually confused, it's -- it's a strict

9    liability statute issue.

10          MR. SILVERMAN:  Well, it was like when I was getting

11   dumped in high school.  You know, it's not about you; it's

12   about me.  Which is that this is a knowledge requirement.

13          And so as we talked about why doesn't -- why am I not

14   telling people that:  Oh, here's a statement, but I should

15   specifically warn you that you don't have to pay this one, that

16   depends whether you've got a mortgage application -- some of

17   these people have modification requests pending, like

18   Mrs. Prindle, and so it comes in -- that specific question

19   comes in the context of just sending -- for argument's sake,

20   say I sent letters out that don't have the mini-Miranda in

21   them.

22          THE COURT:  I see what you're saying.  What you're

23   saying is that we can't look just at the statement, you're

24   saying that the question of whether this mortgage statement

25   would be confusing is viewed not just based on the statement,

1  but in the entire context of what that debtor's relationship is

2  with the creditor and the other things that are going on.

3       That's what I wasn't understanding.

4       MR. SILVERMAN:  And, like, some of those items -- you

5  know, we would not -- some of them we would vociferously fight;

6  some of them we go motions.  You know, like I said, this again,

7  we've been down -- counsel and I have been down this road

8  before, and so depending on some of those answers.

9       But, again, you know, just as the context -- like I

10 said, I didn't put a mini-Miranda in a letter that I can

11 certify, there's no individualized issues.  But given --

12 certainly on the FDCPA and state, depending on what the Court's

13 analysis is regarding what I had to do and when I had to do it,

14 that would require me to -- you know, I'd come up and I'd go:

15 I've got 550 of these things.  Tell me which of these I knew I

16 had to put this language in.

17       THE COURT:  Well, that's that big chart that's

18 completely -- the version of which we have is completely

19 illegible.  I don't have x-ray vision.

20       MR. SILVERMAN:  If it comes to that, again, that's

21 the kind of -- if it comes to that, the kind of argument that

22 we generally put the monitor on and we have somebody blow it

23 up.

24       THE COURT:  We're getting ahead of ourself.  Let me

25 talk to Ms. Varnell about the statements and then about some of

Cindy Packevicz, RPR, FCRR          904.301.6843

1    the other communications.

2            All right.  So what Mr. Silverman tells me is that

3    because of their -- because they still have a security

4    interest, they have a right to send these statements, is that

5    they're required to include certain information in them.  They

6    have the disclaimers.  They're not -- it's not demand letters

7    like I've seen in some of the other cases.

8            Why isn't that entirely permissible?

9            MS. VARNELL:  Your Honor, I think where he's leading

10   the Court astray is to simplify this case in the context of as

11   the law has been evolving in front of our eyes in the last

12   two years.

13           THE COURT:  No kidding.

14           MS. VARNELL:  So it's really very difficult, and I

15   think your job has been much harder, actually, than ours,

16   because we just have to follow the -- you know, the closest

17   passing star that comes along, but you're left with much more

18   difficult decisions.

19           But I would ask you to take note of one of the last

20   statements that he made before he left the podium, which is,

21   well, you know, there's some -- going to be a great deal of --

22   the question of whether or not the debtor would be confused is

23   really based on the entire context of the relationship.

24           And this Court is familiar with, if we're looking at

25   those sort of facts, we're not looking at a motion to dismiss.

1  Instead I would ask this Court to follow *LeBlanc*, the Eleventh

2  Circuit decision that we cited in our case, which says that

3  normally these issues of whether or not it is going to be

4  misleading in the context of the relationship to the

5  least-sophisticated consumer is a question for the trier of

6  fact.

7       In this case, we have a -- something really

8  interesting that I'm really not even certain if I should be

9  bringing it up, but it is in the record.

10      Very interesting that he is sitting here and arguing

11 to this Court that they have to send these statements.  He's

12 really not -- he's artfully dodging saying that, because he

13 knows they don't actually have to send these statements.  He's

14 saying we can send these statements, and if we do -- and

15 correct me if I'm misstating you, Larry, but isn't that true,

16 you're telling the Court:  We can send these statements, and if

17 we do, this is -- the information that TILA requires is in the

18 statement.

19      So that's very different than we have to send these

20 statements.

21      And what you will find, based upon the record that is

22 in front of you, because we submitted the deposition of Stephen

23 Brackett, who is the 30(b)(6) rep for Carrington Mortgage, and

24 he will testify to you that they no longer send --

25      THE COURT:  Whoa, whoa.  Hold on.

1          MR. SILVERMAN:  Wrong motion.

2          THE COURT:  I'm on a complaint, and I'm on what's

3    pled in the complaint.  What's in discovery -- it's the

4    four corners of the complaint that I have before me, whether it

5    states the claim is plausible.

6          MS. VARNELL:  Okay.  Your Honor, then, under that

7    circumstance, then I would submit that the least-sophisticated

8    consumer, a jury, a reasonable jury could find that the

9    least-sophisticated consumer would be misled by the statements

10   that were provided.

11          And I want to note that we submitted within our brief

12   cases including the case of *Barton versus Ocwen Loan Servicing*,

13   which was a district court case from Minnesota, which addressed

14   specifically and rejected the boilerplate bankruptcy disclaimer

15   language when reviewing an account statement.

16          And in *Barton*, the defense notice contained a

17   disclaimer that I think was even better than the one that is

18   present in the *Prindle* case -- it's noted on page 17 of my

19   opposition brief in Document 73 -- and the Court there denied

20   summary judgment based upon the plaintiff's FDCPA claim since a

21   reasonable juror could find that the notices were an attempt to

22   collect a debt.

23          So I think that frequently what happens is they put

24   in the disclaimer and all it does is serve to create a

25   situation that would confuse the debtor.

1      You have on one hand -- well, this Court's already

2  pointed that out -- you have a demand for payment, and on the

3  other hand you have this, well, this disclaimer situation may

4  apply.  And, of course, that's inconspicuously noted on the

5  back of the statement.

6      I don't have any further arguments with regard to the

7  account statements themselves.

8      THE COURT:  Let's talk about the -- okay.  They said

9  that -- they argued on their 12(b)(6) motion that the complaint

10 failed to state a claim because none of the -- none of the

11 communications that you identify are communications in

12 connection with the collection of a debt.

13     And in your motion, you only respond to the mortgage

14 statements.  You don't discuss the tax notice; you don't

15 discuss the loan modification; you don't discuss the

16 foreclosure notice; so why wouldn't I consider those claims

17 abandoned?

18     MS. VARNELL:  Well, Your Honor, I think that our

19 opposition on the motion to dismiss does say that we accurately

20 stated every element of a claim in support of both an FDCPA and

21 FCCPA claim, as of -- and it doesn't mean that we've abandoned

22 those claims simply because --

23     THE COURT:  Well, they make specific arguments about

24 why the modification letter, for example, isn't false or

25 misleading, and you didn't respond to that.

 1          MS. VARNELL:  Well, Your Honor --

 2          THE COURT:  They make specific arguments about why

 3    the tax notice doesn't -- isn't in connection of a debt, and

 4    you haven't responded to that.

 5          MS. VARNELL:  Your Honor, I think that our position

 6    and our opposition was that this is something for the trier of

 7    fact, and that it isn't -- that it shouldn't be determined on a

 8    motion to dismiss.  And that's -- if the Court finds that to be

 9    an abandonment because we don't believe that you have all of

10    the relevant information in front of you in just looking at the

11    four corners of the complaint, we believe that we stated a

12    claim.  We believe that the allegations, combined with the

13    documents that are attached, are enough to overcome the hurdle

14    of --

15          THE COURT:  Well, I have to look at each case.

16          MS. VARNELL:  -- 12(b)(6).

17          THE COURT:  Let's look at the tax notice.

18          MS. VARNELL:  Okay.

19          THE COURT:  They argue that -- and I'm not going to

20    find it abandoned; I'm going to let you argue it here now.  But

21    the tax notice, they argue that it's not made in connection

22    with the collection of a debt, that it's merely informational.

23          They note that it doesn't demand a payment.  It

24    doesn't have a payment coupon.  It doesn't have a payment

25    deadline.

```
 1              It tells Ms. Prindle to contact her taxing authority,
 2    but it doesn't tell her how to make payments.
 3              The only arguable ambiguity is -- I guess, is that it
 4    says:  If you don't pay, we may pay, which may increase your
 5    monthly statement.
 6              But I don't -- what is it in that tax notice that
 7    would -- that could cause anyone to believe that they are
 8    trying to collect a tax payment?
 9              MS. VARNELL:  What is the point of the communication
10    in the first point -- premise if it is not?
11              THE COURT:  Well, it's to -- it's to protect their
12    interest in the collateral so that there's not a -- so that the
13    tax deed doesn't get sold.  But they're not trying to collect a
14    debt.
15              MS. VARNELL:  Well, she does not need to pay the
16    taxes on a home that Carrington mortgage is -- I know -- I
17    understand that Carrington mortgage is concerned about the
18    taxes being paid, but why should Ms. Prindle be concerned about
19    paying the taxes?  They want for her to pay the taxes to
20    protect their own interests.
21              It's not in her interest to pay the taxes.
22              THE COURT:  Right.  But they're -- all they're doing
23    is telling her that her taxes are due.  In order for it to be
24    made in connection with the collection of a debt, it has to be
25    seeking to collect that debt.  They're not --
```

1          MS. VARNELL:  Isn't what they're really doing is

2     saying:  Hey, pay the taxes, which is a debt that we owe, in

3     order to protect our interests in the collateral?

4          THE COURT:  Okay.

5          MS. VARNELL:  And one of the things that they say is:

6     We're going -- you know, we're going to increase -- we'll have

7     to increase your monthly payment in order to recoup the

8     delinquent amount paid.

9          So they're essentially saying:  Hey, pay this third

10    party to protect our interests.  If not, you are going to

11    suffer increased -- all these increases in the amounts you owe

12    us.

13         Which, you know, I think that, again, they're

14    referencing a debt which we argue in the complaint is not owed.

15         THE COURT:  Let me find something here.  Here it is.

16         Now, I recognize that I have to look at this -- view

17    this in the -- through the lens of the least-sophisticated

18    consumer, but the question also is whether -- I mean, what's

19    that language that the Eleventh Circuit has used, is whether

20    the animating purpose of the letter sent was to demand payment.

21         And what you're -- the question is whether it

22    constitutes an attempt to collect a debt.  And there --

23    different courts have identified, particularly the Sixth and

24    Seventh Circuit, have identified a number of factors that you

25    look to in trying to view whether it is really an attempt to

1  collect a debt.

2          And when I look at the tax notice, the -- I just -- I

3  don't see how that, even applying the least-sophisticated

4  consumer test, is an attempt to collect a debt.

5          It's an informational document.  As I said earlier,

6  it doesn't -- it does not demand payment in any way.  It tells

7  the debtor to contact the taxing authority.  There's no payment

8  coupon.

9          I guess there arguably is a deadline, though.  I

10 haven't focused on the first page that arguably has:  A failure

11 to do so within 30 days may result in CMS paying the taxes on

12 your behalf to protect our collateral.

13         That might arguably be a deadline.

14         But, you know, there isn't any question that in

15 maintaining the collateral that Carrington -- I have too

16 many -- make sure I'm referring to the right sentence --

17 Carrington has the right to continue to communicate with

18 Ms. Prindle.

19         And this is the kind of thing that makes -- that's

20 sort of what weighs in favor of an arguable preclusion argument

21 because it's getting into the question of whether -- whether

22 the communication really violates the discharge injunction or

23 not.

24         But, to me, this is -- this is similar to the

25 insurance letter in the *Dire* case that Judge Moody decided at

1    2015 WL 3510283.  When you look at the overall context of the

2    letter, I just don't see how, even viewing the inferences in

3    plaintiff's favor or through the eyes of a least-sophisticated

4    consumer that this can be viewed as Carrington's attempting to

5    collect on a debt.

6              And so the -- to the extent plaintiffs' claims rely

7    on paragraphs 13d and 37d, I don't think that states a claim.

8    And so I'll grant -- well, no, I'm not granting anything

9    because I haven't decided whether it's precluded.

10             But to the extent that I don't find preclusion, I

11   would dismiss those allegations.

12             Let's look at the modification letter and explain to

13   me how the modification letter is false, deceptive, or

14   misleading.

15             MS. VARNELL:  Okay.  Well, may I then ask that the

16   Court permit me to give a little bit of context.  Because as

17   you correctly pointed out --

18             THE COURT:  If it's not pled in the complaint, the

19   context doesn't --

20             MS. VARNELL:  It is pled in the complaint, Your

21   Honor.

22             THE COURT:  Okay.  That's fine.

23             MS. VARNELL:  That's part of what I'm asking you to

24   stop and consider for a moment, because we're looking at each

25   of these individual documents without looking at them, I think,

1    in the context of the overall relationship as -- as is --

2         THE COURT:  I am -- I'm aware of the overall

3    relationship, what's pled, and I am considering that.

4         MS. VARNELL:  In -- on page 3, in paragraphs 12

5    and -- 12 of the complaint, we explain that people are in a

6    very extraordinarily vulnerable situation when they come out of

7    bankruptcy.  And that we believe that the entire program of

8    these communications that are sent to debtors who happen to be

9    in that time of no-man's land, when they -- they're still in

10   the house because Carrington has not chosen to take action to

11   foreclose on the collateral; and they're in a difficult

12   financial position because they've had -- just been discharged

13   from bankruptcy and have very bad credit.

14        And so the complaint specifically alleges that that

15   context is important and that the -- that Carrington is, in a

16   way, preying on their vulnerability and their desire to keep a

17   roof over their heads by saying:  Hey, we know that you may

18   have had a discharge of this debt, and maybe the bankruptcy

19   judge and maybe the trustee and your attorney and nobody

20   believes that it makes sense for you to stay in that house, but

21   we think you could probably stay in there.  You could

22   refinance; we could modify.  You just need to make payments to

23   us.

24        And I think that that context should be considered as

25   you're looking at each of these communications.

1      I just wanted to make certain that I had reminded the

2  Court of that particular vulnerable situation that the

3  plaintiff was there, and that that's within the four corners of

4  the complaint.

5           THE COURT:  What is misleading about the modification

6  offer?

7           MS. VARNELL:  Because it's an offer to modify a term

8  of a loan that she does not owe, that she has no personal

9  indebtedness upon.

10          THE COURT:  But on page 8, it says -- I mean, in --

11 I'm sorry, I shouldn't say page 8.  Let's see.  It's the second

12 page of the actual modification agreement in paragraph H, it

13 says:  I was discharged in a Chapter 7 bankruptcy proceeding

14 subsequent to the execution of the loan documents.  Based on

15 this representation, lender agrees that I will not have

16 liability on the debt pursuant to this agreement.

17          And so it truthfully acknowledges that she was

18 discharged.  It truthfully acknowledges that she would not have

19 liability on the debt.  So why is it misleading?

20          MS. VARNELL:  Because although it says:  Hey, you

21 don't have personal liability, at the same time they have sent

22 communications obviously before this to get her to make trial

23 period payments.

24          You have to -- Exhibit D that you're looking at says:

25 Continue to make your trial period payments.

```
 1          So they have coaxed these debtors into making

 2   payments on a loan that does not exist under the guise that

 3   they're going to offer them some sort of wonderful

 4   modification.

 5          And as in the case with Ms. Prindle, and as alleged

 6   in the complaint, when -- you know, when push comes to shove,

 7   they get to the ultimate signing time of these documents, and

 8   lo and behold, it's not a modified loan.  It's a loan for over

 9   $300,000.

10          It's every bit of the personal indebtedness that

11   should have been discharged to bankruptcy.  It's not a

12   modification.  They are actually -- this document is collecting

13   on an existing or a discharged debt.

14          When you view each of these communications, and

15   particularly the loan modification package, in light of their

16   circumstances, where Carrington Mortgage has every right to go

17   after the house, but clearly the whole scheme of all of these

18   communications is:  Hey, let's talk about debt foreclosure

19   alternative -- or let's talk about foreclosure alternatives,

20   which include you paying everything that was just discharged in

21   bankruptcy and then some.

22          And that -- that is the point of this loan

23   modification package, it is to extract money.  And it worked

24   with regard to Mrs. Prindle.

25          THE COURT:  All right.  Hold on a minute.
```

1          What I'm struggling with, Ms. Varnell, is, having

2    read all the cases, I -- I think I was leaning towards a

3    finding with regard to the FDCPA claim, at least, that the

4    claims were likely not precluded.  But the more we argue now

5    about whether these individual different documents state a

6    claim, the more I feel like I'm having to determine whether the

7    communications are permitted by the Bankruptcy Code and not a

8    violation of the injunction, and if so, why that should be

9    permitted to state a claim.

10          And so it's making me more -- starting more to think

11   about whether my initial -- and I don't want to say initial as

12   if that was cursory, I spent -- I'm embarrassed to admit how

13   much time I spent trying to figure this out and I still don't

14   know the answer.

15          But do you see what I'm saying?

16          MS. VARNELL:  I understand it's difficult.  And I'm

17   wondering would it -- would it help if we figured out how to

18   come up with a ruling and ask the Court for a certification of

19   this, and get the Eleventh Circuit to tell us?  Because none of

20   us really know.  It's very difficult.

21          THE COURT:  Why me?

22          MS. VARNELL:  I know.  Well, maybe --

23          THE COURT:  Haven't some of these others been

24   appealed?

25          MS. VARNELL:  *Helman* is on appeal right now.

```
 1                THE COURT:  I wondered about that.
 2                MS. VARNELL:  It's on appeal.  But, you know, the
 3    briefing was just started.
 4                MR. SILVERMAN:  The Helman 1 was dismissed.
 5                MS. VARNELL:  Helman 1.
 6                MR. SILVERMAN:  Yeah.
 7                MS. VARNELL:  There was just a motion for a
 8    recount --
 9                MR. SILVERMAN:  And we're in all those cases.
10                THE COURT:  Why don't we stay this until the Eleventh
11    Circuit decides?
12                MS. VARNELL:  Well, it's -- I appreciate her
13    conundrum.  And I'm just saying what could we do --
14                MR. SILVERMAN:  And again --
15                MS. VARNELL:  -- to get the Eleventh Circuit to tell
16    us.  Because this is difficult.  And there's a whole lot of
17    other cases, obviously, you know, I mean, these aren't the only
18    defendants obviously that -- or the only mortgage companies,
19    that's why they're popping up all over the state.
20                But why don't -- why not put it up there and certify
21    it?
22                MR. SILVERMAN:  A deck-clearing decision would
23    certainly -- again, I think it's directly appealable.  If there
24    was something intermediate, certainly it's probably within the
25    direct definition of what ought to be certified.
```

```
 1          THE COURT:  Under -- I admit that I contemplated, you
 2   know, depending on what my ultimate ruling was, I contemplated
 3   if it was something -- if part of -- if either the FDCPA or
 4   FCCPA claims were going to go forward, I contemplated offering
 5   or suggesting that one of you-all file a motion requesting me
 6   to certify it under 28 USC Section 1292.
 7          MS. VARNELL:  I think if there ever was a case,
 8   this --
 9          THE COURT:  Well, I've had one other that I thought
10   was.  But -- yeah, well, I don't know.
11          Why don't we take a break.  We've got more to do.
12          MS. VARNELL:  Lunch break?
13          THE COURT:  Yeah.  Why don't I let you eat, instead
14   of starving you.  Because I think we're going to go a good bit
15   more, and I've been yelled at for not letting people take
16   restroom breaks and lunch breaks.
17          So why don't we -- I think likely I'm going to end up
18   not hearing arguments on class cert today.  But I think we're
19   going to -- we're going to keep going, so -- yes, sir?
20          MR. SILVERMAN:  Before I forget, again, on the class
21   cert issue, if it would assist the Court, what we have done in
22   some other cases where we've had, you know, a crazy illegible
23   large document is we can submit an iPad with that document as
24   the resident, you know, you can do all sorts of stuff with it,
25   if that would be assistance to the Court.
```

 1          THE COURT:  Yeah.  Actually, I mean, I guess, if I --
 2     if I open that document up on my iPad, the one that's scanned
 3     into the -- that you-all scanned in, will I be able to expand
 4     it and look at that?
 5          MS. VARNELL:  You can get it legible, but you can
 6     never look at all the info on one page is the biggest problem.
 7     So you can't look at this column with that column, there's
 8     nothing we --
 9          MR. SILVERMAN:  Well, like I said, you know, we can,
10     if that's -- if we're going to -- I read this only because I
11     got a message from our tech person, but we can probably supply
12     an iPad with an app that you can say:  I want to put Column I
13     with Column Q, because I'm in the middle of a three-week trial
14     where we just did that for the judge.
15          THE COURT:  You obviously think I'm more high tech
16     than am I.  Ask Ms. Liles and she'll tell you.
17          MR. SILVERMAN:  No, I'm just -- that's why I'm
18     offering to hand you the device with it built in.
19          THE COURT:  Okay.  We'll get to that.
20          MR. SILVERMAN:  We'll work on that again if we have
21     to.
22          THE COURT:  All right.  We're going to -- we'll come
23     back at 1:40.  I'll let you have an hour because I need a break
24     too.
25          COURT SECURITY OFFICER:  All rise.

Cindy Packevicz, RPR, FCRR            904.301.6843

1          (Recess taken, 12:39 p.m. until 1:53 p.m.)

2          COURT SECURITY OFFICER:  All rise.  This Honorable

3     Court is now in session.

4          Please be seated.

5          THE COURT:  So coming back to FDCPA preclusions --

6     you guys didn't settle over lunch, did you?

7          Okay.  So going back to FDCPA preclusions.

8          Ms. Varnell, let me -- I -- I'm not sure when the

9     last time I ever felt this schizophrenic about a case before or

10    about an issue.

11         So on the one hand, I see that what you're saying is,

12    yes, the Bankruptcy Code says that they are permitted to send

13    statements; and, yeah, the Bankruptcy Code will permit them --

14    the discharge would not prohibit them from offering a

15    modification to stay in the residence or -- but that if a court

16    finds FDCPA claims precluded under these facts that were not

17    just protecting what the Bankruptcy Code allows, we're going a

18    step further and we are protecting the most egregious debt

19    collector.

20         Because what we would be saying is that even if you

21    use false or misleading representations, what we'd be saying is

22    your -- because you're only doing something that the Bankruptcy

23    Code would otherwise allow you to do, you are protected even

24    though you have done it in the most egregiously misleading

25    manner; right?

1          MS. VARNELL:  Yes.

2          THE COURT:  Okay.  And that makes sense, which would

3     mean to me that FDCPA claims shouldn't be precluded.

4          But one of the things that troubles me there is

5     the -- and ironically this goes back to the very first question

6     that I asked, or one of the first questions that I asked, and

7     it's those two allegations in your complaint.

8          The allegation that they mischaracterized the -- or

9     they misrepresent the character or legal status of the debt

10    goes to the fact that they -- whether or not it was discharged

11    in bankruptcy; right?

12         MS. VARNELL:  Yes.

13         THE COURT:  Okay.  Then the allegation before that is

14    that they -- the representations, the overall tenor of the

15    representation is misleading.  In what way?

16         MS. VARNELL:  Because they -- because Mrs. Prindle

17    was in no way, shape, or form, eligible for a Section 524(j)

18    sort of exception to the discharge exemption, you know, that

19    section that they're citing -- as the allegations in the

20    complaint say, she was not up to date on her payment.  She was

21    completely behind and not been making payments, so she was not

22    eligible for the redemption-type things that they are saying

23    that they are offering in these communications.

24         THE COURT:  Okay, hold on.  So I'm looking at 524(j),

25    and where in it does it say that in order for them to be

                    Cindy Packevicz, RPR, FCRR          904.301.6843

1   permitted to send these statements that the person has to be up

2   to date on their payments?

3            MS. VARNELL:  I have to admit, Your Honor, that it

4   would be much easier if I had all of 524 in front of us.  But I

5   know that you have to read subsection J with reference to other

6   subsections, but you can understand that --

7            THE COURT:  You should probably stand up.

8            MS. VARNELL:  Oh, I so apologize.

9            THE COURT:  No, no.  You can come up to the podium.

10   It's just easier to hear you.

11            MS. VARNELL:  Okay.  So my opposing counsel has been

12   kind enough to give me a complete printout of 524, so perhaps I

13   could --

14            THE COURT:  Sure.

15            MS. VARNELL:  It will take me just a second.

16            As I understand and interpret 524, when it comes to

17   the discharge injunction, the point of 524JA2 -- cover offset

18   debt, personal liability, my understanding is that the

19   interpretations of this section and the reason why the section

20   was put into the code in the first place was to create a little

21   safe harbor for people who wanted to stay in their home but

22   that -- and I am not in a position -- I'm sorry, Your Honor, to

23   give you direct citation to law, but I'm not certain that --

24   that it's imperative to the point of my argument in any case.

25            THE COURT:  Okay.  So -- all right.  Then going back

1   to my question was other than whether -- whether there is a

2   debt upon which to collect at all, what -- what else is

3   misleading?  I'm sorry, I was trying to...

4           MS. VARNELL:  The communications that are listed in

5   the complaint, I believe, demonstrate that the defendant was

6   attempting to lure them into the belief that they could partake

7   or qualify for options which they simply could not, and not

8   properly under the law.

9           So, for instance, in Mrs. Prindle's case, there was

10  never any intent on the part of Carrington Mortgage to give her

11  a true modification of the mortgage.  So they're giving her,

12  you know, essentially a pipe dream, holding a carrot out there.

13          If you were to come -- Mrs. Prindle, if you were to

14  just make some of these trial payments, then you are going to

15  be able to enter into a modified mortgage.

16          And I don't think that if you view all of the conduct

17  that happened here, it became clear that that's never the point

18  and purpose of these is to give them a true modified mortgage.

19  They really just want you to reaffirm the debt outside of the

20  bankruptcy system.  That which they did not do within

21  bankruptcy, because it was not in anybody's best interest, you

22  know, the trustee had decided it's not in the best interest of

23  the bankruptcy estate that this debt be reaffirmed.  The judge

24  entered an order.  The debt's not reaffirmed.  But they

25  essentially coaxed the debtors into --

94

1        THE COURT:  But isn't that -- isn't that an argument

2    for why this shouldn't be looked at in bankruptcy?

3        And I say that because what you're saying -- what

4    you're arguing to me is what makes -- one of the things that

5    you're claiming makes this unlawful is the servicer's intent,

6    that look at what they were really trying to do, they were

7    trying to lure these people to believe that they were eligible

8    for something they wouldn't, so that they could get them to

9    reaffirm.

10        But the FCCPA claim wouldn't require that.  It's not

11   a matter of -- it's not a matter of what their intent was.

12   It's a strict liability statute.

13        So if they sent the notice and it's construed as

14   being misleading to the -- based upon the least-sophisticated

15   consumer, then it would be a violation; whereas, if you were

16   looking at whether or not it violated the discharge injunction,

17   the Court would have to look at whether it was willful, whether

18   it was an intentional act to violate the discharge injunction.

19   And so --

20        MS. VARNELL:  I'm actually arguing that it goes to

21   the animating purpose, which I think is -- that's why it gets

22   very muddy, and I know it's difficult.  I wish the courts had

23   never gone down the road of saying that we have to look at the

24   animated purpose of the communication.

25        They're really saying what -- I think what the

1  Eleventh Circuit and all the other courts that have looked at

2  this have said, when you're trying to figure out if it's an

3  FDCPA violation, you've got to figure out what is the point of

4  this communication.

5         And in the case where the debt has been completely

6  extinguished, I really think the burden is not on us to show so

7  much that -- to prove that each and every word in each and

8  every communication was an attempt to collect a debt, but

9  instead, why the heck are you sending anything on a debt that

10  no longer exists?

11         THE COURT:  But they're allowed to.

12         MS. VARNELL:  Well, I know that he takes that

13  position.

14         THE COURT:  Well, I'm reading 524(j).  They're

15  allowed to send something.  I mean, we can all agree they're

16  allowed to send something.

17         MS. VARNELL:  They're allowed to enforce their in rem

18  interests.  And what's clear from the communications listed in

19  the complaint is that it is so much more than:  Hey, we're

20  about to institute foreclosure proceedings and here's notice of

21  your foreclosure suit.

22         THE COURT:  So long as the act is limited to seeking

23  or obtaining periodic payments associated with a valid security

24  interest in lieu of pursuit of in rem relief to enforce the

25  lien.

1          So they're allowed to send -- I guess, here's --

2    here's what I'm -- and I've sort of come full circle on this,

3    because I -- I think, you know, as indicated, I came in here

4    thinking that more likely than not, the FDCPA's claim was not

5    precluded, and that the FCCPA claim was preempted.  That was

6    kind of what I thought based on all this, but I really wanted

7    to hear from you-all.

8          As I said, these issues are very complicated, and

9    obviously my colleagues are all over the place on it, and so I

10   wanted to make sure I heard fully some of your arguments.

11         But the more I look at it, the more it seems to me

12   that the -- that in this particular case -- and I do not think

13   that -- I would likely, if I were asked to rule, disagree with

14   the *Walls* court that all FDCPA claims are precluded by the

15   Bankruptcy Code, even if they deal with the discharge

16   injunction.

17         But in the unique circumstance of a servicer that

18   is -- that has the right under the Bankruptcy Code to send

19   certain types of communications to the debtor, where we --

20   where the debtor's FDCPA claim then rests on a determination of

21   whether the types of communications that are being sent are

22   beyond what is permitted by the Bankruptcy Code or not, I'm

23   starting to think that maybe that -- that claim would be

24   precluded, that that claim ought be decided in the Bankruptcy

25   Court, for two reasons.  One, because of the overall purpose of

1    the Bankruptcy Code with regard to consistency, but also

2    because of the different treatment under the Bankruptcy Code

3    and under the FDCPA of the communications.

4          And I'm not -- I'm not ruling, I'm just telling you

5    that's -- that's what is making me start to think that perhaps

6    these claims are precluded, so that you can -- you can disabuse

7    me of that.

8          MS. VARNELL:  Would it make a difference to the Court

9    if I were able to provide you law within the next three or

10   four hours that demonstrated that while they can send

11   statements, they're not required?

12         We've already agreed with that.  They're not required

13   to send the statements; it's just that they can.  But that

14   524(j) does not apply to debtors that were not current at the

15   beginning and throughout the bankruptcy proceeding, that that's

16   a special provision, if I were able to show you -- I don't know

17   if it has to do with the interpretation of the term in the

18   ordinary course of business or where that came from, but that

19   is definitely my understanding of the law.  I -- you know, I --

20         THE COURT:  Yeah.  And I guess --

21         MS. VARNELL:  The whole matter.  Because if it would,

22   I'd love to resolve that for certain.  And I would tell the

23   Court:  Look, I have called the best leading expert on this,

24   which I can do, and talked with them about what cases to look

25   at on that issue, and I would answer that question

1  affirmatively so that Your Honor would not -- because it is a

2  complex interplay, and I will --

3         THE COURT:  Which maybe that's why it should be in

4  the Bankruptcy Court.  But I'm not -- I'm likely not going to

5  end up resolving that today.  I had every intention of doing

6  it, but I'm not sure I'm going to.

7         MS. VARNELL:  You know, though, one of the statements

8  that Your Honor made earlier was you said the reason why we

9  don't want to bring in the Bankruptcy Court is because we don't

10  get damages.  You know, it bears repeating on the record since

11  you made that statement, though, that's really not the reason

12  why this case is in front of this court.

13         It's because the bankruptcy courts have consistently

14  held -- I mean, there are cases within the middle district

15  where they say:  We just really don't like to do class actions,

16  you know, especially if it's beyond our district.

17         So there's only one Bankruptcy Court, and it was the

18  *Wells Fargo* case in the Southern District of Alabama where it

19  had these exact facts, and they allowed a class -- they

20  permitted a class action.  But the bankruptcy courts, for

21  understandable reasons, find all sorts of difficulties with

22  jurisdiction.

23         And absent the mechanism of a class action, consumers

24  with tiny little claims like this under the FDCPA or the FCCPA,

25  they don't have any -- they have no real ability to get good

1    lawyers.  Heck, they only got me.  Imagine if -- I mean, they

2    could have really gotten someone if there was some money

3    involved here.

4              MR. SILVERMAN:  Objection.

5              MS. VARNELL:  But they -- my point being that that is

6    the truth.  That's why we're in front of this Court because the

7    district courts are so much better equipped at handling FDCPA

8    claims.

9              Because if they aren't a class action, they rarely

10   can handle such complex matters like what we have here, and

11   they're much more efficiently handled as class actions for

12   those type of consumer claims.

13             I just wanted to make certain that --

14             THE COURT:  No, that's a fair point, and I appreciate

15   that.

16             And, I guess, by the same token, what you're saying

17   to me is that if someone like Mrs. Prindle is relegated only to

18   the bankruptcy discharge injunction, then she's doing that --

19   that's a case-by-case individual, and she already -- she's

20   already bankrupt.  She already doesn't -- is living, I guess,

21   paycheck-to-paycheck arguably and how does she get

22   representation in that.

23             MS. VARNELL:  And there are occasionally lawyers that

24   will take those cases, but they're few and far in between, and

25   the records show that.  I mean, there's -- it's really not

1    within the record, but, you know, I think that this Court can

2    be in a position to observe the lack of consumer class actions

3    that have ever been certified in this district, and I can

4    represent to the Court that the *Burgess versus Bank of America*

5    case, we did that exact thing two years ago.

6            We said:  Where is the best place to bring these

7    people?  What do we do to get redress and stop a systematic

8    practice?

9            And we went to Judge Funk, who was the same judge in

10   Mrs. Prindle's case, and tried to see if there was some way to

11   do that mechanism there.  And he said exactly what all the

12   other bankruptcy judges say:  We really aren't equipped for

13   this and I don't want to do class actions.

14           THE COURT:  Well, can I say I don't want to do this?

15   I'm not allowed to say that.

16           MS. VARNELL:  I know.  I know.  You're in -- well,

17   I'll just not say anything.

18           But that is really the practical implication is that

19   you end up denying -- for instance, the *Bank of America* case

20   that Judge Corrigan was so upset about, that would have never

21   been done if Judge Funk had permitted us to prosecute a class

22   action against Bank of America for the -- you know, these kind

23   of violations.

24           THE COURT:  What would never have been done?  I'm

25   sorry.

1        MS. VARNELL:  They would have been stopped.  I

2   believe that Bank of America would have put procedures in

3   place, because that's what class actions do.  They don't just

4   get redress for one person, they change at least one company

5   and hopefully industries.  When you say:  This is the rule.

6   Play within the guidelines.

7        And there really can be no more vulnerable debtors

8   than these people.  They've got no credit.  I mean, they are,

9   by definition, proven that they are the least-sophisticated

10  consumers.  That's how they ended up in bankruptcy in the first

11  place, to a serious degree.

12        THE COURT:  I think there's a current presidential

13  candidate that would disagree with you that filing bankruptcy

14  means that.

15        MS. VARNELL:  Right.  And I learned last week a

16  federal court judge -- didn't know you could do that, but I

17  learned last week from a federal court judge that he had filed

18  bankruptcy.  And I definitely should not have said that -- I

19  wouldn't have made that argument to him.

20        THE COURT:  Okay then.

21        MS. VARNELL:  It's tough, I know.  And that's why I'm

22  offering Your Honor whatever I can possibly do today to --

23  because I -- the law needs to be clarified.  And I know you may

24  not want to stick your toe into that water.

25        THE COURT:  Well, I don't have a choice.

1          MS. VARNELL:  So...

2          THE COURT:  I think I'm in it.  I think I'm in it up

3    to my neck with these two cases.  It's just a question of what

4    we do with it.

5          All right.  But going back to -- because I -- it is

6    relevant to my analysis.  The -- the claims in both Prindle and

7    Carman are premised on the idea that the communications are not

8    permitted under the discharge, that they violate the discharge;

9    right?

10         MS. VARNELL:  No.  The communications are -- violate

11   the FDCPA.  That's our position.

12         THE COURT:  Okay.  But they violate the FDCPA

13   because?

14         MS. VARNELL:  They mischaracterize the nature of the

15   debt and the legal status of the debt.

16         THE COURT:  Because it was discharged?

17         MS. VARNELL:  Yes.

18         THE COURT:  And so if the communications -- your

19   perspective, or on behalf of Ms. Prindle and --

20         MS. VARNELL:  Ms. Carman.

21         THE COURT:  I couldn't remember if it was a he or

22   she.  Is it Ms. Carman?  I couldn't remember, first name.

23         If -- if the communication is one that is permitted

24   by the Bankruptcy Code, that is, if it is -- if it falls within

25   524(j), could it simultaneously violate the FDCPA, because

Cindy Packevicz, RPR, FCRR          904.301.6843

1    using the least-sophisticated consumer test, it --

2         MS. VARNELL:  Is misleading or mischaracterizes?  My

3    answer to that question is yes.  And here's how we know that

4    that's true.  Because, as I started to argue when I first came

5    up here, it doesn't give them a license to do whatever they

6    want.

7         So we know that even though -- even if assuming that

8    he's right, and that Ms. Prindle was qualified to get mortgage

9    statements, and that they had a right to send those to her --

10   and that's just talking about the statements, not the rest of

11   the communications.  Even if they were allowed to do that,

12   would they be allowed to put whatever they wanted to on there,

13   like:  And if you don't, we'll be sending three large men to

14   your house after 11:00 p.m. to come beat you up?

15        You know, reductio ad absurdum, they can't put

16   whatever they want just because they're allowed to send a

17   communication.

18        There has to be another layer that goes on top of

19   what 524(j) may or may not allow that is provided by the

20   Consumer Protection Statute, the debt against unlawful debt

21   collection.

22        And that's what these statutes do, they say whatever

23   activity you're doing, you cannot do these things when you

24   attempt to collect a debt, and that includes don't

25   mischaracterize what you're doing.

1        I submit to you that this is going to be a situation

2   where you're going to want to hear evidence about -- that goes

3   to this issue of whether or not they -- what the point of them

4   sending those statements were.

5        And I will proffer to you an example, even without

6   talking about specific evidence.  If you were to find out as

7   this case went forward that the policy of the company changed,

8   for instance --

9        THE COURT:  Okay.  This is the one thing you already

10  tried to talk to me about once and I said no.

11       MS. VARNELL:  I'm proffering a hypothetical.

12       THE COURT:  No, we're not doing that.

13       MS. VARNELL:  Okay.

14       THE COURT:  We're talking about the allegations that

15  are pled in the complaint.

16       MS. VARNELL:  Okay.

17       THE COURT:  I mean, I read the class cert, okay,

18  so -- but I -- in resolving this issue, I have to resolve it

19  based on the pleadings, and so I'm keeping things separate.

20       MS. VARNELL:  Okay.

21       THE COURT:  All right.  Let me talk to -- let me talk

22  to the defendants for a minute.  And don't get excited, because

23  I have not decided that it's precluded.  I mean, for them.

24  What I've decided is that I'm schizophrenic.

25       MR. SILVERMAN:  Well, I'm certainly not here to talk

1   you out of a -- so...

2        THE COURT:  Well, I mean, I'll go back to where I

3   started with Ms. Varnell after the break.

4        It does make sense to me -- I mean, why isn't she

5   right that, yeah, you're allowed to send me certain statements,

6   but when you go beyond just what's permitted in these

7   statements, or even when you're just doing what's permitted in

8   these statements but you do it in a way that is misleading or

9   that's egregious that would otherwise create a cause of action,

10  why are you protected?

11       And I'm not saying you have done that, I'm -- we're

12  much more global right now.

13       MR. SILVERMAN:  Understood.  But let's start with if

14  I am allowed to do something under the Bankruptcy Code, then

15  any other law that would make me waive that right would be in

16  conflict, whether or not it's deceptive.

17       And, again, I -- we talked a little bit about the

18  preemption and preclusion, can I do both of these things at the

19  same time, which is the *Randolph* discussion, and in a case from

20  this -- Judge Davis, from earlier this year.

21       THE COURT:  The *Qualcom* case?

22       MR. SILVERMAN:  *Townsend versus Quantum3*.

23       THE COURT:  Yes, that's it.

24       MR. SILVERMAN:  Where he says that he distinguishes

25  *Randolph* because he said that's not really the appropriate

1    test.  It's do I have to surrender rights under the Bankruptcy

2    Code in order to comply?

3            So if the Bankruptcy Code said I can send you

4    something that may be deceptive under another law, the answer

5    is that they're in conflict.

6            Because if I'm allowed to do it, I'm entitled to do

7    it.  You can't make me waive it.  So that's one way of looking

8    at it.

9            Now, if I exceed my rights, what I'm allowed to do

10   under the Bankruptcy Code, and that walks into their other

11   claim, I've done something else, then we get to the question of

12   where's -- where does the private right of action live between

13   those two items where you've got the Bankruptcy Code that says

14   you don't have a private right of action and the FDCPA which

15   would give you that action.

16           I don't have -- and, again, thankfully, I don't

17   believe that we're in that context.  As an academic exercise

18   what happens in that situation, I believe that the

19   bankruptcy -- the express provision of the Bankruptcy Code

20   would overrule -- would govern over a less specific context,

21   where don't do anything unfair or deceptive, which is a

22   generalized statement, as opposed to the Bankruptcy Code, which

23   says:  You can send these things out.  And we've got TILA which

24   says:  This is what it has to look like.

25           The specific overcomes -- between the two, under the

1 normal rule of statutory construction, the specific way over

2 the -- over the -- so that I think, from our perspective again,

3 given the *Townsend* description of what the correct

4 preemption --

5        THE COURT:  But you're -- what is it -- what is it

6 that you would have to be giving up?

7        MR. SILVERMAN:  I get -- under 524(j), I get to take

8 such acts to seek or obtain periodic payments associated with

9 the valid security interests in pursuit -- in lieu of pursuit

10 of in rem relief.

11        I get to seek to get you to pay money so that I don't

12 foreclose on your house.

13        I can't lie about it.  And I didn't lie about it.

14 That's not an allegation.  The allegation here is that I am

15 asking them for money that I'm not entitled to ask for.

16        And my point is under the Bankruptcy Code, it

17 specifically says I am allowed to seek or obtain periodic

18 payments associated with the valid security interests in lieu

19 of pursuit of in rem relief.

20        If you don't want me to foreclose, you need to send

21 me a check.

22        THE COURT:  And Ms. Varnell's argument that that's

23 only limited to -- a debt only applies to certain debtors who

24 have been making payments?

25        MR. SILVERMAN:  I'm not -- again, that wasn't raised.

```
1    I've not seen that before.  I've been surprised before.

2              THE COURT:  I think you know the bank pretty well.

3              MR. SILVERMAN:  I'll take the news to mean defense.

4    But, again, if there's something there, then we'll address it.

5    I'm not aware of that being a limitation under the express

6    language of the statute, doesn't read like that to me, but

7    there -- there may be something.  I'm not aware of anything

8    that would operate as a limitation of that general entitlement

9    under 524(j).

10             THE COURT:  Hold on a second.

11             Every time I read paragraph 11 of the complaint, I

12   laugh at the -- it's unclear who owns the mortgage, because I

13   had a mortgage fraud case where the prosecutors tried to trace

14   down who ultimately owned the mortgages, to try and figure out

15   who got restitution and how much it was, and it was an

16   impossibility.

17             But hold on a minute.  That's not what I was looking

18   at -- that's not what I was looking for.  It just reminded me

19   of that.

20             MR. SILVERMAN:  And, again, in terms of creditor, I

21   think the Virginia case that I -- the Ocwen case I talked about

22   this morning, actually goes in their context of the preemption.

23   They talk about the fact that a servicer is a creditor --

24             THE COURT:  Yeah.

25             MR. SILVERMAN:  -- for the purpose of this.  And that
```

1   kind of answers it, so I'll defer to -- that's a pretty simple

2   explanation of why the servicer is the creditor for the

3   purposes --

4           THE COURT:  Yeah, I don't have a problem with that.

5   I was -- I was -- a side comment.

6           I was trying to find a particular allegation.  Let me

7   just see if I can find it.

8           Okay.  Let me give Mr. Bustard an opportunity to

9   speak as well, since you -- we're back on preclusion and you

10  did argue that as well.

11          MR. BUSTARD:  Thank you, Your Honor.

12          I wanted to address a couple points made by opposing

13  counsel with regard to that particular issue.

14          One, I've heard argument that 524(j) only pertains to

15  borrowers that are previously making payments.  There's no such

16  limitation in the language of the statute.

17          I'm arguing this in the Eleventh Circuit right now,

18  as far as the statutory construction.  There's nothing here

19  that suggests that.  That's a limitation -- if the language is

20  unambiguous, then therefore you only look to the statutory

21  language.  I don't know what expert you can come up with that's

22  going to interpret this unambiguous language any different.

23          THE COURT:  You said you've got the issue before the

24  Eleventh Circuit right now?

25          MR. BUSTARD:  An issue of statutory construction,

```
 1    Your Honor.  So I'm familiar with the standard -- you know,

 2    when the language of the statute --

 3              THE COURT:  Oh, okay.

 4              MR. BUSTARD:  You don't look at the intent of

 5    Congress.  You don't look at anything.

 6              And that's what I'm suggesting here is simply it just

 7    says, you know, the injunction -- A2 refers to the injunction

 8    against collection activity, and it says that it does not

 9    operate as an injunction against sending monthly billing

10    statements if it's seeking to obtain or obtaining periodic

11    payments with a valid security interest.  It doesn't say except

12    for, you know, people that haven't been making payments before

13    bankruptcy.  So there's no such limitation in the language.  So

14    it does apply to the two plaintiffs at issue here.

15              Secondly, there is a distinction and a conflict

16    between the two statutes.  I think you posed the question to

17    opposing counsel as far as, you know, can you comply with the

18    Bankruptcy Code and still violate the Fair Debt Collection

19    Practices Act, and she said yes.

20              Well, that's an irreconcilable conflict.

21              How do you comply with one and violate the other?

22    That's a conflict between the two.

23              Here, we're allowed -- it says:  A creditor is

24    allowed to send monthly billing statements actually if it's in

25    the ordinary course of business between the creditor and the
```

1    debtor.

2         Well, monthly billing statements are an ordinary act

3    in the course of business between those.  Before bankruptcy --

4    and here it's suggesting even after bankruptcy you're allowed

5    to do that if you have a valid security interest.

6         But by sending this statement, it's permitted.

7         The least-sophisticated consumer -- and this is

8    another case I just had, the one I just had trial on.  The

9    judge held that even a true statement can be misleading to the

10   least-sophisticated consumer.

11        Here, what plaintiff's are arguing essentially is,

12   that, like, sending me a monthly billing statement, I or the

13   least-sophisticated consumer, may be misled by a monthly

14   billing statement being sent to them suggesting that they're

15   now personally liable for that debt.  Well, that's not a

16   standard of 524 anywhere.  524(j) doesn't say that you have to

17   make sure it's a least-sophisticated consumer.  It's adding an

18   element of liability for conduct that complies with 524.

19        So you have not violated Bankruptcy Code.  But a

20   plaintiff could come in here and say:  The least-sophisticated

21   consumer will be misled by receiving a monthly billing

22   statement, and therefore there's strict liability.  And that is

23   a conflict in complying with both statutes, that they've now

24   raised.

25        They've essentially said:  Sending me this in the

1    context of the whole thing, I or a least-sophisticated consumer

2    may be misled into believing that even though this is a

3    truthful statement that I have to make these payments, that now

4    I interpret it as:  Well, I'm personally liable for it.

5            And it complies with the Bankruptcy Code, violates

6    the Fair Debt Collection Practices Act under that standard.

7    The truth can still be misleading.

8            I think the case in point there was a statement was

9    made by an attorney in the motion, and it was a truthful

10   statement, but the court found that it could be misleading.

11           In my case, my client told the Bar that they owed --

12   they were in default for not having made a payment since June,

13   I think, of 2010.

14           And while that was true, the confusing part of it was

15   for the least-sophisticated consumer, the Bar had made

16   payments, but they were partial payments after June of 2010,

17   and the plaintiff contended that that was confusing to him.

18   That he thought:  Well, I made payments after June 2010, how

19   could I be due for my June 2010 payment?

20           We were talking about full periodic payments,

21   including escrow.  And he was thinking:  Well, I made my

22   principal payments of principal and interest, and therefore a

23   truthful statement the court found was misleading to the

24   least-sophisticated consumer.

25           Monthly billing statements, nothing misleading.  We

1    are allowed to do it under Bankruptcy Code, perhaps a violation

2    of Fair Debt Collection Practices Act, and that's why it should

3    be precluded in this particular claim.

4             And another thing I wanted to add, Your Honor,

5    Counsel keeps talking about, you know, there might be things in

6    these statements where they threaten to send three people to

7    the house to collect, that's not alleged in here and it's not

8    facts that are alleged.  There's nothing to suggest that the

9    monthly billing statements, those kind of statements were made.

10            So the hypothetical she raises is not really

11   appropriate to the facts of this particular case.

12            THE COURT:  All right.  Let me --

13            MS. VARNELL:  I have one thing to alert the Court.

14            THE COURT:  Yes, go ahead.  You settled?

15            MS. VARNELL:  I was trying to remember what are -- we

16   have another attorney on this case, you may have seen his name,

17   Scott Borison.  But the reason why I raise that is I was like:

18   Why do I believe that's the law about that they have to be

19   current?  And my memory -- I've sent someone out to try to get

20   the law on it, but it relates to Subsection 2 of 524(j), where

21   it requires that such act is, quote, in the ordinary course of

22   business between the creditor and the debtor.

23            And my memory is that I learned from our co-counsel

24   that we brought in because he's a bankruptcy expert.  He was

25   like, he said you can't -- it's been interpreted to mean you

1   can't be -- it's not in the ordinary course of business if you

2   have had a debtor that has not paid for a year, to be sending

3   them periodic statements.  And that's my belief.  I just wanted

4   to proffer to you why it might be that the -- it doesn't appear

5   at first glance to be in the statutory language.  But I think

6   that's the provision that requires that.

7          THE COURT:  Okay.

8          MR. BUSTARD:  Your Honor, if I may respond to just

9   that point.

10          THE COURT:  Sure.  Why not.

11          MR. BUSTARD:  I represent clients all the time in

12   residential foreclosure actions, and they continued to send

13   monthly billing statements even when the person hasn't paid.

14          I don't know where she gets the idea -- opposing

15   counsel gets the idea that this isn't in the ordinary course of

16   business.  And, again, it's not in that statute, that

17   exception, that she's trying to --

18          THE COURT:  Well, I mean, it isn't if that's the way

19   the ordinary course of business has been interpreted.  I don't

20   know.

21          MR. BUSTARD:  Well, I can just assure you, it seems

22   like all my clients in the ordinary course of business continue

23   to send monthly billing statements, and it grows and grows and

24   grows, because they're not making past-due payments, but

25   they're certainly going out.

1          THE COURT:  Okay.  Let me figure out where I was.

2          We were talking about the 12(b)(6) arguments.  We

3    were talking about what it is about the loan modification

4    package that is misleading, given that it says that she's

5    received a discharge, and I'm just -- let me look back at the

6    allegations of the complaint.

7          Why is the statement:  Be certain to make any

8    remaining trial period payments on or before the date so due,

9    why is that misleading?

10          MS. VARNELL:  I don't believe that that statement

11    taken alone is misleading.  However, that is underlined and, I

12    think, emphasized for the Court to understand that this really

13    is seeking payment of the debt.

14          But in terms of what is misleading and might violate

15    that subsection of the FDCPA, I think that, again, I refer the

16    Court to the context that we have here, where there is no, you

17    know, the note has been extinguished, their personal liability

18    on it has been extinguished, and yet they list under the

19    agreement the lender as Carrington Mortgage Services, and they

20    reference a mortgage and a note that were completely discharged

21    in the bankruptcy.

22          And I think that it is confusing at a minimum to the

23    least-sophisticated consumer to understand that they don't --

24    making some sort of payment, which is -- under Mr. Silverman's

25    argument, is just a periodic payment in lieu of them

1    foreclosing on the home is not what's taking place there.

2         They are seeking payment on the debt, and they are

3    trying to get her to sign -- do more than just pay on the debt.

4    Pay money now and give us all your financial information so

5    that we can get you on to a new loan and get you under a new

6    document to get out from under a note that's already been

7    discharged.  I think that's very confusing to the consumer.

8         THE COURT:  Would this communication, this loan

9    modification communication, be permissible under the Bankruptcy

10   Code?

11        MS. VARNELL:  I'm not a bankruptcy expert, so I don't

12   know.  But I sure as heck don't think so, because -- I mean,

13   the note's been extinguished and I think that the -- actually,

14   there was an order that came out from the Bankruptcy Court

15   about six months ago where they said we have had such rampant

16   problems with the reaffirmation situation, where there aren't

17   reaffirmations that are in place, and they were highlighting

18   this issue of getting people to pay debts that were not

19   reaffirmed in bankruptcy that they came up with specific rules

20   just this past year for how exactly a reaffirmation must occur,

21   and they said if it's not done within two months after the

22   bankruptcy is over, it is not going to happen.

23        So, you know, my best answer is based upon the

24   bankruptcy -- Middle District of Florida bankruptcy's

25   announcement on that issue this past year, which is, what I

1    think be no.

2            Because they would see this as the equivalent of a

3    reaffirmation of an existing loan.

4            How could you sign a modification agreement that

5    completed the complete -- that included all of the debt that

6    was discharged and not have that be a reaffirmation?

7            I don't think this Court has to look at that issue,

8    though.  I mean, it falls back on, you know --

9            THE COURT:  Well, I guess what I'm trying to

10   determine is whether this -- two things, whether the claim is

11   precluded; and, second, if it's not precluded, whether this

12   loan modification package --

13           MS. VARNELL:  Is misleading.

14           THE COURT:  -- is misleading.

15           MS. VARNELL:  Right.

16           THE COURT:  And your argument that it's misleading is

17   based on the fact that it continues to reference the discharged

18   note over which the debtor has no continuing liability.

19           MS. VARNELL:  Well, they -- it's also confusing

20   because it contains the word "offer."  Which, you know, does

21   the consumer -- as in Ms. Prindle's case here, what she says

22   and what this complaint suggests is that they lure them in by

23   making them think:  Hey, we're going to give you a whole new

24   deal.  There's an offer here.

25           And it's not an offer.  It's a way to seek everything

that was discharged in the bankruptcy.  And I think that Ms.--

in fact, Ms. Prindle was flat-out deceived by the offer.

I don't think that they were permitted to even be

making the offer in the first instance.

THE COURT:  Because of the timing of it or --

MS. VARNELL:  Well, it's the -- because they --

because the offer contains all this reference to the exact debt

which has been extinguished against her personally.

And it's:  Hey, you can -- I know I'm not supposed to

be going after you personally for this debt, but what you

should do is you should not only pay all of that debt, but you

should pay all these other charges that have accumulated.  And

we're going to enter -- we're going to offer you a heck of a

deal.  We're going to give you a whole new mortgage and note

that you can sign onto.

Under the circumstances of this case, it was nothing

more than a way to get her to either pay cash toward the debt

or -- to collect on a debt, or to collect on the debt by means

of getting her to sign other instruments --

THE COURT:  In order to --

MS. VARNELL:  -- of debt.

THE COURT:  In order to stay in the home?

MS. VARNELL:  Right.  And, you know, it's

interesting, if you look at the complaint, it explains that she

was making trial period payments.  She had no idea what the

1   ultimate offer was going to be.

2            THE COURT:  Where does it say that in the complaint?

3            MS. VARNELL:  Well, for instance, just look right

4   there at Exhibit D, the letter says:  Hey, continue to make

5   your trial period payment, and then within the -- that's in

6   subparagraph 57, subsection C, where we talk about Exhibit D,

7   and then --

8            THE COURT:  Hold on.  Let me find that.

9            Yeah, that's -- okay.  That's the same allegation

10  that's repeated throughout.

11           It says tell her -- be certain to make any remaining

12  trial period payments.  You're saying that the complaint

13  alleges she was making trial period payments.  I don't recall

14  that.  Because I thought that was one of the things you were

15  saying was maybe misleading.

16           MS. VARNELL:  Well, it's misleading in that it talks

17  about an offer.  I think that's confusing.  It did, in fact,

18  confuse Mrs. Prindle into believing that she was going to get a

19  new offer, a modification.  And they did that to string her

20  along so that she would pay money on a debt that she did not

21  owe.  And that's exactly what occurred.

22           THE COURT:  Okay.  I'm looking at the -- looking at

23  the actual communication.

24           Point to me the language that you're -- you're

25  referring to.

1      MS. VARNELL:  I don't have that in front of me, Your

2  Honor.  I don't even have it in my very thick book of -- I can

3  pull it up.

4      I don't have it, Your Honor, in front of me.  I'd

5  have to...

6      THE COURT:  I can't give you my copy because I got to

7  look at my copy.

8      MS. VARNELL:  Right.  Are you saying it's not evident

9  from there where it says continue to make your trial --

10     THE COURT:  No.  It does say that, but --

11     MS. VARNELL:  The reason I said --

12     THE COURT:  If she is making trial period payments,

13  what is confusing or misleading or improper about saying

14  continue to make those?

15     MS. VARNELL:  No.  That is referenced because I am

16  explaining that they want her to pay money.  That's the point

17  of that communication is pay us more money.

18     But -- but to send a loan modification package and

19  attempt to collect money under the guise that you're going to

20  give them that there's an offer here without all the -- oh,

21  here we go.

22     That -- oh, if you look at it in context, to begin

23  with, it starts off with:  Congratulations, as though she's won

24  the freaking lottery, and they're going to give her -- she's

25  eligible; she's been determined; she's going to get a whole new

1    loan.  Awesome.  Keep paying money.

2            Step one.  You need to sign this agreement.  Two, you

3    need to continue to make trial period payments on time.

4    There's nothing, though, that entitles them to be getting money

5    on that loan.  And I think it's misleading to consumers to be

6    told that they're going to be eligible for some great new deal

7    in order to lure money out of them.

8            You're going to be able to -- you know, you're going

9    to be able to stay in your house -- and she's under the

10   impression that she's had her personal debt discharged under

11   the bankruptcy.  So whatever deal she's going to work out is

12   going to be hopefully reflective of an appropriate business

13   transaction, for instance.

14           I mean, at the end of the day, she gets to the stage

15   of the modification, and the only reason she didn't sign the

16   doggone deal was it was for like $300,000, which is three times

17   what the property is worth.

18           So that's -- we know it's -- we know the point of

19   sending any document whatsoever was to seek payment.  And I

20   submit to the Court that these very unsophisticated consumers,

21   in their very vulnerable position, are very misled by these

22   wonderful opportunities that they can get a new modified

23   mortgage.  And it wasn't a modification at all in the end.

24           That's why I think that we have to look at all of the

25   facts, and it shouldn't be decided on the motion to dismiss, in

1    order for this Court to judge what the true animating purpose.

2              And if we can look at this at summary judgment the

3    same way Judge Corrigan did, I think that the evidence will

4    reveal that that was the point of every single communication

5    that they were sending to her.

6              And we'll be able to prove that if given the chance.

7    And I think the complaint, you know, states enough.

8              But if this Court is saying that each independent

9    piece of paper on its own, without looking at all of the

10   circumstances, has to on all -- within the four corners of

11   every communication sent, be misleading no matter what, then I

12   don't think we can meet that standard.  But that's not the law.

13             THE COURT:  All right.  Let me -- let me hear from

14   Mr. Silverman with regard to -- why do you -- why are you

15   allowed to send these modification agreements?

16             MR. SILVERMAN:  Am I allowed to seek or obtain

17   periodic payments associated with the valid security interest

18   in lieu of in rem?

19             I can -- you want to stay in the house -- again,

20   we've made it -- the document says you're not going to have

21   personal liability for this.  You want to stay in the house,

22   you want to modify the terms so that we don't foreclose on you,

23   here it is.  That's what this document says.

24             There's nothing in it that is misleading.  To the

25   extent that counsel talks about it being an improper

1    reaffirmation, that's a classic 524.  You know, if you want to

2    talk about when you'll see a contempt motion in bankruptcy,

3    that's it.  But for the purposes of what we're allowed to do --

4            THE COURT:  You're going to have to explain what you

5    just said.

6            MR. SILVERMAN:  Okay.  If I go and seek a

7    reaffirmation -- Sears got busted for this, which is that

8    you -- people go through bankruptcy and their debt is

9    discharged.  And then they go out and send a letter -- you

10   know, a notice or an agreement, you know, you can ratify and

11   reaffirm a debt for no consideration, and that's what they were

12   seeking.

13           THE COURT:  How is that different than this?

14           MR. SILVERMAN:  Here, she has no liability for this.

15   If she signed it and then breached it, what happens?  We can't

16   sue her for that money.  It just means that she's lost her --

17   her defense to our in rem.

18           This is the in rem -- this is a modification to keep

19   us from foreclosing.  This is not a reratification.  That's

20   what section 1H says, that lender agrees I will not have

21   personal liability on the debt pursuant to this agreement.

22           If you want to stay in the house, which we as a

23   lender are obligated to do under the HAMP program -- I don't

24   know if the Court has any of the HAMP cases about which there

25   is no private right of action, but we are obligated to do this.

1    And in this case, we actually carved out that you're

2  not personally liable, we know that, but if you want to stay,

3  you need to make some payments and then you can -- and this

4  will be a new form.

5    We're doing what we're allowed to do under 524.

6  We're doing what we're required to do under HAMP.  And they

7  haven't pointed to anything in here that is directly deceptive,

8  anything that violates -- again, if you're talking about

9  violating the spirit of your discharge, that's a question for a

10  Bankruptcy Court.  But there's nothing in here that would be a

11  direct violation of FDCPA.

12    And to the extent that it is, it's only -- their

13  argument is that you're attempting to have us reaffirm

14  something that that's a question of what was discharged, and

15  you're attempting to undo the discharge, and that's why we say

16  that there's preemption preclusion.

17    THE COURT:  All right.  I think that takes us to the

18  declaratory judgment count.

19    Have I missed anything?

20    MR. SILVERMAN:  I don't think there's substantial

21  disagreement on this, which is that there is no declaratory

22  judgment count under the FDCPA.  There is standing under the

23  Florida Statute that's an available remedy is equitable relief.

24  So we would get to the -- if it's preempted, it's preempted; if

25  it's not, it's not.

1          That could -- if Your Honor were to find -- and,

2     again, this -- if Your Honor were to find that the claims for

3     damages were preempted and precluded, and all that was left is

4     that declaratory judgment count that's below the jurisdiction

5     of this court, and under the Eleventh Circuit it's *Ameritox*

6     case from last week in which they're starting to tell the

7     district courts not to keep supplemental jurisdiction when --

8     of unclear state court issues when there's no federal claim

9     left.

10          THE COURT:  They've been telling us that forever.

11          MR. SILVERMAN:  So, like I said, to recap, which is

12    that the state court declaratory judgment claim, there's

13    standing for that, but that's just governed under the other

14    issue.

15          THE COURT:  I guess, Ms. Varnell, what's -- so are

16    you in agreement that if I find there's no -- that if I find

17    there's only an FDCPA claim and no FCCPA before me, then the

18    declaratory judgment claim goes away?

19          MS. VARNELL:  Yes, Your Honor.

20          THE COURT:  All right.

21          MR. BUSTARD:  Your Honor?

22          THE COURT:  Yes, sir.

23          MR. BUSTARD:  I just want to raise one point also in

24    addition under the declaratory judgment.

25          THE COURT:  Sure.

1        MR. BUSTARD:  We cite in our papers the concept

2   that -- and this comes from *Alderwoods* Eleventh Circuit case.

3   And I'll quote here, page 968.

4        The party seeking to enforce an injunction cannot,

5   however, obtain a successive injunction, i.e., an injunction

6   ordering compliance with an existing injunction.

7        The declaratory judgment that they're seeking is to

8   basically enforce the discharge injunction issued by the

9   Bankruptcy Court.  It's a redundancy.

10       The Eleventh Circuit has held that, you know, there's

11  no purpose to that.  What they're asking to do is basically

12  look at the bankruptcy discharge injunction and reaffirm that.

13  And there's no basis to do that under the *Alderwoods* case, I

14  think they cite there *Barrientos versus Wells Fargo*, again,

15  that's a Ninth Circuit 633 F.3d. 1186, where they also held

16  that there's no purpose to an injunction to enforce an

17  injunction.  You just travel under the initial injunction, and

18  the exhibit at least to the Carman complaint says that this

19  discharge, this is the ordinance that attached to their

20  complaint, this discharge prohibits any attempt to collect from

21  the debtors a debt that has been discharged.

22       For example, a creditor is not permitted to contact a

23  debtor by mail, phone, or otherwise to file or continue a

24  lawsuit, to attach wages or other property, if they're taking

25  an action to collect a discharged debt from the debtors.  A

1    creditor who violates this order can be required to pay damages

2    and attorney's fees to the debtor.  However, creditor may have

3    the right to enforce a valid lien, such as a mortgage or

4    security interest, against the debtor's property after a

5    bankruptcy --

6              THE COURT:  Slow down.  Slow down.

7              MR. BUSTARD:  -- if that lien was not voided or

8    eliminated in the bankruptcy case.

9              So it's there.  And they're just seeking to get you

10   to issue the same type of order, and I think under *Alderwoods*

11   it should be dismissed for that grounds.

12             THE COURT:  Okay.  Mr. Silverman, you -- you argue

13   that under the FDCPA claim, it should be dismissed under

14   12(b)(6) because plaintiff fails to plead knowledge.  But in

15   the complaint -- there are two fairly conclusory allegations of

16   knowledge, which in and of themselves would not probably be

17   enough.  But in paragraph -- well, in the Exhibit D paragraph

18   that appears in each count, it says that the agreement lists

19   the lender as the defendant and references the mortgage and

20   note that were discharged in bankruptcy.

21             And then when you look at Exhibit D, it says that she

22   had been discharged.  So doesn't that satisfy the knowledge

23   component, at least for purposes of the allegation?

24             MR. SILVERMAN:  For the purposes of this motion to

25   dismiss -- and, again, that would have been a without-prejudice

1    argument anyway, so we're not -- we're not pursuing that.

2              THE COURT:   Okay.   I just had failed to address it.

3              All right.   Let me think for a minute what I want to

4    do here.

5              Ms. Varnell, I was looking back at the *Hernandez*

6    decision.   And in that case, Judge Corrigan declined to find

7    the claim there preempted by the FDCPA and the FCCPA.   And it

8    was the pursuing deficiency action.   And in doing that, he was

9    distinguishing the *Williams* case, where the Bankruptcy Court

10   found the FCCPA claims to be precluded.   And he -- he

11   distinguished it, pointing out that the Williams case dealt

12   with the filing of a proof of claim, and that is a right within

13   the Bankruptcy Code.   And -- and he went on to say:   To allow a

14   debtor to file an FDCPA or FCCPA claim against a creditor who

15   exercises its right to file a valid proof of claim would chill

16   creditor's rights in the bankruptcy process, as well as

17   undermine the mechanisms that are set forth by the Bankruptcy

18   Code to deal with those issues.

19             And so my question to you is if you substitute --

20   instead of file a proof of claim, you substitute in the words

21   from the 524(j) exception -- and I've got to pull it back up,

22   but -- so if the statement was to allow a debtor to file an

23   FDCPA or FCCPA claim against a creditor who seeks periodic

24   payments associated with a valid security interest in lieu of

25   pursuit of in rem relief to enforce the lien, would chill

1    creditor's rights in the bankruptcy process as well as

2    undermine the very mechanisms that are set forth by the

3    Bankruptcy Code to deal with these issues.  Why wouldn't that

4    be right?

5          MS. VARNELL:  I don't believe that these

6    communications are simply to seek a periodic payment in lieu,

7    for one.  Let's take the last exhibit that we looked at.

8    They're seeking the -- her signature on an all-new modification

9    agreement.  It's not a periodic payment.

10         THE COURT:  But she's not -- she's not going to be --

11   she's not -- she's agreeing to make periodic payments.  She's

12   not actually undertaking the debt once again.

13         MS. VARNELL:  She agreed to make trial plan payments

14   in order to get a new offer.  They were trying to show -- she

15   had to show -- demonstrate to them that she could make a

16   certain amount under the guise that we're going to give you a

17   new offer that might be in this same range where you would make

18   these same kind of payments.  That's not the same as seeking a

19   periodic payment in order to -- as part of the ordinary course

20   of business.

21         You know, I know these are -- I don't have a simple

22   answer, and I'm not going to try to pretend to this Court that

23   I know whether or not it's going to chill some sort of activity

24   that they're allowed to do under the Bankruptcy Code.

25         And I've definitely learned a lesson that I will not

1  come up to a hearing in front of you without my bankruptcy

2  guide next time.  But as for today, the best that I can offer

3  is that many of your very well-respected thoughtful colleagues

4  have looked at this, and they've seen a problem, and they have

5  sided with -- they have come down on the side that the FDCPA

6  and the FCCPA are additional protections, and that they're

7  important, perhaps most important, to debtors in these

8  circumstances.

9          And that these creditors are very sophisticated and

10  that the creditor's activities exhibited both in this case and

11  the cases that you've been looking at, both in bankruptcy like

12  in *Crawford* and in these other cases show them abusing the

13  system, not being chilled by the system.

14          THE COURT:  And don't get me wrong, I'm not -- as I

15  said, I don't -- I would be hard-pressed to -- even if I find

16  that the particular claim in this case is precluded, I would be

17  hard-pressed to follow the decision that all FDCPA claims are

18  precluded.

19          What I'm looking at is the specific factual

20  circumstances of this case with regard to the question of

21  whether when it comes to these communications from the

22  servicer, some communications of which they are permitted to

23  make, whether that specific claim is preempted by the FDCPA.

24          So, for example, in some of -- in many of these other

25  claims or these cases that I've looked at from my colleagues,

```
 1    that's not what is at issue.  It's not the -- it's not that
 2    those -- either the periodic statements -- I think there was
 3    one or two that I saw that dealt with that, but it's that
 4    narrow range for this -- and I say that for a similar reason
 5    that, as I told you earlier, that I'm pretty much convinced
 6    that the filing of a -- to the extent there's an FDCPA claim
 7    based on the filing of a proof of claim, that that is
 8    preempted, because the Bankruptcy Codes both permits it and it
 9    provides a structure for dealing with that.  And, indeed, with
10    the filing of a proof of claim, particularly where the debtor
11    lists the creditor, then the creditor has a limited period of
12    time to decide whether or not to file the claim, and so it
13    would almost allow debtors to create an FDCPA claims.  Because
14    you could list the sale intentionally to see if the creditor
15    files a proof of claim.  If they do, you don't object to it,
16    and then you file your FDCPA claim later.
17              That is problematic to me, and that's one of the
18    reasons that I don't think that the two can coexist.
19              MS. VARNELL:  Your Honor, may I ask the Court whether
20    it's of consequence when you think about the timing of it.  You
21    know, the Bankruptcy Code existed prior to the passage of the
22    Fair Debt Collection Practices Act and the FCCPA.  And Congress
23    decided that these were extra protections that needed to be put
24    in place.
25              They are meant to be construed broadly, as broadly as
```

1   possible and as in favor of the debtor as they possibly can be.

2   And I think that that should have bearing on the Court's

3   analysis as to whether there was an intended preclusion or

4   preemption left consideration.

5         THE COURT:  Okay.  I am going to defer ruling on the

6   motion for class certification until I figure out what claims

7   are in the case.  It would be silly for us to talk class

8   cert --

9         MS. VARNELL:  We agree.

10        THE COURT:  In fact, I almost think that what I

11   really ought to do is just deny the motion for class

12   certification without prejudice to renewal based on whatever

13   claims there are later, because the briefing, I think, would

14   need to be substantially different.

15        Would there be any objection to that?

16        MS. VARNELL:  What if you don't dismiss any of my

17   claims?  Then it would be all --

18        THE COURT:  I'm pretty sure the FDCPA is gone.  I

19   really -- I think that is preempted.  But, all right, I'll just

20   defer ruling on it.

21        MS. VARNELL:  Thank you, Your Honor.  I appreciate

22   it.

23        THE COURT:  I'm just trying to think if I need

24   anything else from you-all.  I probably don't, other than a

25   smarter brain in my head.

1          You-all filed a notice of supplemental authority and
2    you pointed me to a portion of a decision about discussing
3    whether or not a loan was in default, and I wondered if there
4    was a reason you were asking me to read that.  Because the
5    allegations of the complaint are that the loan was in default
6    when it was transferred, and the allegations in the complaint
7    are that both defendants are debt collectors.  So why was I
8    being asked to look at that?
9          MR. SILVERMAN:  That was filed on behalf of the
10   motion to dismiss and the class certification motion, and the
11   question of figuring out when somebody is in default is a class
12   cert issue.
13         THE COURT:  Okay.  Okay.  Thank you.
14         Ms. Varnell, in looking -- you referred me a couple
15   times to the *Gooden* case, and I was looking back because I
16   recall that Judge Corrigan in that case found some specific
17   communications not to be violations, and others to be
18   violations.  And I'm looking at page 8.  Well, no, star page
19   7 -- 6.
20         MS. VARNELL:  Star 6 on the Westlaw?
21         THE COURT:  Yes, ma'am.  6 to 7.  I'm under Headnote
22   8.
23         MS. VARNELL:  Okay.
24         THE COURT:  So the actions that -- that Judge
25   Corrigan found to violate the FDCPA were the failure to handle

1    the bankruptcy properly, and then specifically, the sending --

2    okay, on 10 occasions, the statements that contained payment

3    instructions, a payment due date, and an amount due.

4          And that's -- let me look at -- that's -- that's what

5    you would be pointing me to as persuasive with regard to this

6    claim?

7          MS. VARNELL:  Yes, Your Honor.  *Gooden* was offered

8    for both the motion to dismiss, and that would be one of the --

9    I wanted the Court to see, in general, the facts that he

10    permitted claims under the FDCPA.  That's, I think, of note,

11    despite the fact that there's bankruptcy issues involved there.

12    And I think that, you know, if he were presented with the same

13    arguments being advanced by defense here today on a motion to

14    dismiss, it's pretty obvious that they were overruled and not

15    found preempted.

16          So that was another premise.  I mean, I know it's not

17    in the opinion, but it's a summary judgment opinion.

18          THE COURT:  But was preclusion raised in the case?

19          MS. VARNELL:  I do not know.

20          THE COURT:  I can't assume that it was raised.  I

21    mean, I can look back at whether it was raised.  But if it

22    wasn't raised, the fact that it wasn't addressed sua sponte by

23    Judge Corrigan wouldn't tell me anything.

24        (Mr. Silverman and Ms. Varnell confer off the record.)

25          THE COURT:  I have no idea what just happened.

1      MS. VARNELL:  I also felt that the *Gooden* case was

2   instructive to this Court to see how he was able to apply --

3   apply it different to each of the various actions by the

4   defendant in that case.  And I thought -- felt that it would be

5   helpful to this Court to see how that --

6      THE COURT:  Well, that's what I was doing earlier.

7   And that's -- you quarreled with me that I shouldn't be looking

8   at each communication.  And I think I am supposed to be looking

9   at each communication.

10      MS. VARNELL:  Within the context, yeah.  I didn't

11   mean to quarrel.

12      THE COURT:  Okay.

13      MS. VARNELL:  So, for instance, paragraph 12

14   within -- under star 7, I thought it might be interesting for

15   the Court to consider in that it says, you know, he's looking

16   at how do you examine whether a foreclosure complaint is going

17   to violate the act.

18      And it said when it's seeking a deficiency judgment

19   if applicable, it's attempting to collect on a security

20   interest and the note.

21      And so here I would ask the Court to consider that a

22   number of the communications under consideration are not

23   specific to the mortgage and not talking about how to -- just

24   referencing the mortgage, they're also referencing the note.

25      THE COURT:  Okay.  All right.  Anything else that I

1   should hear?

2         MR. SILVERMAN:  No, Your Honor.

3         THE COURT:  Ms. Varnell, anything else?

4         MS. VARNELL:  Thank you, Your Honor.

5         THE COURT:  Mr. Bustard?

6         MR. BUSTARD:  No, Your Honor.

7         THE COURT:  All right.  Then we're in recess.

8         COURT SECURITY OFFICER:  All rise.

9      (Proceedings concluded at 3:22 p.m.)

10

11                        -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cindy Packevicz, RPR, FCRR            904.301.6843

C E R T I F I C A T E

UNITED STATES DISTRICT COURT)

MIDDLE DISTRICT OF FLORIDA  )

I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.

Dated this 223rd day of October 2015.

/s/Cindy L. Packevicz

Cindy L. Packevicz, RPR, FCRR