IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

TWYLA PRINDLE, individually
And on behalf of a class of persons
Similarly situated,
      Plaintiff,

V.                          Case No. 3:13-cv-1349-J-34PDB

CARRINGTON MORTGAGE SERVICES,
LLC,
      Defendant.
_____

**CLASS CERTIFICATION/MOTION HEARING**
BEFORE THE HONORABLE MARCIA MORALES HOWARD
UNITED STATES DISTRICT JUDGE

Jacksonville Division
May 9, 2016
Courtroom 10B

OFFICIAL COURT REPORTER:

    Cindy Packevicz Jarriel, RPR, FCRR
    221 N. Hogan Street, #128
    Jacksonville, FL  32202
    Telephone:  904.301.6843  Fax:  904.301.6847

    (Proceedings reported by stenography; transcript
Produced by computer.)

A P P E A R A N C E S

COUNSEL FOR PLAINTIFF:

**JANET R. VARNELL, Esquire**
**Steven Thomas Simmons, Jr., Esquire**
Varnell & Warwick, PA
P.O. Box 1870
Lady Lake, FL  32158
Email:  jvarnell@varnellandwarwick.com

**MAX H. STORY, Esquire**
Max Story, Esq.
Suite 100
328 2nd Avenue North
Jacksonville Beach, FL  32250
Email:  Max@storylawgroup.com

**SCOTT CRAIG BORISON, Esquire**
Legg Law Firm, LLC
5500 Buckystown Pike
Frederick, MD  21703
Email:  Borison@legglaw.com


COUNSEL FOR DEFENDANT:

**CELIA CHAPMAN FALZONE, Esquire**
Akerman LLP
Suite 3100
50 N Laura Street
Jacksonville, FL  32202
Email:  Celia.falzone@akerman.com

**LAWRENCE D. SILVERMAN, Esquire**
Akerman Senterfitt
1 SE 3rd Avenue, 25th Floor
Miami, FL  33131
Email:  Lawrence.silverman@akerman.com

<u>P R O C E E D I N G S</u>

May 9, 2016                                                    2:09 p.m.

＊　＊　＊　＊　＊

(Court called to order.)

THE COURT:  All right.  This is Case No. 3:13-cv-1349-J-34PDB, *Twyla Prindle versus Carrington Mortgage Services, LLC*.

And there are two motions pending before the Court. There is plaintiff's second renewed motion for class certification and incorporated memorandum of law, which is Document No. 107.

And Carrington responded to that in Document No. 110. And plaintiff filed a reply at Document No. 115.

We also have Carrington's motion for summary final judgment Document No. 112, and plaintiff's opposition to that, which is Document No. 121.

Counsel, beginning with plaintiff, if you would please make your appearances for the record.

MS. VARNELL:  Janet Varnell for the plaintiff.

MR. BORISON:  Scott Borison on behalf of the plaintiff.

MR. SIMMONS:  Steve Simmons for the plaintiff.

MR. STORY:  Max Story for the plaintiff.

THE COURT:  All right.

MR. SILVERMAN:  Lawrence Silverman and Celia Falzone

1   for the defendant.

2              THE COURT:  All right.  They outnumbered you today,

3   Mr. Silverman.

4              I'm trying to decide where best to start.

5              Maybe we should start where I think we sort of left

6   off at the last substantive hearing.

7              Mr. Kelly, may I see those charts.

8              With regard to the motion for class certification, I

9   expressed the concern at the conclusion of one of our two last

10  hearings -- I can't recall if it was the first or the second --

11  that this chart was relatively incomprehensible.

12             And I was a little surprised when the motion for

13  class certification was filed that you're still relying on this

14  chart, because I'm not sure I can really determine anything

15  about numerosity from this chart.

16             I'm struggling with determining whether the debt was

17  in default at the time it was -- it was required.  I'm

18  struggling with determining whether the communications were

19  sent and what communications were sent.

20             Well, there's more, but -- and the burden of

21  establishing the requirements for class certification falls

22  first on the plaintiff.

23             And so I guess I'm -- and these issues were brought

24  up in the briefing last time.  And so -- yet there was no --

25  doesn't seem to have been any effort to address or correct

1    those things.

2          And so Ms. Varnell -- or I don't know who it is on

3    your side of the room that wants to address that, but let's

4    start with that because that's a pretty significant issue, to

5    my mind.

6          MS. VARNELL:  We also struggled with the readability

7    of the evidence that was proffered in response to our discovery

8    request, but went through the deposition and asked questions to

9    make it comprehensible for both the plaintiff and the Court

10   what information was actually contained within the chart.

11          And there are two important points that would address

12   the issues raised by the Court with regard to the chart.  I

13   think the first is that I don't believe that the defendant is

14   going to contest numerosity in terms of the number of

15   communications that were sent during this applicable statute of

16   limitations to postdischarged bankrupt debtors, and I don't

17   believe that their brief specifically does contest that there

18   are more than sufficient number of people, even -- even

19   accepting the fact that this Court dismissed our FCCPA claim

20   that would reduce the statute of limitations.

21          So I think that is most important line in the sand

22   for the Court in terms of numerosity.

23          As to the issue of default, as the plaintiff

24   presented, there is, on the defendant's chart, each one of

25   those lines that was entered there, Your Honor, are unique loan

1    numbers, unique borrowers that Carrington was servicing.  There

2    is a Date Warehouse Added column, which the deposition

3    testimony clearly said that is the date that they got it.  And

4    when you compare that Date Warehouse Added with the date of the

5    bankruptcy discharge, that, I believe, is sufficient to render

6    a determination that there are -- there are definitely more

7    than 40 people that are going to fall within that time frame.

8         And in addition to that default argument, the Court

9    may recall that in our briefing, we presented the language that

10    appears in every standard Fannie Mae/Freddie Mac --

11         THE COURT:  I don't know that -- you didn't present

12    any -- you argued that that language appears in every standard

13    Fannie Mae loan, but you didn't present any evidence of that,

14    actual evidence that that specific language is in every Fannie

15    Mae loan.

16         MS. VARNELL:  You're right, Your Honor, I presented

17    a...

18         THE COURT:  Whoa.  There's really no such thing as a

19    standard Fannie Mae loan.  Every bank or mortgage company can

20    create their own note and mortgage.  There are required I think

21    it has certain -- certain terms in them, but I'm not sure that

22    you presented any evidence that that exact language applies.

23    And further that that language leaves it to the discretion of

24    the holder of the loan to determine whether in fact they

25    consider that to be a default.

1    It's not that filing bankruptcy automatically is a

2    default, or at least -- maybe it is, but where's the evidence

3    of that?

4    MS. VARNELL:  Your Honor, the plaintiff did present

5    an exemplar Fannie Mae mortgage which contained the language,

6    and I don't believe the defendant argued or contested -- and I

7    don't believe they're going to contest it when they're standing

8    here today, that every one of the mortgages that they serviced

9    are going to contain -- that is one of the most standard

10   provision that appears in mortgages that show up on the

11   secondary market.

12   They want to make certain -- the lenders need to make

13   certain that they can declare an event of default whenever

14   there's a potential for -- whenever there's a potential for

15   their rights to go after the security interest might be

16   impaired or to recover the loan.

17   Similarly, on -- in response to your queries on the

18   issue of being unable to tell were communications sent to each

19   of these borrowers and which communications were sent, the

20   plaintiff did present evidence in the motion for class

21   certification that from both the corporate rep that works on

22   the IT side, as well as the corporate representative that

23   testified relating to policy, that they are able to determine

24   exactly which communications were sent to exactly which

25   particular borrower and when they were sent.

1    And it was purported by the defendant in the

2  presentation of that chart that the people appearing on there

3  met the criteria that we requested in discovery, which were:

4  Present a chart that lists each unique borrower in the state of

5  Florida that had a bankruptcy discharge date and you obtained

6  servicing -- or that you were servicing the loan postdischarge

7  and they were sent communications that were of the type that we

8  challenged in our complaint.

9    So I believe that that is sufficient, and I don't

10  think that the defendants are contesting quite the nuances that

11  the court is concerned about.  So...

12    THE COURT:  Well, they specifically argue that at

13  least 336 of the accounts would not fall within the class

14  because they were not in default at the time they were

15  acquired; right?

16    MS. VARNELL:  Because --

17    THE COURT:  Which is one of the issues that I'm

18  asking about, so I don't know how you're saying that they're

19  not contesting it.

20    MS. VARNELL:  I agree that they are making an

21  argument that they weren't in default because those -- it is

22  their testimony that 336 of those borrowers had paid or were up

23  to date on the mortgage payments that they were trying to

24  collect from them.

25    But I think that that is a strained and contorted

1    view of what default is and -- for the reasons that I presented

2    about our definition of default.

3        But, again, if the defendant stands here today in

4    response to your same question and says:  Your Honor, I think

5    that there aren't more than 40 people that meet the definition

6    of being in default, and we -- they were post-discharge and we

7    sent the challenged communications to them, then maybe we would

8    have to address that.

9        But I do not believe -- I believe that perhaps the

10   inartful briefing on both sides may lead the Court to believe

11   that there is a challenge that isn't really here.

12       I don't think that they're going to contest, standing

13   here today, that the class of individuals that were sent these

14   letters postdischarge from bankruptcy were -- are not

15   sufficiently numerous.

16       THE COURT:  Well, maybe by talking about it just in

17   terms of numerosity, I'm too much narrowing the concern.

18   Because it really -- it comes from -- your class definition is

19   presupposing that -- your class definition appears to

20   presuppose that all of these were, in fact, in default at the

21   time because -- simply because of the filing of the bankruptcy.

22       MS. VARNELL:  Your Honor, would that not be a common

23   issue as well to be determined for the class?  If, in fact, the

24   plaintiff is correct -- and I can present substantial evidence

25   at trial or that it is an event of default -- would that not be

1  a common issue for the entire class?  I would submit that it

2  might be.

3          THE COURT:  I don't know.  Because I don't know

4  that -- I don't know that they're all common loan documents.

5          And I'll hear from Mr. Silverman on that.

6          But -- and I don't know -- as I said earlier, I don't

7  know whether the question of whether -- the mere fact that it

8  has that potential default mechanism in there if that means

9  that the filing of the bankruptcy petition actually renders

10  them in default or whether it depends on how the lender treats

11  it.

12          MS. VARNELL:  Well, if we conveniently leave it up to

13  a debt collector to define when it's to their -- inures to

14  their benefit that an act that is typically deemed default is

15  not a default for purposes of class certification in an FDCPA

16  case, whereas there's evidence that that would be grounds for

17  the lender in every case to proceed as though the loan were in

18  default, doesn't that frustrate the -- doesn't that frustrate

19  the whole point of having an FDCPA class action rule?

20          I mean, we're supposed to be using this law to inure

21  to the benefit of consumers who are subject to unlawful debt

22  collection.

23          And if you leave the definition of something like

24  default up to the lender to look at in hindsight and say it

25  isn't an act of default when I can defeat class certification

1   by saying that: Well, we'll have to go through and determine

2   whether or not some unnamed trustee in the New York Bank of

3   Mellon, whether or not they determined it was a default or not,

4   then, you know, you're never going to have a class action of

5   mortgage -- sorry.

6         THE COURT: Well, I'm not sure that that's what --

7   and I'm asking these questions because this stuff wasn't

8   developed in the briefing.

9         But I mean, would it not be that in the -- you're

10   suggesting that it's up to the debt collector five years down

11   the road to, in hindsight, say whether that was -- whether they

12   considered it to be in default or not. But I guess what I'm

13   wondering is, is there some way to establish whether at the

14   time the debt was acquired whether it was considered to be in

15   default?

16         MS. VARNELL: I think that has to be the case, Your

17   Honor. It has to be an objective test. It can't be a

18   subjective determination based upon a mortgage servicer. It

19   has to be an objective --

20         THE COURT: No, you're saying something different

21   than what I said.

22         MS. VARNELL: Okay.

23         THE COURT: What I'm saying is it's not what the

24   mortgage servicer thought: It's whether it was in default at

25   the time it was acquired. Okay.

1       And whether it was in default at the time it was

2  acquired, doesn't that -- isn't that determination based on

3  what the lender, the person that was actually owed the money

4  before it went to the servicer, on the way they're treating it?

5  Are they treating it as being in default or not?

6       MS. VARNELL:  Well, many of these loans were taken --

7  you know, they weren't in default at the time that they were

8  taken in servicing, so it's not when it gets transferred

9  necessarily over to Carrington.

10      Unfortunately I know that complicates, but I want to

11 be clear to the Court that not every loan that Carrington was

12 servicing is automatically in default.  But we do take the

13 position that you can stand on the fact that a filing of a

14 bankruptcy has to be a default event.

15      That is one critical piece of evidence that we are

16 relying on for the plaintiff class, that that's an event of

17 default and should be determined as much by this Court for the

18 purposes of the application of the FDCPA.

19      THE COURT:  So even the ones that -- the 336 accounts

20 that they say are not in default because they were up to date

21 on the payments, you would consider those to be in default

22 simply because they had filed bankruptcy?

23      MS. VARNELL:  Well, Your Honor, I question -- I think

24 in going through the deposition, it was clear that they were

25 giving a very generous interpretation of what is up to date.

1    So, for instance, Ms. Prindle was tremendously behind

2  on her payments.  She goes through the entire bankruptcy and a

3  period thereafter not making and is not up to date on her

4  mortgage payments, as are the vast majority of anybody who is

5  going through a Chapter 7 proceeding.  So there's -- we're not

6  talking about a Chapter 13 situation here.

7    What we have here is what's commonly referred to in

8  the bankruptcy world as a stay and pay.  You know, the bank

9  is -- wants to get whatever money they can get out of people,

10 and it's going to take time to foreclose, so if they can get

11 someone to pay money, they want them to do that.

12   And the person going through the bankruptcy process

13 is, you know, in a -- in an inferior position in both -- in

14 terms of information and leverage, and they're in a terrible

15 financial position.  So they really want to keep a roof over

16 their heads the majority of the time.  That's one of the

17 primary reasons that we brought this case.

18   So we believe that -- we believe that the

19 interpretation that the defendant is applying for what loans

20 were or weren't in default is contradicted by the evidence

21 generally.

22     Because Ms. Prindle -- I'm sorry.

23     THE COURT:  No, go ahead.

24     MS. VARNELL:  Being so far behind on her loans.  I

25 mean, there can be no argument that she was in -- that she was

1    not in default.  She was, you know, tens of thousands of

2    dollars behind on her mortgage at the time when she was -- when

3    she emerges from the Chapter 7 bankruptcy proceeding.

4          And --

5          THE COURT:  What does the chart say about her?

6          MS. VARNELL:  Well, because they won't tell us which

7    line, you know, which name goes with what unique account

8    number, we're unable to determine which one is actually

9    Ms. Prindle's line.  That was not something they --

10         THE COURT:  Well, did you ask that in deposition?

11         MS. VARNELL:  We asked whether or not -- we went

12    through the entire history of Ms. Prindle's loan.  And they

13    didn't disagree that she was in default at the time -- at the

14    time that the communications were sent.

15         THE COURT:  But did you ask them which line in this

16    chart was Ms. Prindle?

17         MS. VARNELL:  I can't recall, but I could get that

18    answer to you before -- if you give me 10 minutes.  I would

19    imagine that I had.

20         One of the difficulties that we encountered with the

21    chart, and I'm sure that Mr. Silverman will be able to

22    elucidate more on it than I was, but even the corporate

23    representative flat testified -- and I think in the original

24    brief I explained at least in the footnote what he said.

25         He said:  I didn't create that chart.  The guys over

1    there in the corner did -- pointing to his lawyers. And he

2    couldn't answer what half of the information that was contained

3    in the chart meant.

4         But that is not meant to -- I'm not trying to

5    disparage the defense counsel or the defendant in that

6    statement. Instead, I'm saying that we've had a very

7    cooperative relationship with the defense counsel, and I felt

8    like that their assurances about the nature of what those

9    columns entertained was not going to be suddenly disputed or

10    different than what they represented to me at the deposition.

11         And that's why I was comfortable telling this Court

12    that that chart did contain sufficient information on which

13    both plaintiff counsel and this Court could rely to determine

14    that the class was sufficiently numerous and that the

15    individuals who were sent the challenged communications could

16    be determined as well as the bank -- the date of bankruptcy

17    discharge as well as what the current status of the loan was at

18    the time that the communications were sent.

19         THE COURT: Well, there's a column that says Date

20    Bankruptcy Filed, and there's a column that provides for the

21    Property Zip Code.

22         Looking at those two columns, you couldn't -- I mean,

23    because you're --

24         MS. VARNELL: There's a date of discharge as well.

25         THE COURT: Yes. I mean, because you're telling me

1   that the chart is inaccurate based on Ms. Prindle because

2   you're saying Ms. Prindle was tens of thousands of dollars

3   behind.

4           And so my question was whether -- is the chart

5   inaccurate about Ms. Prindle?

6           And you're saying you don't know because you don't

7   know which line Ms. Prindle is, but you -- there's enough

8   information there for you-all to have determined which one

9   Ms. Prindle is, whether you asked it in deposition or not,

10  isn't there?

11          MS. VARNELL:  But we don't know which one belongs to

12  Ms. Prindle, nor do I think that they were able to tell us the

13  answer to that question because of how they created that

14  responsive document.

15          You know -- so in other words, they can never tell

16  you that this loan number goes with John Doe until they go back

17  and compare it with their electronic records, which is

18  something that they would have to do.

19          And, you know, I think that my representation --

20  representations to the Court, which were -- which cited to

21  deposition testimony from the corporate representative, is

22  sufficiently reliable for this Court to enter an order on.

23          I don't believe -- I believe that this Court is -- is

24  questioning things that the defendant is not raising.

25          So the defendant --

1          THE COURT:  I'm really not.  I may be saying it in a

2     different way than they're saying it --

3          MS. VARNELL:  Okay.

4          THE COURT:  -- but I'm not raising things that they

5     haven't argued.

6          These same things, they argue them in different ways.

7     They argue them in terms of commonality and they argue them in

8     terms of predominance.  And, you know, I may have brought it up

9     in terms of numerosity, but that's not the sole place it comes

10    up in.  I brought it up in that context only because I had

11    commented before that I questioned the usefulness of this

12    chart.  So I was surprised to see that it didn't change.

13         But they -- they specifically raised the arguments

14    about the chart being insufficient evidence, because, for

15    example, they say that you can't determine from the chart

16    whether the accounts were in default at the time the defendant

17    required them, and they say that at least 336 of the accounts

18    wouldn't fall within the class definition because they weren't

19    in default.  They --

20         MS. VARNELL:  Well, Your Honor --

21         THE COURT:  They say it includes multiple borrowers,

22    but only one had filed bankruptcy, so it wouldn't -- so it's

23    overinclusive in that regard.

24         They say that it doesn't filter to identify the

25    postdischarge payments.  They say that it lists others that

1   don't fit within the class definition period because they had a

2   zero balance at the very beginning and couldn't be in default.

3          So I'm not raising issues that they've conceded.

4          MS. VARNELL:  What about this, Your Honor.  If they

5   say:  Okay, there are 336 people on this chart of well over 500

6   people that don't fall in the class definition.  Doesn't that

7   necessarily mean that more than 200 do?  Which would mean that

8   it was sufficiently numerous.  And if we're -- because we have

9   to discuss the issues of predominance differently.

10          THE COURT:  I guess the concern that I have -- and

11   this is what I was telling you earlier, maybe that would mean

12   that, okay, there are at least 200 people.  But doesn't that go

13   back to the question of whether the class definition that's

14   being used -- because the class definition that you have is

15   what resulted in this chart, that may very well be

16   overinclusive -- I don't know -- such that it might not be

17   appropriate for class certification?

18          So -- but I'll tell you what.  Why don't I hear from

19   Mr. Silverman for a moment.

20          MR. SILVERMAN:  Let me start by answering some of

21   what I think the Court's question is and then we'll work

22   backwards from that, which is the chart, the numbers,

23   everything else.

24          As counsel have said -- they've alleged

25   three classes.  One, people who -- well, let me start simply,

1 which is the class definition.

2 The reason that the class definition starts with the

3 premise that these are people who were in default or -- at the

4 time -- at the time that is transferred to Carrington, because

5 if they are not in default at the time they transferred to

6 Carrington, we're not a bill collector under the statute.  So

7 in order to pick up a violation of the statute, that would only

8 include people who were in default before we got the loan,

9 otherwise we're not a bill collector, we're a creditor.

10 So that's the justification why their definition

11 says -- I presume that's why it says what it says.

12 THE COURT:  I understand that.

13 MR. SILVERMAN:  So they've alleged three different

14 subclasses.  One is people who got what we'll call the

15 statement; one people who got what we call the modification;

16 one people with actual damages.

17 Starting with the easiest one, which is based on we

18 can tell from the chart the actual damages, that's about eight

19 people.

20 I think the rule of thumb is that in order for

21 numerosity, you need 35 to 40 to make a subclass certifiable.

22 Actual damages, when you compensate for the fact that

23 only a small number of people paid us after the bankruptcy,

24 coupled with the fact that very few of those were people who

25 were in default when we got the loan, between those two, the

1    actual damages class is well below the threshold.

2            That leaves us with the people who got the statement

3    and people who got the modification.

4            The chart does not quantify the people who got the

5    modification, and, frankly, I don't think as we sit here know

6    what that number is.

7            As to the people who got the statement, if we start

8    with a total of 586, we know that at least 330 of them were

9    people for whom they weren't in default when we got it, so

10   we're not a bill collector.  That takes you down to 250.

11           THE COURT:  All right.  Let's stop there and address

12   the question of -- Ms. Varnell argues -- arguably supported by

13   the sample -- exemplar mortgage that she's given, that the

14   filing of the bankruptcy is an event of default, so...

15           MR. SILVERMAN:  Again, we have quantified the

16   question of when you're in default by looking as to whether you

17   paid us or not, whether you were deficient when you were paying

18   the loan.

19           I don't believe that if -- if you were adding an

20   additional category of people who may have been current but

21   declared bankruptcy before we got the loan, like that was going

22   to add another column that's going to add to the 250, I don't

23   think that's a material number, or it's a significant number.

24           THE COURT:  Well, if they filed bankruptcy, are they

25   by definition in default?

1          MR. SILVERMAN:  No.  We can't -- under bankruptcy

2     law, if you declare bankruptcy, we cannot declare you in

3     default.  That's what bankruptcy is supposed to protect.  We

4     have whatever contractual secured rights we have, but you

5     declaring bankruptcy doesn't put you into default.

6          But for the purposes of what we're talking --

7     starting with the numerosity consideration, which is how we

8     were getting -- what's the correct number of class members and

9     is it over 40 or not?  I don't believe that the question that

10    we're talking about, which is --

11         THE COURT:  Can you-all -- if you're going to

12    whisper, can you mute the microphone, because it's hard for me

13    to hear him.

14         MR. SILVERMAN:  I don't think it moves the needle

15    that much.

16         Again, we were talking at length about whether

17    declaring bankruptcy puts you into default.  That's not really

18    relevant to either of the motions that's pending today.  The

19    question is for the purpose --

20         THE COURT:  I'm sorry.  How -- that's her whole

21    premise, so how can you say it's not really relevant?

22         MR. SILVERMAN:  I don't think it's their premise for

23    the -- they're saying that if -- again, they're suing me under

24    the Fair Debt Collection Practice Act, which requires me to be

25    a debt collector.

1        THE COURT:  Right.

2        MR. SILVERMAN:  I'm only a debt collector as a

3   servicer if you were in default before that.

4        THE COURT:  I know that.

5        MR. SILVERMAN:  And once -- and now that you've been

6   through a discharge, I'm not allowed to send you certain

7   letters, and therefore you're suing me because the letters that

8   I sent are deceptive.  I'll let them make that allegation.

9        Whether or not you -- you were put into default under

10  the agreement because you declared bankruptcy somewhere along

11  that chain, I don't see -- it really doesn't impact either of

12  the two questions -- main questions, which are:  Were you in

13  default when I got the loan?  And:  Did what I sent you, is

14  that unfair because you have been discharged in bankruptcy?

15       So the intermediate question, because most of these

16  people didn't go to bankruptcy until after we got -- again,

17  they're not -- we don't get many of these -- I don't believe

18  that really moves the needle that much to try to discern

19  whether the bankruptcy was before or after.  But if we want to

20  get to that point -- but to answer your ultimate question --

21       THE COURT:  Maybe -- maybe I'm not making my question

22  clear.  Let me back up.

23       So you argued in your motion, unless I misunderstood

24  it, that this chart is overinclusive, because, for example, 336

25  of the people in there were not in default as of the day you

1   acquired --

2            MR. SILVERMAN:  Correct.

3            THE COURT:  -- the mortgage.

4            MR. SILVERMAN:  Yes.

5            THE COURT:  Or the servicing rights.

6            MR. SILVERMAN:  Yes.

7            THE COURT:  Ms. Varnell says that's baloney, because

8   everybody in this chart had filed bankruptcy before you

9   acquired their mortgage; right?

10           MR. SILVERMAN:  No.

11           MS. VARNELL:  No.  Your Honor, everyone in the

12  bankruptcy had been in default as a result of filing

13  bankruptcy.

14           As for the date of acquisition, the point is that you

15  can compare with the data points exactly when they got the loan

16  and exactly when the loan went into default -- but I think I

17  have something for you.

18           THE COURT:  Okay.  Well, wait.  Because --

19           MS. VARNELL:  Might clear it up.

20           THE COURT:  Wait.  Isn't it -- isn't it your

21  contention that the mere filing -- if they filed bankruptcy

22  before it was acquired, regardless of whether they're up to

23  date on payments, that that is default?

24           MS. VARNELL:  That is -- that is one piece of

25  evidence that we presented the Court, but I just remembered the

1    other piece of evidence.

2           I didn't realize this was -- I felt like we had --

3    but there is one other piece of evidence that might -- might be

4    helpful to you.

5           If you look at the statements that are at issue, the

6    challenged statements, if you look at Ms. Prindle's mortgage

7    statements, you'll notice there's a line item which would

8    appear on every one of these if it was a substantially similar

9    account statement, it says Default Costs.

10          So how can they argue to the Court that the loan was

11   not in default if they're charging default loan costs?

12          MR. SILVERMAN:  And, again, for 30 seconds, let me --

13   because I was actually when I got up here, I was going to try

14   to answer the overall question, which is that they filed a

15   motion for class certification saying there's about 580 people

16   in the class.  We've said that that's significantly

17   overinclusive.  It's not 580.

18          As to the three subclasses, are there more than 40

19   people who got the statement after -- after being discharged

20   from bankruptcy for whom we would be considered a debt

21   collector?  The answer:  Probably, yes.  Trying to --

22          MS. VARNELL:  Thank you.  Thank you.

23          MR. SILVERMAN:  They've alleged three classes.  The

24   broadest class, which they allege is 580 people, which we think

25   is more of about 125.  But again, that's not an issue -- when

1    you are analyzing numerosity, you don't have to issue an order

2    that has all 125 people.  You just have to say that it's an

3    ascertainable issue and there's substantial evidence to support

4    each of the elements for class certification.

5          That's why we've kind of gone off on some of these

6    items like when is the default and things like that.

7          For the three alleged classes, they're not even close

8    on the actual damages class.  On the number of people who got

9    the modification letter, there's really no evidence at all

10   breaking that out.

11         As to getting the statements, based on our response,

12   the -- we said -- you know, they said it was 580.  We said the

13   chart shows more about 250.  That chart was prepared when there

14   was a two-year statute of limitations instead of one, because

15   Your Honor took out the state claim with the two-year statute

16   of limitations, so it's probably more like 125.  But have we

17   argued that it's under 35 to 40?  No.  So I think that's trying

18   to get to that answer.

19         Again, we have significant challenges to the class

20   certification.  But on the pure numerosity issue, of the

21   three subclasses, two of them fall well below -- one of them

22   there's no proof, which is the modification; actual damages

23   fall well below.  We have challenged the inclusion and how you

24   would define the statement class, but is it under -- we don't

25   allege that it's under 40.

1          THE COURT:  Okay.  Ms. Varnell, address the actual

2     damages and the loan modification subclasses, please.

3          MS. VARNELL:  The evidence that was presented to the

4     Court was that the response from the defendant to the question

5     of how many people paid money postbankruptcy discharge on the

6     debt that they did not owe is sufficiently numerous.

7          It is our contention that they are not in a position

8     to contest numerosity on that subclass without improperly

9     inviting this Court to make merits determinations prior to

10    class certification.

11         Because what is and is not actual damages flowing

12    from, you know, what was the reason for the payment, that's

13    something they want to -- that they want this Court to look at

14    prior to class cert, we think, is not properly before the Court

15    at a class certification stage in a letter FDCPA class.

16         THE COURT:  Isn't their argument on that, though,

17    that the mere fact of payments after discharge isn't enough.

18    It has to be that they made -- that the debtor made the

19    payments because of the improper communications?

20         And so aren't they saying -- they are arguing that

21    the Court would have to conduct many trials to determine what

22    their purpose of making the payments was?

23         MS. VARNELL:  Right.  I do believe you've accurately

24    stated the defense position.  You'd have to ask them whether

25    they agree with that.  But we disagree that that is a relevant

1 factor in determining whether or not that is an actual damages

2 amount.

3      We don't believe that the reason for sending the

4 communication, nor the reason for payment, is relevant under

5 the straight language of the statute.

6      THE COURT:  Hold on a minute.  I'm looking back at my

7 notes.

8      In order to receive actual damages, does the

9 plaintiff have to show -- is it enough that they simply made

10 payments after receiving communications, or is it a more

11 subjective inquiry of whether they made payments because of

12 that communication as opposed to because of their own desire,

13 say, to stay in the house or something else?

14      MS. VARNELL:  Your Honor, it's our position that --

15 that the fact that the -- that the money was paid, if it was

16 paid after any objectionable communication was sent, that it

17 should be deemed actual damages that flows directly from that.

18      So we -- I guess the answer to the question is yes.

19      THE COURT:  Well, let's look at Ms. Prindle in

20 particular.

21      So as I understand it, Ms. Prindle made $2700 in

22 payments.

23      MS. VARNELL:  That evidence is in dispute, for

24 instance, Your Honor, the amount that she paid.  That's what

25 the defendant has admitted.

1          THE COURT:  Well, you didn't let me finish.

2          MS. VARNELL:  I'm sorry.

3          THE COURT:  Because I don't think what I was about to

4     say is in dispute.

5          You're saying that the total amount that she paid is

6     in dispute.  But is it in dispute that she made four payments

7     of $690 on the trial modification?

8          MS. VARNELL:  On the trial modification.

9          I believe that if you view the evidence in its

10    current state, that would be in dispute.  Because we have a --

11    we have testimony from Ms. Prindle that she paid up to 6 -- I'm

12    sorry, $4,000, and so they are -- those are the payments that

13    they are willing to say were trial plan payments and

14    acknowledged that those were made pursuant to the trial plan.

15         So I think that if you -- if we're just going to view

16    the evidence based as it stands today, that that's a fact

17    that's in dispute how much she paid.

18         THE COURT:  Okay.

19         MS. VARNELL:  But I don't -- I definitely don't want

20    to leave the podium without addressing the other question that

21    the Court's asked me, though, on the mortgage modification

22    class.

23         THE COURT:  No, we'll get back to that.

24         But setting aside the exact figure, if -- let's say

25    hypothetically -- all right.  It's not in dispute that she

1  requested a modification, right, at some point in time?

2          MS. VARNELL:  No, Your Honor.  But it's in dispute

3  whether or not that's relevant under the FDCPA because --

4          THE COURT:  That's what I'm --

5          MS. VARNELL:  Yeah.

6          THE COURT:  That's what I'm trying to get to.

7          It's not in dispute that she requested a

8  modification, and it's not in dispute that she made certain

9  trial payments; right?

10         MS. VARNELL:  Correct, Your Honor.

11         THE COURT:  So the question that I was asking you is,

12 those payments that were made as part of the trial modification

13 would be after she received the first offending mortgage

14 statement that is in this?

15         MS. VARNELL:  The first communication that's

16 challenged as being deceptive or confusing, yes.

17         THE COURT:  So is it plaintiff's position that if the

18 facts are shown that every payment that she made was made as

19 part of the trial modification, that because those were made

20 after the offending -- after a previous offending

21 communication, that would all be actual damages?

22         MS. VARNELL:  Yes, Your Honor.  But that would only

23 relate to the actual damages subclass again, not to whether or

24 not she had -- is entitled to statutory damages.

25         THE COURT:  And actually, with regard to Ms. Prindle,

1   her -- the first offending communication with Ms. Prindle is

2   actually after the trial modification period, but I was

3   changing the facts a little bit just to understand -- get what

4   your position is.

5          It's your position that regardless of whether

6   somebody asked for a trial modification and made payments on

7   that, if they had previously received any communication that is

8   objectionable under the FDCPA, that would -- they would be in

9   your actual damages subclass?

10          MS. VARNELL:  Yes, Your Honor.

11          THE COURT:  Okay.  Let me hear from Mr. Silverman

12  about that, and then we'll -- I'm not forgetting the loan

13  modification.

14          MR. SILVERMAN:  Two points, Your Honor.  First of

15  which is that your premise, I think, the dates are wrong.  All

16  of Ms. Prindle --

17          THE COURT:  I just explained -- I just said that.  I

18  know that.  I changed the dates on purpose, so I'm trying to

19  understand the supposition.

20          MR. SILVERMAN:  Ms. Prindle doesn't have standing --

21  she's not a class rep for the actual damages class since all of

22  her payments were before the letter she's challenging.

23          And, again, we're still -- we're numerosityish.  But

24  on the typicality and commonality, she's not the typical

25  plaintiff on the actual damages.  She doesn't have standing,

because that's not her claim.

As to the number of people in that actual damages class, that's addressed in page 12 of our response to the class certification. The chart lists 78 accounts in which there was some payment postbankruptcy credited to the account. So those were quote, unquote payments.

It then turned out that 56 -- 57 of them were not actual payments. They were zeroed out once there was a short sale or the loan was transferred out. There was never a payment by the borrower to Carrington. There was just money credited back.

The number of total accounts where there was an actual payment was 22. And of those, only four of those were in default at the time that Carrington acquired the loan. And so that's why I mentioned that as to the actual damages, even if Ms. Prindle had standing to be the class rep, which she doesn't --

THE COURT: And you're defining default how when you say that?

MR. SILVERMAN: If you look at the -- you mean from the -- well, the max is 22. Depending -- even if I'm wrong as to how we define default, whether it was a bankruptcy, under the chart we looked at where they checked off as deficient or default at the time that we got the loan. That maximum number is 22, so it doesn't matter.

1    We believe that 18 of those were not in default.

2  Only four were.

3    If you look at Document 107, then 2-6.  Hold on.

4    But, again, we've noted that.

5    The far right column is -- in the chart is the total

6  number of people in which payments were registered in any

7  amount.  I think the chart either says 70 or 78.  It's in the

8  far right-hand top corner.

9    But then when you drill down, most of those, quote,

10  "payments," were people's short sales.

11    And so they, you know, they could give it 100, and

12  they sold it for 70, it was a $70,000 payment listed.

13    When you get to actual damages, where people actually

14  wrote a check, that's a very low number.

15    THE COURT:  Part of my problem is this chart -- for

16  example, Ms. Varnell, this very first one that I'm looking

17  at -- and I don't know what -- the chart isn't -- so bankruptcy

18  was filed March of 2005, but it was Date Warehouse Added, which

19  is when Carrington comes into possession of it, was in 2004.

20    So would you consider that to be a member of the

21  class or not a member of the class?

22    Files bankruptcy after acquired by Carrington.

23    MS. VARNELL:  The -- the loan was in default at the

24  time that -- well, we don't know what the -- I have to look at

25  two other data points, of course, to answer that question.

1          We don't know what the status of the loan was based

2     upon those two data points that you just read there.  You have

3     to look at several other data points.  You have to look at when

4     was the date that the payment -- like, was there a payment due

5     at the time that they acquired the loan and things of that

6     nature.

7          THE COURT:  I can't tell that from this chart.  The

8     next payment -- the date payment due was August 1, 2009.  So

9     it's much later.

10         MS. VARNELL:  The loan would have been in default, in

11    the example that you gave me, only if they had done -- one of

12    two events occurred.  Either the bankruptcy had occurred prior

13    to that or they had not paid -- they had not accurately made

14    their payments on the loan.

15         So I have to look at each of the data points to know

16    the answer to that question.

17         But Your Honor recall that I pointed -- brought to

18    the Court's attention that the very account statements, the

19    challenged communications that are at issue here.

20         And the one that I gave the example to of the Court

21    contains a line that says:  Default loan costs.

22         THE COURT:  That doesn't address whether they were in

23    default at the time it was acquired.

24         MS. VARNELL:  Well, Carrington doesn't own any of the

25    loans, so they are debt collectors for the creditors at any

1   point, so -- they're not -- you get what I'm saying about the

2   issue of whether or not you're a debt collector is in part

3   determined upon whether you are the actual creditor.  And

4   they're not.  They're collecting the loans for third parties.

5           They don't own any of these loans, according to the

6   evidence that we presented to the Court.

7           You know, part of the confusion that's caused here,

8   Your Honor, of course, came about because it resulted from the

9   Court had limited us to the FDCPA claim, which was only one

10  year, so the offending communications were on -- many of those

11  that were presented on the chart were determined to be

12  time-barred.  And unfortunately discovery had long closed on

13  class certification issues at the time that this Court issued

14  the ruling.

15          What I -- the reason why I raise that is I'm certain

16  that the Court, rather than deny class certification, if you

17  truly believe that we need to go back and clarify the data

18  points that are on the chart to give this Court an accurate

19  reading of -- assessment of the information that we presented,

20  I would beg the Court to permit us to go back and do just a

21  limited amount of discovery to put the evidence that was

22  presented by the defendant in response to our discovery

23  requests within the confines of the remaining claim and the

24  time -- the relevant time period.  Because perhaps that would

25  clarify some of the confusion and perhaps we could get the data

in a format where it can be manipulated and presented more clearly to the Court.

I -- I still stand on the fact that we have submitted adequate information based upon the deposition of the corporate rep that stated unequivocally:  We can identify exactly -- we know when someone is discharged from bankruptcy; we know when we acquired the loan; we know what communications were sent to whom and when they were sent to those individuals; and we, of course, can look to the offending statements to see if there were default costs being default loan charges at the time there -- all of that can be viewed and is sufficient for this Court to find, especially in light of the fact that Mr. Silverman is stating that the defendants are not going to contest that there's the class of individuals who would fall into the main class definition of account statements is sufficiently numerous.

I would submit to the Court that it's adequate to do two things:  One, certify the class on the account statements, and the issue of default should be a common issue that is determined for the class.

It's not defined under the FDCPA.  It's something that we can argue and present evidence on a common basis because the defendants tell us they can present that evidence with regard to every single class member.

And then I would request that the Court permit us to

1    engage in follow-up discussions with regard to the other

2    two classes, the mortgage modification class and the actual

3    damages subclass, in light of the Court's ruling on the motion

4    to dismiss which limited our time -- our statute of

5    limitations.

6         THE COURT:  Well, let's -- looking at the

7    modification class, regardless of when the Court ruled on your

8    motion to dismiss, you knew that looking at this chart you

9    couldn't tell who got what communication or how many people got

10   a loan modification document.

11        I mean, throwing that back at me isn't -- one of

12   those questions -- the law clerk that originally worked on this

13   raised to me was:  We can't tell what communications were sent

14   because -- recall that at the beginning you had -- you had

15   claims based on other types of communications.  You also had

16   the delinquent tax notice communication.  And, I mean, why

17   are -- how do we know how many people got the loan modification

18   package or a loan modification package?

19        MS. VARNELL:  Again, we presented evidence, Your

20   Honor, that the defendants can identify exactly which

21   communications were sent to each borrower.  And that chart was

22   produced in response to the specific question as to which of

23   these individuals or which individuals who reside in Florida

24   have these following attributes, which included the receipt of

25   the communications that were challenged in the complaint.

1       That was the point of the creation of the chart in

2   the first instance.

3       I'd also point out to the Court that HAMP required --

4   we know that federal regulation required them to attempt loan

5   modifications with people with troubled loans.  And, in fact,

6   incentivized them economically to -- and paid mortgage loan

7   servicers for every single modification that they could show

8   that they attempted to make.

9       So not only are we -- do we have the testimony of the

10  corporate representative saying that the practice prior to

11  February of 2014 was to automatically generate the

12  communications that we challenged in this complaint, all of

13  them, prior to February 2014 after the filing of this lawsuit,

14  they changed their policy, but they -- the practice was to

15  automatically generate the documents that were at issue.

16      So I think that that's sufficient for the Court to

17  make a reasonable presumption that it's more likely than not

18  that all of the individuals who appear on that chart would have

19  received some sort of a modification package that we've

20  challenged in this complaint.

21      So, again, I'd stand on the fact that we have

22  submitted sufficient evidence from which the Court could

23  certify the case today.

24      Now, we -- again, we had a little bit of a moving

25  target, because we took -- took the discovery under the belief

1    that we had a two-year statute of limitations.  And I would

2    have tailored it much better had I had discovery still open at

3    that point in time, but...

4              THE COURT:  Well, are you --

5              MS. VARNELL:  But they're not contesting that there's

6    more than 48 people that got the statements.

7              THE COURT:  Ms. Varnell, you alleged different --

8    different claims in your complaint.  You alleged some that had

9    a one-year statute of limitations and some that had a two-year

10   statute of limitations.

11             Suggesting that because you had some that had a

12   two-year statute of limitations, you didn't focus on what you

13   needed to establish for the one-year statute of limitations,

14   because you hadn't gotten a ruling on whether you'd get to keep

15   all the claims, you have to understand where that doesn't

16   really make a lot of sense.  I mean, you keep telling me it was

17   because I hadn't ruled at that point.  But you pled the claims

18   and you knew what you had to establish for each of the claims.

19   So I guess I'm trying to understand why you keep going back to

20   that point.

21             MS. VARNELL:  Only because it's clear to the -- both

22   the plaintiff and the defendant and the Court are wrestling

23   with how many members and whether there's sufficient numerosity

24   under, for instance, the actual damages class.

25             And I'm just explaining to the Court that, you know,

1   discovery had long closed on the issue of class certification

2   at the time that -- that we were presenting the brief and the

3   evidence to the Court on this go-round.  That's all.

4           What I -- my point I'm trying to make is not please

5   excuse the plaintiff, but instead I'm trying to say to the

6   Court:  There is sufficient evidence in front of you, given the

7   defendant's testimony about what they are able to identify from

8   their records, and that -- that we have enough to certify the

9   account statement class, and that that is sufficiently

10  numerous.

11          And as to -- perhaps we should pause at the same

12  exact question with regard to the mortgage statement, but if I

13  understood Mr. Silverman correctly, I think that he's saying

14  they're not in a position to say how many people are actually

15  within the mortgage statement class.  Because, just like the

16  plaintiff, he's saying:  Well, when we first looked at this, we

17  were dealing with a two-year statute of limitations.  So we

18  produced a response and told you:  Yeah, there's this many

19  people that would have gotten all the communications.  But he's

20  not certain that he's willing to stand by that today.

21          But as we stand here today, they have not

22  supplemented under Rule 26 their discovery response, so that

23  what is the evidence in front of the Court, as it sits here

24  today, is that response.  That is the response from the

25  defendant as to how many individuals received the

1    communications at issue.  And also it has a category of those

2    individuals who paid money after receipt of those

3    communications.

4           But it's -- they cannot escape the fact that they are

5    clearly able to identify, from their own records, based upon

6    the testimony of their corporate representative, exactly who

7    got which communication, when.  And an FDCPA communication

8    class, this Court should properly examine, as most courts

9    looking at FDCPA letter classes do, how many people got the

10   letter and were the letters sufficiently similar.

11          THE COURT:  I think you didn't mean to say that,

12   because you're arguing I shouldn't look at who got the letter.

13   You're arguing I should only look at who -- who they sent the

14   letter to.

15          MS. VARNELL:  Are you talking about the difference

16   between "receipt" and "send"?

17          THE COURT:  Yeah.  I think you didn't mean to say I

18   should look at who got the letter.

19          MS. VARNELL:  You're right, Your Honor.  It's who

20   sent -- who they sent -- the defendant sends the communications

21   to.

22          THE COURT:  Can you address Mr. Silverman's argument

23   about -- no, wait.

24          No, I said can you address -- I said can you address

25   Mr. Silverman's argument.

1          MR. SILVERMAN:  Oh.  Oh, okay.

2          MS. VARNELL:  I'm so -- I'm completely confused.  I

3 apologize.

4          THE COURT:  I said can you address Mr. Silverman's

5 argument that -- and then you turned around and walked away.

6          I'm asking you to address the argument he made that

7 Ms. Prindle doesn't have standing to bring the actual damages

8 claim because, according to them, she never made any

9 statement -- I'm sorry, any payment after June 27, 2013, which

10 is the timing of the mortgage statement that's within the

11 statute of limitations.

12          MS. VARNELL:  Your Honor, what we can establish and

13 what was alleged in the complaint is that she had received

14 communications prior to that time which were of the same nature

15 that are challenged during the statute of limitations period.

16          THE COURT:  But she can't base a claim off of those

17 prior, because they're beyond the statute of limitations.

18          MS. VARNELL:  I agree, Your Honor.  And I think that

19 the Court, under the circumstances, given that we're -- that we

20 have been able to establish that she did receive those before,

21 but she's not within that statute of limitations, should permit

22 us to amend, if that is a defect that the Court finds that

23 she's not adequate to represent.  If we're able to present this

24 Court with an individual who does fall within that, we should

25 be able to amend and put in someone with proper standing.

1    Because it's not a question of whether or not a claim

2    exists, it's a question of whether or not Ms. Prindle now that

3    we're down to one-year of statute of limitations can properly

4    represent those individuals.

5    But there's no -- there can be little doubt that

6    the -- there were challenged communications and people paid

7    money, in light of the fact that they present a chart of over

8    500 people who paid money after receiving the communications

9    or...

10    THE COURT:  Wait.  You just said there were only 78.

11    MR. SILVERMAN:  22.

12    THE COURT:  Well, he said 78, but then you say that

13    only 22 were actual payments.  The charge doesn't say over 500

14    people made payments after receiving the communications, does

15    it?

16    MS. VARNELL:  I agree, Your Honor.  I apologize that

17    I misstated that.  That was not my intention.

18    THE COURT:  Okay.  Let's back up to some other

19    issues.

20    The context of the communications in terms of the

21    relationship between the parties.

22    When we were at the motion to dismiss stage, I

23    questioned the claim based on the loan modification document

24    because it said -- if I recall correctly, on the very first

25    page, it said that -- I don't remember the exact language, but

1  it acknowledged that the -- that she had filed bankruptcy and

2  that she wasn't personally liable for the amount of the loan;

3  right?

4         MS. VARNELL:  You're asking whether or not we

5  discussed that at the motion to dismiss or whether or not the

6  language appears in the modification package?

7         I'm not sure I understand the Court's question.

8         THE COURT:  Okay.  I'm sorry.  Let me do it this way.

9         And I apologize, I do have a loan modification

10  package up here somewhere.  But my recollection is that on the

11  very face of it there was a statement recognizing that she had

12  previously filed bankruptcy and that she wasn't personally

13  liable for the debt; right?

14         MS. VARNELL:  I acknowledge that that language

15  appeared on that mortgage modification statement, yes.

16         THE COURT:  And my recollection of our discussion was

17  that when I -- when we were talking about either whether it was

18  false or misleading, or whether that could be considered a

19  communication in connection with the collection of a debt,

20  because given the fact that it clearly said that -- and what

21  you said to me was:  You can't just look at this letter, this

22  loan modification package, you have to consider it in the

23  context of the communications between the parties.

24         MS. VARNELL:  I believe what I said, Your Honor, is

25  you have to look at the context of the relationship of the

1  parties as opposed to the communications of the parties.

2  THE COURT:  Well, what's the difference between the

3  relationship and the communications?  And wouldn't the

4  communications be part of the relationship?

5  MS. VARNELL:  Your Honor, I don't believe that that's

6  the relevant -- that the communications are what -- the

7  communications from the borrower and the other communications

8  that might have come from the debt collector are what define

9  the relationship here.

10  You heard me mention earlier this concept of, you

11  know, stay and pay.  So I use that term when we -- when I first

12  stood up here.

13  So what happens is a debtor is discharged after a

14  Chapter 7.  And it's extremely common that a vulnerable debtor

15  is not in a very good position to get another roof over their

16  heads.  They can't go get refinanced or another house, and

17  these are the types of facts that I thought that you should

18  consider under the applicable law interpreting the FDCPA.

19  You have a mortgage servicing company, a debt

20  collector, who is in a position of -- both that is superior in

21  terms of both knowledge and leverage over the debtor, who is in

22  a very inferior position in terms of knowledge and

23  understanding of what their rights and opportunities are, and

24  leverage.

25  And so what I was telling the Court that you had to

1   consider is you have to not only just -- when you're

2   determining whether or not a communication is confusing, for

3   instance, you have to take into consideration that overarching

4   relationship between the parties.

5          So that was what I was trying to convey to the Court

6   that you have to look -- you have to see that you've got a

7   mortgage servicing company who is being paid by the federal

8   government for every single opportunity that they send out a

9   mortgage modification package, because then they get credit for

10  attempting workouts, and you have somebody who is desperate to

11  keep a roof over their heads and who is in total financial

12  distress, and you have to recognize that in determining whether

13  or not the least-sophisticated consumer might be deceived or

14  confused or misled by that communication.

15         So that was what I was attempting to argue to the

16  Court.

17         THE COURT:  Okay.  If I have to consider that,

18  wouldn't I also have to consider what the servicer is telling

19  Ms. Prindle when they talk to her?

20         MS. VARNELL:  No.  Because, Your Honor, the test --

21  we were told by the relevant case law that it's an objective

22  test, and that it's whether or not the least-sophisticated

23  consumer, not an actual subjective:  Was Ms. Prindle fooled by

24  it?  Instead the Court is to look to whether or not the

25  least-sophisticated consumer under the circumstances would be

1   deceived or misled by it.

2           THE COURT:  And the under-the-circumstances part is

3   the part that you're saying requires me to consider the -- the

4   overall relationship between them?

5           MS. VARNELL:  It's --

6           THE COURT:  Consider the overall relationship, but

7   not consider the specific circumstances?

8           MS. VARNELL:  No.  I think that the FDCPA is clear,

9   that it doesn't -- it doesn't matter what an unsophisticated

10  borrower might say when they're in distress to the mortgage

11  company.

12          Hey, you know, she actually asked for refinance,

13  among other things.  She didn't just, you know, apply for the

14  modification, she also asked to have her loan refinanced, and

15  we're willing to concede that.

16          But we believe that the relative sophistication of

17  the parties has to be taken into consideration.

18          And the mortgage servicer knew that she was desperate

19  to stay in the home, and I think that they manipulate the

20  borrowers under that circumstance by -- and the complaint

21  alleges as much.

22          We think that part of the problem here is that you

23  have uniquely distressed consumers by debt collectors that are

24  in a uniquely powerful position, because they've got the

25  ability to keep a roof over their heads, where they're able to

1    extract money out of them that they do not owe.

2          And that was the -- at the heart of the complaint as

3    it was alleged.

4          THE COURT:  Whether or not a communication is a

5    communication made in connection with the collection of a debt,

6    the case law says that one of the things you look at is the

7    overall relationship between the parties; right?

8          That's part of how you determine whether it's

9    actually trying to -- what the actual intent of the

10   communication is; right?

11         MS. VARNELL:  Yes, Your Honor.  You do have to look

12   at the -- you have some case law suggesting the animating

13   purpose is something that this Court should view.

14         But it's not within the FDCPA, I will point that out.

15   I think it's -- it might be -- it might be important for me

16   just to point out something.

17         What's really important today, especially since we're

18   going to be arguing summary judgment at some point today --

19         THE COURT:  Well, we're essentially doing that now,

20   aren't we?

21         MS. VARNELL:  That's why I want to raise this right

22   now.

23         You know, the Eleventh Circuit said in the *Vega*

24   *versus T-Mobile* case, they cautioned about being careful not to

25   needlessly intertwine the discrete issues before the Court on

1  class certification with the merits of the case that are raised

2  in dispositive motions.

3          And that's *Vega versus T-Mobile*, Eleventh Circuit,

4  April 7, 2009.

5          And, you know, that wasn't at issue when we were

6  preparing our class cert brief, but I do want to bring that to

7  the Court's attention today because I don't want to invite it

8  into error by digressing into the issues that I believe we'll

9  be able to prove at trial.

10          There are a number of jury issues that I think the

11  defendant has invited the Court to consider as part of the

12  class certification motion, and they simply do not belong in an

13  FDCPA written communication challenge in class --

14          THE COURT:  Well -- and, I'm sorry, Ms. Varnell.  In

15  fairness to you, I had sort of moved away from class

16  certification and was asking questions related to the summary

17  judgment.

18          MS. VARNELL:  The summary judgment.

19          In that case, I have to beg the Court's pardon under

20  the circumstances.  We have -- Mr. Borison has come all the way

21  from California -- actually, you were in a foreign country

22  yesterday; right? -- specifically to argue summary judgment

23  motion.

24          THE COURT:  I was in Alabama.  Does that count as a

25  foreign country?

1    MS. VARNELL:  Having lived and practiced law there
2  for eight years, yes, ma'am, it does.

3       If I may let him answer those questions.

4       THE COURT:  Sure, sure, sure.  I apologize.  I
5  decided to move to summary judgment to see if we could narrow
6  some of the issues, but I didn't make that clear, so I
7  apologize.

8       We did intentionally -- this was originally scheduled
9  just on the class certification issue.  And when we saw how
10 that they -- that the briefing on the class certification was
11 kind of raising some of -- some merits issues -- and you're
12 right, you don't decide merits issues, but it made me think
13 that I might need to decide merits issues before possibly
14 dealing with class certification, and that's why I went ahead
15 and renoticed it as addressing summary judgment as well, so.

16      MS. VARNELL:  I understand, Your Honor.

17      If I may, though, Mr. Borison --

18      THE COURT:  That's fine.  Although, in fairness, part
19 of the reason I was asking you some of those questions is they
20 were arguments that you made to me in the motion to dismiss
21 that specifically caused me to deny the motion to dismiss to
22 look beyond just the language in the statement.

23      And so you're kind of going to be stuck with what she
24 said to me at the motion to dismiss, so hopefully you've read
25 the transcript.

1      MR. BORISON:  That's sort of the least of my
2  problems.  Usually he goes first.
3      I mean, as far as the merits arguments and whether or
4  not summary judgment's appropriate, what we would submit to the
5  Court -- and I do think exactly what Ms. Varnell was saying
6  that when you're looking at these things, it is an objective
7  test as far as whether or not the least-sophisticated consumer
8  would be misled by it.
9      And I think part of the reason that you denied the
10  motion to dismiss is because you recognized there were -- may
11  be some issues, for instance, looking at the letters, whether
12  or not they were really within 524(j) 11 USC.
13      THE COURT:  I'm speaking specifically about the loan
14  modification document right now.  I'm not talking about --
15      MR. BORISON:  Okay.  So the loan modification, I can
16  address that.  And I actually went back and looked, because you
17  had made the statement that -- maybe on the first page or
18  something of the letter.  I went back and looked.  And I might
19  not be looking, but I looked at the exhibit to the complaint,
20  which was 58-4.
21      There is a cover letter, but it doesn't talk about
22  bankruptcy.  There is on the second page of the loan
23  modification agreement, paragraph H that says:  If you've been
24  in bankruptcy, then you go ahead.
25      And what we had responded in our response to the

1   motion for summary judgment on that issue was we think -- and

2   I -- we recognize that the Court said you were more skeptical

3   of that claim, but I think if you do look at the document,

4   basically you have a document that, you know, in comparing it

5   to, for instance, *In re Biery* case, you really have to make

6   these things clear.

7               Putting that paragraph on the second page after you

8   have a series of other reasons saying that you're going to bind

9   yourself to this agreement, and then coming back as paragraph H

10  and saying suddenly, you know:  But we recognize you filed

11  bankruptcy and therefore you're not subject -- you're not

12  personally liable, we think does present an issue as to whether

13  a least-sophisticated consumer would understand that.

14              And I recognize, you know, it's difficult to put

15  ourselves in the position of the least-sophisticated consumer.

16  However, I think the jury could understand if they're properly

17  instructed that that's how they have to view this thing and

18  come up with a conclusion as to whether they think it would be

19  misleading or confusing.

20              And while we're all used to legal documents and it's

21  very easy for us to go through and look for those magic

22  clauses, so to speak, I don't think most consumers, whether the

23  least sophisticated or not, are on the same level as us.

24              When they look at these documents, they're reading

25  and they're trying to find out what are they liable for.

1          And I think if you look at a paragraph that says,

2   after several paragraphs:  Okay, you're going to sign up for

3   this and you're going to be liable for this, then to get to a

4   paragraph that says:  Okay, you're not liable because you've

5   been discharged, I don't see how those are consistent

6   statements inside the document itself.

7          And so I do contend that that would, at a minimum, be

8   a factual issue for the jury to decide.

9          They could decide looking at that full document

10  whether putting in paragraph 1H -- and, by the way, there's

11  another paragraph that we pointed out in our brief where it

12  says:  Here's what's being modified.

13         And it goes on and says that all of the original

14  terms, except as specifically modified in this paragraph 3, are

15  in effect.

16         So it's not only that there's A through J before the

17  H appears, there's also additional provisions in that same

18  document, for instance, in Number 3, where they talk about the

19  modifications and saying that the only thing that's changed is

20  what we specifically set forth here.  And it doesn't set forth

21  in that paragraph:  By the way, you're not liable.

22         So if you take a look at the whole document, which I

23  think is appropriate, you find that it's not clear-cut.  I

24  mean -- and again, we can look at it and say:  Okay.  Well, you

25  know, it's sort of like a notwithstanding clause that we use

1   all the time after we say everything and then we say:

2   Notwithstanding all of the above.  That's how I see 1H, which

3   we maybe as lawyers understand, but I don't think a lay person

4   would understand that.  Or at least there would be a question,

5   a reasonable difference of opinion as to whether that's clear

6   to someone.

7           THE COURT:  With -- I mean, the argument that was

8   made to me at the motion to dismiss, that I can't -- I can't

9   decide based just on the document, that I actually have to look

10  at the relationship between the parties, do you agree with

11  that?

12          MR. BORISON:  Well, I do think that's part of the

13  consideration, is that --

14          THE COURT:  And is that part of the consideration

15  with regard to the question of whether it's falsely misleading,

16  or is that part of the consideration as to whether it

17  constitutes a communication in connection with the collection

18  of a debt or both or neither?

19          MR. BORISON:  Making sure I got you -- all of them

20  down.  But I think the test as far as receiving it and viewing

21  it is the least-sophisticated consumer.

22          But I do think -- so to answer that part of the

23  question, I think you do look at the document and how someone

24  would interpret it.  But I don't think you look at it in a

25  vacuum.  And it's sort of a unique position we're in because

1  it's a situation with, you know, intersectional bankruptcy law

2  and the effect on liability on a debt.

3          So I do think it's important to consider that this

4  person, one, has filed bankruptcy; two, they're sort of

5  desperate to stay in the house; and three, then, you know --

6  and maybe -- maybe that's just another way of saying the

7  least-sophisticated consumer.

8          THE COURT:  All right.  And, Mr. Borison, is it --

9  it's certainly the least-sophisticated consumer standard which

10  you apply in determining whether it's false or misleading;

11  right?

12          MR. BORISON:  Yes.

13          THE COURT:  Is it also the least-sophisticated

14  consumer standard that you apply in determining whether the

15  communication constitutes a communication in connection with a

16  collection of a debt?

17          MR. BORISON:  Yes.  Because I think that's part of

18  it.  I mean, the question is is whether or not looking at it,

19  whether this is asking me to make a payment.

20          And that's why I was pointing out to the Court that,

21  you know, if you look at that whole loan modification

22  agreement, it's paragraph 1H, but there's several other

23  paragraphs that say the exact opposite, including one that

24  says:  Look, by the way, all the original loan terms are in

25  effect, except what we specifically address in this agreement.

1           So I do think you look at it.

2           THE COURT:  Okay.  All right.  Let me hear from

3 Mr. Silverman.  Thank you.

4           MR. BORISON:  Thank you.

5           THE COURT:  And I understand --

6           MR. BORISON:  And the foreign country was not

7 California, despite -- but it was interesting.  I was in

8 Moldova for trial competition, which I thought was a jury trial

9 competition.  Turns out, they don't have jury trials.

10           THE COURT:  Okay.  All right.  So Mr. Silverman --

11           MR. SILVERMAN:  I came up from Miami.  That's more of

12 a foreign country that whatever place you guys are talking

13 about.

14           Again, we're before -- just -- I want to say for 15

15 seconds that the conversation that was just had, this is

16 supposed to be a class action claim that we're talking about

17 drilling down into the individual aspects of each one of these

18 people who called first, what's the status.  That's one of the

19 reasons why it's not -- that aspect of the claim is not

20 appropriate for class action.

21           THE COURT:  The loan modification?

22           MR. SILVERMAN:  The loan modification.  The who is --

23 the question of what the status of the parties is, what the

24 relevant posture of the parties, who asked first.

25           But to come back to the question that Your Honor had

1 posed, obviously the question of whether it's debt collection,

2 that's not in the FDCPA, but there have been some legal tests

3 in the Southern District adopted the *Goodson* Sixth Circuit

4 test, seven-part standard, the nature of the relationship;

5 whether the communication expressly demanded payment; whether

6 it was sent in response to an inquiry or request by the debtor;

7 whether the statements were part of a strategy to make payment

8 more likely; whether the communication was from a debt

9 collector; whether it stated it was an attempt to collect the

10 debt; whether it threatened consequences should the debtor fail

11 to pay.

12          I mean, I think those standards are pretty well set

13 out.  Some courts have different flavors.

14          But that's step 1, is it an attempt to collect a

15 debt?

16          And we had, in the motion to dismiss, talked about

17 the fact that certain of these kinds of communications under

18 524(j) that falls out -- whether it's preemption or whether

19 it's just the logistics of that's not an attempt to collect a

20 debt, it's something different.  We've already talked about

21 that ad nauseam.

22          The next question, which was is it false or

23 misleading?  Again, I think everybody agrees that's an

24 objective standard.

25          THE COURT:  Okay.  Can we back up?

1          MR. SILVERMAN:  Looking at that --

2          THE COURT:  Can we back up?

3          Do you agree that in determining -- that in looking

4    at those seven factors that you just identified and determining

5    whether a particular communication is a communication in

6    connection with the collection of a debt, that I apply the

7    least-sophisticated consumer standard?

8          MR. SILVERMAN:  There's no place to apply that.

9    It's -- the least-sophisticated consumer standard is a standard

10   of reasonability.  It's not a standard of weight.  It's what

11   you're comparing it to.

12         What we're talking about here is there's a seven-part

13   standard, who's got -- they've got the burden of proof to move

14   the scale on -- in their direction.

15         Though the element of who is the -- who is on the

16   other side of the phone, who is opening the letter, that's

17   present in several of those elements, it's already in there.

18   The question of who asked for it first.

19         We know that the person who's calling -- we're

20   talking -- this is a standard for residential mortgages.  The

21   person who calls the bank or the servicer is the borrower.

22         We're already presuming certain items regarding their

23   skillset or lack thereof.

24         I think the question of least-sophisticated consumer

25   is just like -- we do this all the time, again, Florida

Deceptive Unfair Trade Practices Act, same kind of issue.  It's an objectively -- it's an objective standard looking at it, picking in your mind Bob or Cindy who is the least-sophisticated person that you've got in your mind, what they think.  And then for the purposes of summary judgment, is there a lack of justiciable issue of fact applying to that person?

But I don't think that first part which is is the person a debt collector, that's a classification of some pretty big companies and we already know who they're dealing with.  That's a legal definition under the FDCPA.

I don't -- there's no element of diluting that because they're dealing with poor -- poor residents.  That's already baked into the process.

But coming back to the question of what -- is this a false or misleading document?  Is this a false or misleading presentation?

At the motion to dismiss, Your Honor essentially ruled that because the allegation is that these contacts were false or misleading, and there's something behind them that's false or misleading, we'll let this survive a motion to dismiss.

Then you warned:  If the reason that it's false or misleading is just because they're sending it to someone who came through a bankruptcy discharge, that's not going to be

1   enough.

2          Now that we've come through further briefing, the

3   question remains -- and, again, I presume right now we're just

4   talking about the loan modification?

5          THE COURT:  We are.  We're talking about the loan

6   modification.

7          MR. SILVERMAN:  What in there is false or misleading?

8          It says:  You're not responsible for anything else.

9   In order to get to that point, Ms. Prindle already had to

10  request a trial plan, meet at least three payments under the

11  trial plan, until that happens, they don't send you the

12  modification request.  You've not only requested it, you've had

13  to jump through hoops to get there.  This is something that

14  presumably you wanted.

15         And so the question remains:  What in there would

16  be -- would be false or misleading about those terms?  It's a

17  loan contract.

18         You're not -- you can only dilute it so far.  And

19  they've made the specific point in the contract that if, you

20  know, you're -- you've been discharged in bankruptcy, therefore

21  you don't have to do this.  That was on the cover page.  That's

22  one of the clauses, specifically talks about.

23         When we get to the point we can talk about the

24  general idea of these kinds of practices, but ultimately we

25  come down on a motion for summary judgment, what does the

1  document say and what's wrong with it?

2        And I had -- we issued an interrogatory on that and

3  they responded to it.

4        And, again, if Your Honor later on wants to talk

5  about that on the loan statement, which is, from where I'm

6  sitting, a bigger issue because that's -- that's a class that

7  we're going to end up fighting.

8        The modification is a -- as far as, you know, I can

9  see, it is a party of -- you know, that's a single person with

10  $1000 damages.  We can argue about that as much as we want and

11  we have to deal with it because it's briefed, but the loan

12  statement is a much bigger issue in the case.

13        But, again, obviously we're talking first about the

14  loan modification.  Obviously Your Honor has some questions

15  regarding our positions, which ultimately boil down to we've

16  set forth that under the question is it an attempt to collect a

17  debt?

18        You asked us for this.  You jumped through the hoops

19  that you -- that we made you jump through in order for us to

20  even send this to you.

21        It says what it's supposed to say.  There's nothing

22  wrong with it.  That's our position as to the loan

23  modification.

24        THE COURT:  All right.  Then with regard to the

25  mortgage statement, what distinguishes the mortgage statements

1  now at summary judgment from the Court's analysis of them at

2  the motion to dismiss?

3          MR. SILVERMAN:  Not much.  The main difference is,

4  again, Your Honor knew what you intended to rule on the motion

5  to dismiss, and we interpreted that there was -- that this

6  claim survived preemption, survived a dismissal on the basis

7  that it had been alleged that the statement was somehow false

8  or misleading, and therefore we were going to go and take

9  discovery and find out what was false and misleading about it.

10 But that was in the four corners of the pleading.

11         Your Honor accepted it.  And we didn't drill back too

12 far about what exactly about it was false or misleading.

13         And then Your Honor had indicated that if the only

14 reason that it's false or misleading is because you're sending

15 it to a bankrupt -- to a bankrupt discharged person, that's not

16 going to be enough.

17         We served the interrogatory that asked:  Okay, what's

18 false -- what's false or misleading about it?

19         And the response, again, is in the record and --

20         THE COURT:  I don't remember what the response is.

21         MR. SILVERMAN:  Oh, okay.  Let me --

22         THE COURT:  She was asking if I had my microphone on.

23         MR. SILVERMAN:  Okay.  Let me pull that up.  I'll

24 give you the cite as well.  The document is Document 121-3.

25 And it's an exhibit -- it's Exhibit 3 to, amongst other things,

1  their opposition to motion for summary judgment.  They being

2  the plaintiff.

3             THE COURT:  Yeah, just a moment.

4             MR. SILVERMAN:  And if we turn to Interrogatory 2,

5  which is the:  Please explain how the mortgage statement

6  falsely represented or represents the character, amount, or

7  legal status of the debt.

8             And there was -- and again, it then talks about

9  what's on the face of the document.  There is no allegation

10  that it's a different amount than what Ms. Prindle owed.

11             We come back to it's the same legal argument that

12  pursuant -- does Carrington have a right to send a statement or

13  not?

14             And that was an issue on the motion to dismiss

15  that -- Your Honor ruled on a lot of different issues.  The

16  $64,000 question of is the statement in -- the loan statement,

17  in and of itself, a violation?

18             Your Honor didn't rule on that because you accepted

19  their pleading that there was something false and misleading

20  about it.

21             And the answer is is that there's nothing false and

22  misleading in the background of it.  The numbers that are

23  reflected there are the numbers that -- that are in my client's

24  record.

25             THE COURT:  I'm sorry, sir.  Interrogatory 3 deals

1   with the loan modification package.

2             MR. SILVERMAN:  Number 2.

3             THE COURT:  Oh, 2.  You said 3.

4             MR. SILVERMAN:  I'm sorry.  I apologize.

5             THE COURT:  So let me read the answer.

6             Okay, go ahead.

7             MR. SILVERMAN:  Coming back to your question, is

8   there anything changed since the motion to dismiss?  The answer

9   is no, that the motion to dismiss on the four corners of that

10  statement, is it legal or illegal, we ended up kicking that can

11  down the road because there was a suggestion in the pleading in

12  the complaint that there was something false and misleading

13  about it.  And the answer is there's nothing else than what's

14  on that page.

15            So the same arguments that we spent five hours

16  talking about, which is whether a claim to a discharged debtor

17  as to whether -- are these preempted under the FDCPA versus

18  524(j)?  Is this a contact?

19            All of that -- it's exactly the same as it was

20  before, but the specific legality of the statement we did not

21  reach on the motion to dismiss because of the representation to

22  Your Honor that as pled, there was something else in the

23  background.  And the answer is there's nothing else and this

24  comes back to the front.

25            THE COURT:  Hold on a second.

1        MR. SILVERMAN:  That's page 14 of your order.

2        THE COURT:  I'm sorry?

3        MR. SILVERMAN:  All that, what I just said was

4   addressed in page 14 of your oral order as transcribed.

5        THE COURT:  Okay.  I was actually looking back at the

6   complaint.  But I'll pull that -- out the transcript.  I was

7   just trying to remember the specific allegations in the

8   complaint.

9         I'm trying to figure out how to ask what I'm

10  trying -- without confusing things further.

11       In terms of the mortgage statement, I recall that --

12  of the concerns that I had were the fact that the bankruptcy

13  disclaimer was on the back; the fact that it sort of -- if you

14  filed when Carrington knew whether they had or not; the fact

15  that it gave a payment due date; that it had a tear-off coupon

16  to send back -- or at least I assumed it did.

17       My recollection is the copy of the one that we had

18  didn't actually have the payment coupon attached, but it

19  appeared to be that.  It gave a payment due date.  It gave a

20  payment amount.  Certainly on its front, looks like it's

21  seeking a payment.  And it was plaintiff's allegation that that

22  was false and misleading.

23       And so your position is if there's nothing actually

24  false on the statement, that it then cannot be misleading even

25  to the least-sophisticated consumer, is that --

1       MR. SILVERMAN:   In part.   Which is there are a couple

2   cases that specifically say that postbankruptcy discharge,

3   these kinds of -- call them mortgage statements -- are

4   presumptively legal under 524(j).  We cited the *Gill* case, the

5   *Manning* case.  There are a couple cases that take the opposite

6   view.

7           So that's an entry-level issue, which is are you

8   precluded -- and we cited a couple cases that say that you

9   are -- if I send you a 524(j) statement that contains

10  everything that Regulation Z, which is 1026, says that is

11  supposed to be in there, the due date, the late fees, all of

12  those are things that are supposed to be in that statement,

13  that presumptively that at that point it's legal unless there's

14  something false about it, the numbers are wrong, or you're

15  implying if you don't pay, I'm going to sue you, you're going

16  to be responsible.

17          As to the boilerplate, as Your Honor called it, like

18  that, but that -- if you look at the various cases interpreting

19  this area of law, one of the things you immediately have to do

20  is look at the statement that they were talking about.

21          There was recently a case that they cited from

22  Kentucky, I think it's *Deal*, where there is no -- there is no

23  disclosure regarding that if you're in bankruptcy, this is just

24  for informational purposes.

25          So some of these cases do -- even though they talk

about the same issue from a preemption perspective, you have to look at what they were actually looking at.

We talked about at length at the last hearing as to whether the kinds of preemption that Your Honor --

THE COURT:  We're not going to get back -- I ruled on preemption.

MR. SILVERMAN:  Yeah.  No, no, no.  But we come back to -- when we talk about preemption, talking specifically about a mortgage statement, which is -- that's at the micro level. We've already rejected the idea from some of the courts that I'm not going to -- this area of law is out of bounds.  Again, you've adopted what's kind of the middle ground, which is I need you to see what you did and we need to be talking about it.

Now we're talking about a mortgage statement.  There have been a couple cases specifically talking about sending a mortgage statement just like this, with these elements, because, again, as you've heard this argument before, since I've got the security interest, I need to tell you what you owe, when you would need to pay it.

THE COURT:  Well, you -- you don't have to send that. You choose to send that.

MR. SILVERMAN:  Well, since I'm entitled to send that, there -- yes, we choose to send that.  But since we're entitled to send that, you're not allowed to make the

1  presumption -- you could have just not done it.

2      Once we do it -- we're allowed to do it.  And once we

3  do it, we're required to do it a certain way, which is the way

4  that Reg Z says, these are the things that are included.

5      THE COURT:  But you're not required to -- well, go

6  ahead.  Reg Z.

7      MR. SILVERMAN:  Yeah, it's --

8      THE COURT:  No, I know what it is.  I'm just -- I'm

9  wondering if I have a copy of it up here.

10      MR. SILVERMAN:  I'm just going to give you the

11  citation, which is 12 CFR 1026.41.

12      THE COURT:  Yeah.  I just don't recall if I have a

13  copy of it.

14      Yeah, here it is.

15      So is there any information that is contained on

16  that -- the periodic statement that you're sending that you

17  concede is not actually required by Reg Z?

18      MR. SILVERMAN:  I don't believe so.

19      Similar information we attach is with the Court is

20  also available.

21      The CFPB, Consumer Financial Protection Bureau, such

22  as it exists, which is always a political battle, we've

23  attached their guidance, which they suggest that when you do

24  this, you put the boilerplate on it as well, include the

25  statement:  To the extent your obligation was discharged,

1  et cetera.

2          The main difference between the motion to dismiss and

3  motion for summary judgment between then and now is now you

4  have the record evidence and you know that when that statement

5  was sent to Ms. Prindle, she had called, requested a trial

6  period plan, made four trial period payments, and was -- in

7  order to qualify for a modification.

8          THE COURT:  Well, that's -- that's part of what I was

9  asking earlier is I was trying -- I was trying to get from

10  you-all at what point in the analysis is that relevant?

11          So is that information relevant to me determining

12  whether this is a communication made in connection with the

13  collection of a debt, or is it relevant to a determination of

14  whether -- how the least-sophisticated consumer would view it?

15  And if it is -- if it's at the latter stage, doesn't that take

16  us out of an objective inquiry?

17          MR. SILVERMAN:  The answer is the former, which is

18  that you asked for this.  The statement that she had -- that

19  she received that's the statement in evidence lists her

20  specific payments and when her next payment is due.

21          THE COURT:  Well, she didn't ask for the mortgage

22  statements.

23          MR. SILVERMAN:  No, no.  She asked -- she wanted a

24  trial plan.  The mortgage statement that she is suing upon, not

25  the prior ones that are barred by the statute of limitations,

1   the one from July -- late June, early July.

2           THE COURT:  June 27, 2013.

3           MR. SILVERMAN:  If you'll look at the amounts, it

4   reflects that she's made recent payments.

5           THE COURT:  How does that mean she asked for the

6   mortgage statement?

7           MR. SILVERMAN:  No, she didn't -- I didn't say she

8   asked for the mortgage statement.  She asked for the -- I

9   apologize.  She wanted to be in a trial period plan with --

10          THE COURT:  Okay.  Setting aside the loan

11  modification, the trial period.

12          MR. SILVERMAN:  Yes.

13          THE COURT:  The mortgage statements, you-all were

14  sending those routinely; right?  She didn't request the

15  mortgage statements?

16          MR. SILVERMAN:  Correct.

17          THE COURT:  Okay.  So looking at the mortgage

18  statements, am I to consider the fact that she had those

19  communications that -- and that she was told nine times:

20  "You've been discharged in bankruptcy," is that relevant?

21          I know you say that's very relevant to the loan

22  modification statement, but is it relevant to the mortgage

23  statement claim?

24          MR. SILVERMAN:  It is relevant to the mortgage

25  statement, because as the least -- as, again, for the purposes

1  of false or misleading, it's an objective standard.  I'm not

2  aware of any case law that moves that needle based on the

3  circumstances of the relationship between the parties, or

4  the -- the daily status of where they are.

5          But as the least-sophisticated consumer, she receives

6  a statement that lists her last payment.  And so as the most --

7  as a least -- as the least-sophisticated consumer, Ms. Prindle,

8  where she is in late June of 2013, there's nothing on there

9  that could be misleading to her.

10          Does this suddenly say -- could the Court find that

11  Ms. Prindle, after having gone through the trial plan and made

12  the three trial -- four trial payments, was -- could or was

13  deceived or misled regarding whether she owed money and was

14  personally responsible for it by virtue of this statement?

15          THE COURT:  Well, what -- for some reason, I'm not

16  understanding the relevance of -- you're saying it lists her

17  last payment; right?

18          MR. SILVERMAN:  Yes.  The upper right-hand corner.

19          THE COURT:  Uh-huh.

20          MR. SILVERMAN:  You're -- we're talking about the --

21  again, I have to flip to the one that's at issue, which is in

22  the stack; right?

23          So it is Document 58-3, page 5 of 5.

24          THE COURT:  Okay.  So that's the one I'm looking at.

25          MR. SILVERMAN:  But it's the same thing.

1          Current payment due date.

2          Is there anything -- can that be -- given what we now

3    know on a summary judgment, is that misleading, knowing that

4    she's made the previous four trial payments for the previous

5    months?

6          Is there a current payment due?

7          Is that -- are any of these misleading, given what

8    the posture of July -- of June 27, 2013, even to the

9    least-sophisticated recipient of this on a motion for summary

10   judgment?

11         Ms. Prindle gets this, and is there an argument that

12   she is somehow deceived, having gone through bankruptcy,

13   that -- where she is on the scale?

14         THE COURT:  Well, plaintiff would say yes, because

15   nothing is due.  She doesn't -- she's been personally

16   discharged.  You don't have the right to collect anything from

17   her.

18         MR. SILVERMAN:  Well, she has -- we've seen in the

19   record, the documents concerning the trial payment plan, that

20   she -- and at this point she contacted us, asked us for a

21   modification.

22         And so is this -- again, your -- this is a secondary

23   argument, which is you need to find that this is an objectively

24   false and misleading, with -- and, again, obviously the -- we

25   know that there is the disclosure on the second page that's not

1    on the exhibit that's attached here, the specific disclosure

2    about bankruptcy, that given -- the difference between the

3    motion to dismiss -- you asked what the difference between the

4    motion to dismiss and the summary judgment is that we now know

5    that she's been in the trial plan right before this.

6            It still doesn't take away from my primary argument

7    on this point that this was an area we kicked the can down on

8    preemption, the specific legality, the legality of this,

9    because of the pleading that there was somehow something more

10   or different regarding the numbers or what was going to be

11   delivered.

12           We're now back at that stage on the summary judgment,

13   which is, based on the case law -- again, I've cited the cases

14   that say this kind of statement in a 524(j) context is both

15   not -- depending -- either preemptive, clean under the FDCPA,

16   or not an attempt to collect a debt under the FDCPA.

17           The cases get to that same result under two different

18   theories, but that's ultimately the point on the statement.

19           THE COURT:  Well, you have not -- there's a case out

20   there that says it's not an attempt to collect a debt because

21   it's not a personal obligation of the plaintiff because they've

22   been discharged.

23           MR. SILVERMAN:  Correct.

24           THE COURT:  The *Eruda*.

25           MR. SILVERMAN:  Yes.

1          THE COURT: You're not making that argument; right?

2          MR. SILVERMAN: Well, again, there's two -- some of

3 the cases say that you're preempted -- sending a statement

4 under the 524/Reg Z items is preempted.

5          THE COURT: Let me -- sorry, because I --

6          MR. SILVERMAN: Yeah.

7          THE COURT: There's a specific theory under that that

8 some have made under that *Eruda* case -- which I don't think

9 you're arguing, and I just want to make sure I understood it

10 right, and that is there's a suggestion that the plaintiff is

11 not a consumer because they've been discharged, they don't

12 personally owe the debt and so they don't fall within --

13          MR. SILVERMAN: No.

14          THE COURT: You're not making that argument?

15          MR. SILVERMAN: No, we have not made that argument.

16          THE COURT: Good. Thank you.

17          MR. SILVERMAN: We try to stick to the -- to the

18 solid earth.

19          THE COURT: Okay.

20          MR. SILVERMAN: I'll take it, but...

21          THE COURT: No.

22          MR. SILVERMAN: I think the last hearing, we had

23 another motion at the same time and somebody was yelling at me

24 because I was conceding some stuff. We had two cases set for

25 hearing at the same time.

1          THE COURT:  Oh, yeah, we did.  I think the other

2     one's *Neal*.

3          MR. SILVERMAN:  I think it settled afterwards.

4          Again, our point is whether you call it preemption or

5     call it not informational/not intended to collect the debt

6     because of the disclosure, it's the same issue.

7          And, again, we had a long argument on this, and Your

8     Honor has ruled on many aspects of this before.  This was what

9     was left.

10         And coming back before Your Honor, there's really,

11    you know, there's nothing other than what's on the page for you

12    to decide unless you decide that Ms. Prindle's personal

13    experience and status is relevant to that.

14         THE COURT:  All right.  Let me talk to Mr. Borison.

15         Just looking at the mortgage statement, tell me what

16    is -- well, is there anything objectively false on the mortgage

17    statement?

18         MR. BORISON:  Well, total amount due, there's no

19    amount due from Ms. Prindle.  There's no past due amount.

20    There's no other amounts due.  All of those appear on the

21    statement and in bold.

22         If I could, Your Honor, if I could just go back to

23    the loan modification, because I had a chance to pull it up in

24    between.

25         And I thought it was important to point out to the

1   Court, the third page or the second page of the loan

2   modification cover letter includes a summary of the terms.  And

3   I can give you a cite to it, if you want.

4                    THE COURT:  I have it right in front of me.

5                    MR. BORISON:  Okay.  If you look at the second page

6   where it's labeled Summary, this summary obviously is intended

7   to inform the reader of everything important in the loan

8   modification agreement.

9                    If you look at it, of course, it begins with any past

10  due amounts as of the end of the trial period; past due amounts

11  indicating that you owe money.  But more importantly, nowhere

12  in this summary is there any mention of the bankruptcy

13  discharge that you're not personally liable.

14                   This is the document that they prepared and sent to

15  this person and said this is what you need to know about this

16  enclosed document.

17                   THE COURT:  Yeah.  I guess with regard to the loan

18  modification, here's the difficulty I have with that claim is

19  that we can't ignore that Ms. Prindle requested the loan

20  modification.

21                   And so they send her a loan modification and it -- it

22  says -- it doesn't say:  If you've been discharged in

23  bankruptcy.  It says --

24                   MR. BORISON:  Right, paragraph H?

25                   THE COURT:  Paragraph H.  Quote:  I was discharged in

1     a Chapter 7 bankruptcy proceeding subsequent to the execution

2     of the loan documents.  Based on this representation, lender

3     agrees that I will not have a personal liability on the debt

4     pursuant to this agreement.

5          And there's the fact that Ms. Prindle spoke to

6     representatives of Carrington on -- looks like at least

7     nine occasions, based on the record, because she doesn't

8     dispute their evidence that they told -- that she had those

9     conversations.  And that in each one, she was told that because

10    she had been discharged in bankruptcy, she didn't have personal

11    liability under the loan.

12         So under those circumstances, how can -- I mean, the

13    mortgage statement is a different issue.  But on the loan

14    modification, how can that -- they sent a document at her

15    request.  It accurately tells her that she doesn't have

16    personal liability.

17         What did they do wrong?

18         MR. BORISON:  Well, here's -- I think this case is

19    all about carte blanche, and here's why I say that.  Because

20    basically what the defendant keeps telling the Court is, like,

21    for instance, under 524(j), because 524(j) entitles us to do

22    these things, then we can't be held liable.

23         But I think -- I mean, let me tell you why I disagree

24    with that.  524(j) is very limited.

25         Number 3, the requirement says that such act is

1    limited to seeking or obtaining periodic payments associated

2    with a valid security interest in lieu of pursuit of in rem

3    relief to enforce the lien.

4         Where in the statement or the modification is there

5    any reference that that's the purpose of these letters?

6    There's nothing in the statements, there's nothing in the loan

7    modification that says:  Look, this fits within 524(j).

8         Their argument is once we have the right to send

9    something, we can say whatever we want.

10    THE COURT:  Well, I rejected that.  I said they --

11    just because they have the right to send it did not mean they

12    had the right to be false or misleading in the document, and

13    that's part of the reason that I said that 524(j) and the FDCPA

14    could seemingly coexist.

15         But once -- and you're now going back to the mortgage

16    statement, but -- and I was on the loan modification.

17    MR. BORISON:  Right.  And I was going to get to

18    the -- and here's why I'm saying the whole case is about carte

19    blanche, because then their second argument on the loan

20    modification is:  Look, if the person asks us for it, then

21    we're allowed to do whatever.

22         I think sending a statement with the summary of the

23    important terms everybody would interpret would include, "By

24    the way, you're not liable," if you thought it was an important

25    term.  And I think at a minimum it creates a fact question as

1    to whether or not a jury would see that from the eyes of the

2    least-sophisticated consumer.

3          But -- so that's the thing.  I don't think the fact

4    that she called suddenly gives them -- I mean, it almost sounds

5    like their defense is:  Well, she entrapped us.  She led us to

6    this.  You know, we don't want to say false things or not

7    summarize it properly, but she made us because she called us

8    and asked for it.  I don't think that works.

9          And then the other issue, Your Honor, just to -- and

10   maybe it's gone back to, but the other issue is whether or not

11   they were in default or not.

12         Again, you know, unfortunately it's not defined under

13   the FDCPA what default means.  But, you know, if you look at

14   the statements and -- as was pointed out to you -- you know,

15   their position is:  Well, we don't know who's in default.

16         I mean, like Ms. Prindle's, you know, the statement

17   shows the default cost.

18         But then they come into court and say:  Well, we're

19   not sure she was in default.  Because, you know, since it's not

20   defined under the FDCPA, you know, maybe -- maybe we can't be

21   held liable.

22         So -- and then, you know -- and going to the

23   statement, Your Honor, I do believe it's false to tell her that

24   the total amount due is $97,571.  And I think if someone got a

25   statement sent to them with their name on it, with no reference

whatsoever to what 524(j) is limited to, which is:  Hey, you

can do this.  This is purely to -- in lieu of in rem relief.

Nowhere on this statement is there anything that

talks about:  This is just an alternative.  We're not seeking

payment from you.

No.  It says -- I think anybody who is going to look

at this, if you ask them what does this mean, it means the

person who is addressed to, Twyla Prindle, was being told that

she owes a total amount due of $97,571.85.

I think, respectfully, at a minimum, it creates an

issue for the jury to decide whether or not that's true.

But the Court also pointed out that there were

several other things, you know, the disclaimer is on the back.

It talks in terms of "if you filed" when they knew she filed.

There is a payment coupon referenced.  It says, you know, at

the bottom of that, it says:  Please detach the coupon portion

of the statement.

So there was apparently a coupon portion at some

point.  And then it also talks in terms of a due date, current

payment due, other amounts due, past due amounts.

I don't see how you come away from this looking at

this letter and say:  At a minimum, it creates confusion as to

whether Carrington is telling her she owes an amount due.  It

doesn't fall within 524(j).

There's nothing on this document that would bring it

1  within the confines of 524(j).

2          And then they say:  Well --

3          THE COURT:  It's because it doesn't say it's in lieu

4  of?

5          MR. BORISON:  Right.  I mean -- well, that's -- and

6  there's nothing about voluntary payments or anything else.  If

7  you look at the *In re Biery* case, the Kentucky case that he

8  referenced.  I think that court set out that there's certain

9  things that should be in there, that if you're really trying to

10  conform to 524(j).

11          524(j) is just a convenient argument after the fact

12  to say:  Look, we were sending these statements.  She never

13  asked for the statements.  We were sending them.  We were

14  telling her she owed amounts due, and now we're going to say

15  back in retrospect:  Oh, well, 524(j) gives us a free

16  get-out-of-jail card.

17          I don't think it does.

18          And then they say:  Well, we were entitled to.

19          And then they rely on 524(j).  But what's interesting

20  is what the evidence before the Court is, is they stopped this

21  practice after we filed suit.

22          You know, because he also mentioned that they were

23  required to send it.  Well, apparently they weren't that

24  required, because they were able to stop sending them because

25  they were sued.

1          I think what's before the Court is looking at the

2     these documents, that it presents a fact issue as to whether a

3     consumer would be misled into believing that they owed some

4     amount.  And when the documents talked in terms of total amount

5     due, past due amount, other amounts due, that's not an

6     unreasonable conclusion that a jury could draw, saying:  Yes, I

7     think this was confusing.

8          And with all due respect as to the loan modification,

9     I think there are some issues there.  But I'm not going to

10    press that point because, you know, I hear you.

11         THE COURT:  Yeah.  I guess -- well, let me ask you

12    this, before I get the -- with regard to the actual damages,

13    given the fact that Ms. Prindle did not make any payments after

14    June 27 of 20 -- well, it's actually -- hold on a minute.

15    Where's the letter?

16         MR. BORISON:  I think the June 27, '13, is the --

17         THE COURT:  The offending statement?

18         MR. BORISON:  Right.

19         THE COURT:  That she --

20         MR. BORISON:  Go ahead.  She may not have -- she

21    probably does not have an actual damage claim if -- there is a

22    dispute as to the amount they set forth, 27, we say over 4,000,

23    but we haven't been able to narrow it down.

24         And I do think it's partly because -- and I recognize

25    earlier we talked about, you know, we talked about their

1  spreadsheet and I was sort of in pain over there because it's
2  sort of like they gave us a spreadsheet in response to our
3  questions to identify certain people, and then we get here or
4  in the motions and they're saying:  Well, your spreadsheet's
5  wrong.
6          Well, it wasn't our spreadsheet.  I mean, you know.
7          THE COURT:  Well -- and understand, I don't know what
8  the -- I don't know what the parameters were or the questions
9  as far as what was asked for.  All I know is that I --
10         MR. BORISON:  It was a mess.
11         THE COURT:  I thought I pointed out that I had issues
12 with the spreadsheet beforehand, and so I was a little
13 surprised that I didn't get any greater clarity.  But that's
14 probably -- that's neither here nor there.
15         All right.  So -- but with regard to her actual
16 damages claim, you-all --
17         MR. BORISON:  Yes.
18         THE COURT:  You-all agree it doesn't have an actual
19 damages claim?
20         MR. BORISON:  Yes, Your Honor.
21         THE COURT:  Okay.  And your disagreement with my
22 ruling at the motion to dismiss, you're not giving that up by
23 conceding that based on my ruling that she doesn't have an
24 actual damages claim, because I recognize if we had the
25 two-year statute of limitations, it would be a different story.

1          MR. BORISON:  Right.

2          THE COURT:  Okay.  So let me just tell you-all where

3     I think I am.

4          And on summary judgment, I'm -- and I don't usually

5     do this, because I find -- and Ms. Falzone, who clerked for me,

6     knows that sometimes what I say is:  Okay, let's try and write

7     it up and see if it floats.

8          And so this is what I'm thinking right now, but it's

9     not necessarily my conclusion because sometimes when we

10    actually write it up, I read it and go:  Wow, I was wrong and

11    we have to regroup.

12         But right now I'm thinking that summary judgment is

13    likely to be granted in favor of Carrington on the loan

14    modification.  It's obviously due to be granted with regard to

15    actual damages.

16         But I'm -- for a lot of the same reasons that I

17    denied the motion to dismiss on the mortgage statement, I'm

18    less -- less certain that that claim goes by way of summary

19    judgment.

20         Now, I would tell you that my level of certainty

21    regarding what -- I'm more confident in my position as to the

22    mortgage statement at this point than I -- I'm sorry, loan

23    modification, than I am as to the mortgage statement, because

24    there are a couple things that you-all brought up that I had

25    not considered quite in the context that you are arguing them,

1   and so I have to look back at them.

2          But I say all that because I want to ask

3   Mr. Silverman, if, in fact, I determine that summary judgment

4   is due to be denied as to the mortgage statement, and if, in

5   fact, numerosity is not an issue, why wouldn't class

6   certification be appropriate as to that claim?

7          MR. SILVERMAN:  Your Honor, counsel for the plaintiff

8   is correct, to the -- you know, it's always an art form

9   figuring out which of the merits issues come over to the class.

10          And in this case, this is one of the cases where --

11   and you see these in class certification opinions, where the

12   courts do have to make some level of decision as to what -- how

13   am I going to -- what's the structure for the analysis of the

14   underlying plaintiff claim so I can figure out whether

15   typicality and commonality are met?

16          And in this case, as we had -- to sum it up briefly,

17   which is that depending on how Your Honor perceives how we're

18   going to analyze the statements -- again, is it an attempt to

19   collect a debt?  That's a seven-part test.  And again, we've

20   cited that.

21          Is that test the same for every one of the members

22   who receives the statement?  If it's different, then

23   commonality and predominance suffer as a result.

24          If you find -- and I'll give you an example, which is

25   not this case.

1    If we had a case where we're talking about a credit

2    card creditor, postdischarge, nonsecured claim, pretty much any

3    letter you send out to those discharged people is going to be

4    resulting in a single class action.  And, again, counsel for

5    the plaintiff specializes in this.  And I would -- again, we

6    settle those quickly because there's no defense to that.

7    Because there's no justification.  There's no

8    relationship between the parties that would impose any kind of

9    differentiation between class members.

10   I have argued, for the purposes of how you should

11   decide the interaction between 524(j) and all the other rules,

12   that that test of whether I am attempting to collect a debt

13   varies between class members, is my contact with Ms. Prindle

14   different than -- based on the -- what we now know, different

15   than it would be to another discharged person who received, is

16   it going to depend -- you know, if you find -- again, I

17   think --

18   THE COURT:  And that's part of -- that's part of what

19   I kept trying to get you-all to help me out on, is at what

20   point in the analysis am I supposed to be considering that?  Is

21   it at the analysis of that seven-part test or is it at the

22   stage where I'm looking at the least-sophisticated consumer?

23   MR. SILVERMAN:  Well, the least-sophisticated

24   consumer is an objective standard.  That's not where I win.

25   Where I win as the defendant is either on commonality or

predominance.  Those are kind of two halves of the same coin.

This is a damages case.  Ultimately are the common issues going to predominate?  If I have a trial, do I have to put every member of the class up or not?

And again, I apologize.  We started on numerosity and I thought we were going to kind of go back and forth four times for each of the elements.

But ultimately -- and, again, I think, as a strawman, I think counsel for the plaintiff in their reply said that we as the defendants are arguing that you need to do this, this, this and this differently for each member of the class.  It wasn't completely on-point, but it was pretty close.

Which is, to the extent that Your Honor finds that the contact between the servicer and the class members requires an individual analysis, to the extent that we need to really drill down and figure out what -- who was in default and who wasn't when it got transferred to Carrington for the purposes of deciding whether a debt collector, that's an individual, file-by-file issue.

If you find that those -- those issues predominate, then you shouldn't certify.  That's the defense position.

Is it easier -- is it easier to certify rather than, in this case, since there, you know, from the defense perspective we argue that if the plaintiffs are right, then they're talking about plaintiff contempt hearings in individual

1   bankruptcy cases.

2          Is that a sufficient remedy for these class members

3   who feel --

4          THE COURT:  You lost me.

5          MR. SILVERMAN:  We're going to be -- one of the

6   things the plaintiffs argue is what's the alternative?

7          You know, you see class actions over a $7 charge.

8   And part of the argument from the plaintiff is this is superior

9   to the alternative of not certifying a class, because otherwise

10  there's no relief.

11         That either you certify this as a class or these

12  bastards are going to get away with this terrible thing.

13         That's not the case here because any class member who

14  felt or who is actually injured by what is alleged here, which

15  is a discharge injunction violation, has a fairly sharp knife

16  that they can throw at my client, which is one of the reasons

17  why that this is not a case where a class certification is a

18  superior resolution.

19         THE COURT:  You brought up the issue of is there

20  going to be a dispute as to whether or not you're a debt

21  collector as to each individual member of the class because of

22  whether or not they're in default.

23         But earlier when I was asking questions about that,

24  you seemed to be telling me that that wasn't a dispute between

25  you-all.

1          MR. SILVERMAN:  That -- we were talking about at the

2    time of numerosity.  We got up, we were talking about the first

3    element, which is numerosity.

4          And counsel for the plaintiffs was talking and I --

5    about, well, once you go into bankruptcy, that constitutes a

6    default.

7          And I was kind of just coming up to concede and say:

8    You meet numerosity -- no matter how you mix this, you're going

9    to meet numerosity.  There's going to be more than 40 people

10   for whom -- or would have gotten -- that we would have been a

11   debt collector for who we sent the statement out for.

12         THE COURT:  So how -- then what is your contention as

13   to how default would be determined?

14         MR. SILVERMAN:  Default is a mushy standard.  The

15   best -- there's a 2003 case from the Second Circuit -- is it

16   Elger, AlBrel, Albrandy?

17         Again, it's not a defined issue.  And so are there

18   more than 40 people?  Yes.  Don't quote me on that hopefully.

19   But, again, we're not -- we're not --

20         THE COURT:  She's kind of quoting you on it.

21         MR. SILVERMAN:  I know that.

22         But, again, we're not, in good faith, stating that

23   numerosity is met.

24         However, for the purposes of predominance, do common

25   issues predominate over individual issues?  That ultimately

1  boils down to what is this trial going to look like?

2      How many people -- do I know that once I decide that

3  this letter is good or bad, how many people recover from that

4  and how many individual trials do I then have to have?  And how

5  many of those are going to be disputed?

6      THE COURT:  Why do we have to have individual trials?

7      MR. SILVERMAN:  That's my -- as more -- to the extent

8  that the question of, for instance, how you determine who is a

9  debt collector?  I mean, what is an attempt to collect a debt,

10  the seven-part test.

11     To the extent that varies between class members, then

12  the answer is going to be different for those 125, 150 people.

13     Is the answer for Class Member No. 1 the same as

14  class member for No. 100?

15     Ultimately, there are some common issues.  Of course,

16  there are.

17     Do the common issues predominate to the point where

18  it is a superior method of adjudication to have a class action

19  or is it going to be -- sometimes you can certify a class on a

20  complicated case.  If there's defective product or defective

21  brakes on a car.  You can certify as to liability but have

22  individual trials on damages.

23     That's not necessary here.  This is statutory

24  damages, unless *Spokeo* gets reversed, in which case the whole

25  case goes away.  But we always -- we drop that in a footnote

1  and we'll see what the Supreme Court does, you know, and we'll

2  leave it at that.

3        But ultimately Your Honor would have to decide,

4  within your discretion, is there enough common issues of fact

5  so that the individualized issues are such that they overwhelm

6  the process that having a trial turns into a series of many

7  trials.

8        And as we've identified in our objection -- our

9  opposition to the class certification, whether you call it

10 predominance or typicality or commonality, if we're only

11 talking about the statement class, those questions are can

12 you -- depending on the Court's desired application of that

13 seven-part standard to determine whether or not somebody is

14 a -- whether a communication is for the purposes of attempting

15 to collect a debt, is that going to be common or is that going

16 to be individualized?

17       That's something in the context of the summary

18 judgment, you know, we sort of teed it up there.  You may

19 choose to reach it there, you may not.

20       The other issues that we've identified in the

21 response include things like, you know, is there a common

22 definition of in default, or deficient, or in deficiency such

23 that we know we can decide on a common basis who is a member of

24 the class?

25       And, again, if, you know, in many of these cases, we

1   can sometimes reach a stipulation as to something like that.

2          So that's, you know, that's a way to kick the can

3   down the road as well.

4          THE COURT:  Hold on one second.

5          I'm sorry?

6          MS. VARNELL:  He asked me a question.

7          MR. SILVERMAN:  She agreed on that last point.

8          THE COURT:  All right.  Just a second.

9          MR. SILVERMAN:  We're giddy.  It's late.

10         THE COURT:  The problem with when your law clerk

11  gives you a 90-page memo of law on something is finding what

12  you want to -- all right.  Hold on.

13         The -- looking at the -- so I guess what you're

14  saying is it comes down to whether I'm -- how individualized

15  the inquiry is going to be with regard to the analysis of

16  whether a particular mortgage statement constitutes a

17  communication in connection with the collection of the debt?

18         MR. SILVERMAN:  Yes.

19         THE COURT:  And so if I -- if I think that it is

20  relevant whether the individual had requested a loan

21  modification, as you said with Ms. Prindle, or whether she had

22  been told, as in Ms. Prindle's case, that she was discharged,

23  then it would be a very individualized inquiry, which you-all

24  would say is not subject for class treatment.

25         MR. SILVERMAN:  Not appropriate for classification in

1  the Court's discretion, yes.

2         THE COURT:  But if -- regardless of whatever other

3  information is out there, if the Court determines that the

4  mortgage statement on its face could be construed as seeking

5  payment on the debt, then the claim would be subject to

6  consideration on a class-wide basis so long as the question of

7  default didn't kick it out; right?

8         MR. SILVERMAN:  Yes.  The more -- the more you

9  simplify it, the more common issues predominate.  And the more

10  individualized, the less common individual issues predominate.

11         THE COURT:  Okay.  I got it.  Don't know what I'm

12  going to do with it, but I got it.

13         Ms. Varnell, Mr. Borison, is there anything you want

14  to add as to those last few issues?

15         MS. VARNELL:  I'd like to make just two statements

16  specifically since we were addressing class cert.

17         I think it should be important to the Court's

18  consideration that with regard to whether or not there were

19  communications between the consumer and the mortgage servicer

20  that the evidence in front of this Court is that the

21  statements -- until February of 2014, long after the suit was

22  filed, is that these statements went out with the same language

23  to everyone, and went out to every mortgage holder,

24  irrespective of what communications were made.

25         So that's why this Court -- the common issues

1  predominate over any individualized issues because these
2  statements went out irrespective of what the communications
3  were, so I don't think that they can rely upon oral testimony
4  to pull them out from under that fact.
5       Second, I wanted to point out to the Court that we --
6  we really want the Court to consider that we can -- they have
7  the capability, because they know exactly what communication
8  went to exactly which person, to know whether or not everybody
9  who got a mortgage account statement contained a line that said
10 "default loan cost" so we will know whether the loan was in
11 default when we compare that statement with the time that the
12 loan was acquired.
13      So I don't think that there's been any dispute in
14 front of the Court today that they can determine whether or not
15 the loan was -- would have contained that statement on it.
16      And I don't think there's any dispute from the
17 defendant that they knew that the consumer had filed for
18 bankruptcy.
19      So we have presented common evidence that could be --
20 from which the default determination could be made.
21      THE COURT:  Yeah.  The only thing I think that
22 argument misses is whether the mortgage statement sent to them
23 in 2013 showed a default -- evidenced that at that time it was
24 in default, that doesn't address whether it was in default at
25 the time it was acquired.

1           MS. VARNELL:  I agree, Your Honor.  Their records --

2 they're not disputing that they can determine it from their

3 record.

4           And that's why Mr. Silverman's statement is both

5 scholarly and gracious where he has said we could work that

6 out.  We can determine -- and he's saying the number is over

7 40.  And we could make the Court's life less complicated by

8 agreeing on who was and wasn't in default.

9           THE COURT:  Okay.  Then I thought we had agreed on

10 all that, that's why I'm not understanding why you brought it

11 back up.

12           MS. VARNELL:  Okay.  Thank you very much.

13           That's all I have.

14           THE COURT:  Okay.

15           MR. SILVERMAN:  Thank you, Your Honor.

16           THE COURT:  All right.  I'll take it under advisement

17 and enter a written order.

18           We're in recess.

19           COURT SECURITY OFFICER:  All rise.

20    (Proceedings concluded at 4:40 p.m.)

21                           - - -

22

23

24

25

C E R T I F I C A T E

UNITED STATES DISTRICT COURT)

MIDDLE DISTRICT OF FLORIDA  )

    I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.

    Dated this 26th day of May 2016.

             /s/Cindy Packevicz Jarriel
             Cindy Packevicz Jarriel, RPR, FCRR