**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

TWYLA PRINDLE, individually and
on behalf of a class of persons
similarly situated,

     Plaintiff,

v.            Case No. 3:13-cv-1349-J-34PDB

CARRINGTON MORTGAGE SERVICES, LLC,

     Defendant.

_____/

# O R D E R

  **THIS CAUSE** is before the Court on Carrington's Motion for Summary Final Judgment (Doc. 113; "Motion"), filed on February 12, 2016. On March 17, 2016, Plaintiff, Twyla Prindle, filed Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. 121; "Response"). At the Court's direction, on June 24, 2016, Prindle filed Plaintiff's Response to Court's Order for Briefing on the Impact of Spokeo v. Robins (Doc. 130; "Plaintiff's Supp. Brief"), and Defendant, Carrington Mortgage Services, LLC, filed Carrington's Supplemental Brief on Spokeo's Impact (Doc. 131; "Defendant's Supp. Brief"). Accordingly, this matter is ripe for review.

**I. Background Facts[1]**

  Prindle took out a mortgage loan from Citicorp Trust Bank on her home, located at 1019 Ashton Cove Terrace, Jacksonville, Florida 32218. Revised Second Amended

---

[1] Unless otherwise noted, the facts recited herein are undisputed based on the information provided by the parties. For the purposes of resolving Carrington's Motion, the Court views all disputed facts and reasonable inferences in the light most favorable to Prindle. The Court notes that these facts may differ from those ultimately proved at trial. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

Complaint (Doc. 58; Second Amended Complaint) ¶ 6; Carrington's Answer, Defenses and Affirmative Defenses to the Revised Second Amended Complaint (Doc. 101; Answer) ¶ 6. She filed a Chapter 7 bankruptcy petition in 2009. Second Amended Complaint ¶ 7; Answer ¶ 7. Prindle initially indicated that she intended to retain her home and reaffirm the debt within the bankruptcy. Doc. 6-1 at 30. However, although she remained in the home, she ultimately did not reaffirm the debt. Second Amended Complaint ¶ 9; Answer ¶ 9. Prindle received a discharge under Chapter 7 of the Bankruptcy Code on March 26, 2010. Second Amended Complaint ¶ 10; Answer ¶ 10; see Doc. 58-1 at 2.

Prindle entered into a Homeowner Unemployment Assistance Forbearance Agreement with the servicer of her mortgage loan. See Declaration of Elizabeth Balce, dated Oct. 17, 2014 (Doc. 72-1; 2014 Balce Decl.) ¶ 5. Carrington began servicing Prindle's mortgage loan in July 2011, and in August 2011 declined to extend the forbearance agreement. Id. ¶¶ 4, 6. Carrington then filed an in rem foreclosure action against Prindle on June 19, 2012. See Complaint to Foreclose Mortgage, Case No. 16-2012-CA-006560 (June 19, 2012) (Doc. 6-3; Foreclosure Complaint). On July 9, 2012, Prindle called Carrington to express interest in a loan modification to enable her to retain her home. 2014 Balce Decl. ¶ 7; see id. at 8. During that telephone conversation, Carrington's representative informed Prindle that because her loan was discharged through bankruptcy, Carrington was not seeking to collect the debt from her personally.[2] Id. ¶ 7. Carrington then provided Prindle with an application for a loan modification under the government-sponsored Home Affordable Modification Program ("HAMP"). Id. ¶ 8.

---

[2] Carrington's call log includes the notation "gave BK disc." 2014 Balce Decl. at 8. The other call logs referenced in this Order contained materially similar notations. See id. at 10–12, 14, 16–18. Balce explained that that notation signified that the representative explained to Prindle that "due to her prior bankruptcy discharge, [Carrington] was not attempting to collect the debt." Id. ¶ 7.

Prindle returned the loan modification application to Carrington on July 24, 2012. Id. ¶ 8. From December 3, 2012, to May 31, 2013, Prindle had at least six telephone conversations with Carrington's representatives concerning the status of the loan modification process, and she received the same bankruptcy disclaimer (informing her that she was not personally liable for the mortgage loan due to her bankruptcy discharge) eight more times. 2014 Balce Decl. at 10–12, 14, 16–18. On January 23, 2013, Carrington provided Prindle with a trial period plan offer. Id. ¶ 9; see also id. at 29. From March through May 2013, Prindle made three required trial period payments of $690, and she made a fourth payment of $690 on June 3, 2013, for a total of $2,760 in payments to Carrington. Id. ¶ 10.

On June 27, 2013, Carrington mailed Prindle a periodic mortgage statement (the "June 2013 Statement").[3] Second Amended Complaint, Exhibit C (Doc. 58-3) at 5. The Statement listed, among other things, a "Loan Due Date" of April 18, 2010; a "Current Payment Due Date" of July 18, 2013; and a "Current Payment Due" of $1,957.64. Id. It also apparently included a detachable payment coupon,[4] as well as instructions for how to make a payment and directions for setting up automatic payments to "give you peace of mind knowing your monthly mortgage payments are taken care of." Id. The front of the Statement directed Prindle to "see the reverse side of this statement for additional information." Id. The back of the Statement contained various statements about payment

---

[3] Prindle's Second Amended Complaint suggests that she received other statements possibly within the relevant limitations period. She alleges that the mortgage statements attached to her Second Amended Complaint are a "[c]omposite of [e]xemplar" statements. See Second Amended Complaint ¶ 37b. Moreover, she had attached an additional statement—dated October 28, 2013, and sent to her counsel—to her earlier Amended Complaint. See Amended Complaint, Exhibit B (Doc. 16-2) at 2.

[4] The Statement referenced an attached payment coupon, but the version of the document Prindle filed with her Second Amended Complaint did not include the coupon. See Second Amended Complaint, Exhibit C at 5.

options, insurance, and property taxes. 2014 Balce Decl. at 74, 76.[5] The back of the

Statement also contained two disclaimers pertinent to this case. The first, under the

heading, "Important Notices," and titled, "MINI MIRANDA," stated:

> This communication is from a debt collector and it is for the purpose of collecting a debt and any information obtained will be used for that purpose. This notice is required by the provisions of the Fair Debt Collection Practices Act and does not imply that we are attempting to collect money from anyone who has discharged the debt under the bankruptcy laws of the United States.

2014 Balce Decl. at 74, 76. The second disclaimer, listed under the heading "Important

Bankruptcy Notice," stated:

> If you have been discharged from personal liability on the mortgage because of bankruptcy proceedings and have not reaffirmed the mortgage, or if you are the subject of a pending bankruptcy proceeding, this letter is not an attempt to collect a debt from you but merely provides informational notice regarding the status of the loan. If you are represented by an attorney with respect to your mortgage, please forward this document to your attorney.

Id.

On July 19, 2013, following Prindle's successful completion of the trial period

payments, Carrington mailed Prindle a pre-signed offer for a Home Affordable

Modification Agreement (the "Loan Modification Package"), which would modify the terms

and payment schedule of the mortgage loan associated with Prindle's home and result in

a waiver of unpaid late charges. See Second Amended Complaint, Exhibit D (Doc. 58-4;

Loan Modification Package) at 2, 4. The letter accompanying the offer instructed Prindle

---

[5] These attachments to the 2014 Balce Declaration are two "[e]xamples of the disclaimers appearing on each statement." See 2014 Balce Decl. ¶ 15. Although formatted differently, the documents contain the same information, and Prindle does not dispute that the information on the back of the June 2013 Statement differed in substance from these examples. Indeed, in responding to Carrington's Motion, Prindle submitted a document that is identical to the second sample Carrington provided. See Response at 12 n.4; compare Response, Exhibit 4 (Doc. 121-4) at 3, with 2014 Balce Decl. at 76.

to complete and return the agreement to accept the offer and to continue making trial period payments. Id. at 4. A summary of the agreement outlined the new principal balance, interest rates, term, schedule, fees, and other aspects of the agreement. Id. at 5. The document also stated that Prindle should "read the enclosed Modification Agreement carefully and make sure that you understand it and that the statements set forth in the 'My Representations' section are true and accurate." Id.

The proposed agreement began with a series of "Representations and Covenants" at Paragraph 1. Id. at 7. As relevant here, Paragraph 1.H stated:

> I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Loan Documents. Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this agreement.

Id. at 8. Paragraph 3 described the modification of the mortgage loan, including the new maturity date and the modified principal of $307,105.29, of which $175,264.50 would be deferred. Id. The proposed agreement included a table showing the payment schedule, which would begin on September 1, 2013, with an interest rate of 2 percent, a monthly principal and interest amount of $399.25, and a monthly escrow payment of $291.02, for a total monthly payment of $690.27. Id. The monthly escrow payment, and thus the total monthly payment, would adjust annually with Prindle's taxes, insurance premiums, or assessments. Id. at 5, 8. The interest rate would adjust annually through July 2020, at which point it would remain at 4.375 percent for the remainder of the term (through July 2036), and Prindle would pay a monthly principal and interest amount of $558.21 for the

remainder of the term of the loan. Id.; 2014 Balce Decl. at 52.[6] Assuming Prindle made all payments on time through the maturity date, she would owe a balloon payment of $256,318.28 at the end of the loan. 2014 Balce Decl. at 58; Loan Modification Package at 12.

The proposed agreement included several "Additional Agreements" at paragraph 4, including that "the Loan Documents as modified by this Agreement are duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed." Loan Modification Package at 9; 2014 Balce Decl. at 52–53. The proposed agreement also stated that Prindle was "not required to waive or release any claims and/or defenses in connection with this Agreement." Loan Modification Package at 9; 2014 Balce Decl. at 53. It stated that "all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect" and that, "except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents." Loan Modification Package at 9; 2014 Balce Decl. at 53.

After receiving the Loan Modification Package, Prindle continued to discuss options related to refinancing the mortgage loan rather than modifying it. 2014 Balce Decl. ¶ 13. In August 2013, Carrington determined that Prindle was not eligible to refinance the loan. Id. However, in September 2013, Carrington offered Prindle a renewed loan modification package. Id. ¶ 14. Prindle made no payments under that proposed

---

[6] The Home Affordable Modification Agreement attached to Prindle's Second Amended Complaint is missing the third page of the proposed agreement. Composite Exhibit 5 to the 2014 Balce Declaration includes that missing page. See 2014 Balce Decl. at 52.

agreement, and Carrington ultimately rescinded the agreement on October 4, 2013, due to Prindle's rejection of the offer. Id.; see id. at 63.

## II.     Procedural History

Prindle filed this lawsuit in state court on September 17, 2013. See Doc. 2 at 1. On November 4, 2013, Carrington removed the case to this Court. Doc. 1. With leave of Court, Prindle filed her Second Amended Complaint on September 16, 2014, raising three claims. In Count I, Prindle alleged that Carrington violated the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692–1692p ("FDCPA"), by sending communications that "asserted that Ms. Prindle owed a debt based on the mortgage loan," including a notice of intent to foreclose, monthly mortgage statements, a loan modification package, and a delinquent tax notice. Second Amended Complaint ¶¶ 5–28. She alleged that those communications violated §§ 1692e and 1692e(2)(A) of the FDCPA. Id. ¶¶ 23–24. In Count II, Prindle alleged that Carrington violated the Florida Consumer Collection Practices Act, Florida Statutes sections 559.55–559.785 ("FCCPA"), by sending those communications because, in doing so, Carrington "[c]laim[ed], attempt[ed], or threaten[ed] to enforce a debt when [it knew] that the debt is not legitimate," in violation of section 559.72(9). Id. ¶¶ 29–47. In Count III, Prindle sought a declaration that Carrington's conduct was unlawful and improper, an injunction prohibiting Carrington from sending documents requesting payment on discharged debts, and an order requiring Carrington to disgorge "all ill-gotten gains," under the Declaratory Judgment Act, 28 U.S.C. § 2201. Id. ¶¶ 48–63. Prindle also filed a motion for class certification. See Plaintiff's Motion for Class Certification and Incorporated Memorandum of Law (Doc. 59; First Class Certification Motion). Carrington moved to dismiss the Second Amended Complaint on October 17, 2014, primarily arguing

that the case was due to be dismissed because (1) the case was moot by virtue of its offer of judgment affording Prindle the full relief she sought; (2) the Bankruptcy Code "preempted" the claims under the FDCPA and FCCPA; and (3) the allegations failed to state a plausible claim for relief. See Carrington's Motion to Dismiss the Second Amended Complaint (Doc. 71; Motion to Dismiss) at 1–2. Prindle renewed her motion for class certification following discovery on May 29, 2015, see Plaintiff's Renewed Motion for Class Certification and Incorporated Memorandum of Law (Doc. 82; Renewed Class Certification Motion), Carrington filed a response to that motion on July 13, 2015, see Carrington's Motion to Strike and Opposition to Plaintiff's Renewed Motion for Class Certification (Doc. 85; Response to Renewed Class Certification Motion), and Prindle filed a reply on August 10, 2015, see Plaintiff's Reply in Support of Class Certification (Doc. 89; Reply to Renewed Class Certification).

On September 23, 2015, the Court conducted a hearing on Carrington's Motion to Dismiss.[7] See Transcript of Motion Hearing dated September 23, 2015 (Doc. 98; Tr. of 9/23 Hearing). At the outset, the Court rejected Carrington's mootness argument based on Stein v. Buccaneers Ltd. P'ship, 772 F.3d 698, 702–04 (11th Cir. 2014). The Court then heard several hours of argument from both parties on the remaining issues, see Tr. of 9/23 Hearing at 7–132, after which the Court took the Motion to Dismiss under advisement and deferred ruling on the Renewed Class Certification Motion. See Clerk's Minutes for Motion Hearing dated September 23, 2015 (Doc. 95; Minutes of 9/23 Hearing) at 1.

---

[7] At the hearing, the Court discussed both the instant case and a similar case, Carman v. Green Tree Servicing, LLC, No. 3:14-cv-1224-J-34MCR, because the cases involved overlapping issues. Doc. 98 at 3. The parties in the Carman case subsequently reached a settlement, and the plaintiff in that case voluntarily dismissed her case, see Doc. 41 in No. 3:14-cv-1224-J-34MCR.

On September 25, 2015, the Court, in a telephonic hearing, announced its ruling granting in part and denying in part Carrington's Motion to Dismiss. See generally Transcript of Motion Hearing dated September 25, 2015 (Doc. 99; Tr. of 9/25 Hearing). The Court concluded that the Bankruptcy Code did not implicitly repeal the FDCPA to the extent Prindle contended that the specific content of the identified communications violated the FDCPA. Id. at 13–14. The Court stated:

> To the extent that the Bankruptcy Code allows a lienholder to seek and accept periodic payments despite a discharge, but the FDCPA would provide a remedy if the lienholder does so by using false, deceptive, or misleading communications, the two statutes can seemingly coexist. A lienholder can assert its right under Section 524(j) [of the Bankruptcy Code] to seek and accept periodic payments without doing so in a false or misleading manner.

Id. at 14. Turning to Prindle's specific FDCPA claims, the Court concluded that the claims based on the notice of intent to foreclose and any communications before September 17, 2012, were barred by the statute of limitations. Id. at 25. The Court also concluded that Prindle failed to state a plausible claim that the delinquent tax notices were attempts to collect a debt that employed false, deceptive, or misleading statements. Id. at 25–26. However, the Court determined that Prindle did state a claim based on the June 2013 Statement because the front of the statement appeared to demand payment, while the back of the statement contained "boilerplate disclaimers that can be viewed as either inconsistent or at least confusing, particularly in light of the amount due on the first page, and can leave a consumer guessing as to whether or not they owe the debt." Id. at 26–27. The Court also found that Prindle adequately alleged that the statement was a communication in connection with the collection of a debt. Id. at 27–29. Finally, as to the Loan Modification Package, the Court concluded that, in light of the need to consider "the

context of the overall relationship between the parties" and the apparent intent of the communication, Prindle stated a plausible claim that the communication was false, deceptive, and/or misleading. Id. at 29–30. However, the Court concluded that the Bankruptcy Code preempted Prindle's FCCPA claim. Id. at 15–21. Based on the parties' previous agreement that Prindle's claim under the Declaratory Judgment Act would be due to be dismissed if her FCCPA claims failed, the Court dismissed Prindle's claim for a declaratory judgment in Count III. Id. at 21. Having narrowed Prindle's claims, the Court denied her Renewed Class Certification Motion without prejudice to her filing another renewed motion properly addressing the remaining claims. Id. at 32.

On December 21, 2015, Prindle filed Plaintiff's Second Renewed Motion for Class Certification and Incorporated Memorandum of Law (Doc. 107). Carrington filed the instant Motion on February 12, 2016. The Court heard oral argument on both pending motions on May 9, 2016, and took the motions under advisement. See Transcript of Motion Hearing dated May 9, 2016 (Doc. 125; Tr. of May 2016 Hearing). Following the hearing, the United States Supreme Court issued its decision in Spokeo, Inc. v. Robins, 136 S. Ct. 1540 (May 16, 2016), which addressed the requirement that a plaintiff demonstrate a "concrete" injury in fact to establish standing under Article III of the United States Constitution. In light of that new decision and the fact that Carrington had raised the issue of Prindle's standing in the course of these proceedings, the Court directed the parties to submit supplemental briefs explaining the effect of Spokeo on this case. See Doc. 124. On June 24, 2016, Prindle and Carrington submitted supplemental briefs addressing the effect of the Spokeo decision. See Plaintiff's Supp. Brief; Defendant's Supp. Brief.

### III.   Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[8] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then

---

[8] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Where the nonmoving party has failed to make a sufficient showing 'to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' there exist no genuine issues of material fact." Mize, 93 F.3d at 742 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

## IV.    Discussion

In enacting the FDCPA, Congress sought "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). As relevant to this case, § 1692e of the FDCPA prohibits debt collectors from using "any false, deceptive, or misleading representations or means in connection with the collection of any debt." 15 U.S.C. § 1692e. It also, more specifically, prohibits a debt

collector from falsely representing "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A).

Notably, the FDCPA does not apply to every communication between a debt collector and a debtor. "[F]or a communication to be in connection with the collection of a debt, an animating purpose of the communication must be to induce payment by the debtor." Parker v. Midland Credit Mgmt., Inc., 874 F. Supp. 2d 1353, 1357 (M.D. Fla. 2012) (quoting Grden v. Leikin Ingber & Winters PC, 643 F.3d 169, 173 (6th Cir. 2011)). "Obviously, communications that expressly demand payment will almost certainly have this purpose." Id. (quoting Grden, 643 F.3d at 173). However, an explicit demand for payment is not necessary, as "communications that include discussions of the status of payment, offers of alternatives to default, and requests for financial information may be part of a dialogue to facilitate satisfaction of the debt and hence can constitute collection activity." McLaughlin v. Phelan Hallinan & Schmieg, LLP, 756 F.3d 240, 245–46 (3d Cir. 2014). On the opposite end of the spectrum, where a communication is "merely information" and explicitly informs the debtor that the communication or notice is not an attempt to collect a debt or a demand for payment, courts have held that these communications are not subject to the FDCPA. See Hasbun v. Recontrust Co., 508 F. App'x 941, 942 (11th Cir. 2013); Hernandez v. Dyck-O'Neal, Inc., No. 3:14-cv-1124-J-32JBT, 2015 WL 2094263, at *3 (M.D. Fla. May 5, 2015); Parker, 874 F. Supp. 2d at 1358.

The Eleventh Circuit Court of Appeals has not identified a specific test for determining whether a particular communication is made in connection with the collection of a debt such that it falls within the ambit of the FDCPA. As such, many courts in this

Circuit look to out-of-circuit decisions for guidance. See Parker, 874 F. Supp. 2d at 1356. In Parker, the court discussed several decisions from the Sixth and Seventh Circuits and identified "the relationship of the parties, the intent of the communication, as well as whether there was a demand for payment as factors to consider when determining whether a communication falls within the scope of the FDCPA." Id. at 1356–57. Other factors courts have considered include whether the communication was sent in response to an inquiry or request by the debtor; whether it was from a debt collector; whether it stated that it was an attempt to collect a debt; and whether the communication threatened consequences if the debtor failed to pay. See Bohringer v. Bayview Loan Servicing, 141 F. Supp. 3d 1229, 1240–41 (S.D. Fla. 2015).

In determining whether a debt collector's communication violates § 1692e's prohibition against the use of "false, deceptive, or misleading representations," the Eleventh Circuit instructs the Court to employ "the 'least-sophisticated consumer' standard … to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd." LeBlanc v. Unifund CCR Partners, 601 F.3d 1185, 1193–94 (11th Cir. 2010) (internal quotation marks omitted). The "least-sophisticated consumer" is "presumed to possess a rudimentary amount of information about the world and a willingness to read a collection notice with some care." Id. However, the test is an objective one to both protect naïve consumers and prevent "liability for bizarre or idiosyncratic interpretations of collection notices." Id.

### A.    Standing

The Supreme Court's recent decision in Spokeo requires the Court to examine more closely whether Prindle has adequately demonstrated that she has standing to bring

her claims under Article III of the Constitution. In <u>Spokeo</u>, the plaintiff (Robins) sued Spokeo, Inc., under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA"), alleging that Spokeo had failed to follow several procedures required under that statute. <u>Spokeo</u>, 136 S. Ct. at 1545–46. Robins alleged that someone had searched Spokeo's website for information on Robins, and the profile Spokeo generated contained several inaccuracies, including that Robins is married, has children, is in his 50s, is employed, is relatively affluent, and has a graduate degree. <u>Id.</u> at 1546. The Ninth Circuit Court of Appeals concluded that Robins had standing because he alleged Spokeo had "'violated <u>his</u> statutory rights'" and because his "'personal interests in the handling of his credit information are individualized rather than collective.'" <u>Id.</u> (quoting <u>Robins v. Spokeo, Inc.</u>, 742 F.3d 409, 413 (9th Cir. 2014) (emphasis in original).

The Supreme Court vacated the decision and remanded the case concluding that the Ninth Circuit had failed to fully address whether Robins had alleged an injury in fact by considering only whether Robins had alleged a particularized harm without considering whether that alleged harm was sufficiently concrete. <u>Id.</u> at 1550. In doing so, the Supreme Court first identified the familiar requirements of constitutional standing under Article III: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." <u>Id.</u> at 1547. It determined the case before it "primarily concern[ed] injury in fact," which requires a plaintiff to "show that he or she has suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." <u>Id.</u> at 1547–48 (internal quotation marks omitted).

The Supreme Court then made several observations about its prior jurisprudence regarding the injury-in-fact requirement of Article III standing. First, the Court noted that "[p]articularization is necessary to establish injury in fact, but it is not sufficient. … [A]n injury in fact must be both concrete and particularized." Id. at 1548 (emphasis in original). To be concrete, an injury must be "de facto; that is, it must actually exist," and it must be "real, and not abstract." Id. (internal quotation marks omitted). That said, the Court recognized that intangible injuries can be concrete. Id. at 1549. "In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." Id. As to historical considerations, the Court noted that "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." Id. As to Congress's judgment, the Supreme Court observed that "Congress is well positioned to identify intangible harms that meet minimum Article III requirements." Id.

> Thus, we said in Lujan [v. Defenders of Wildlife, 504 U.S. 555, 112 S. Ct. 2130 (1992),] that Congress may "elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate at law." 504 U.S., at 578, 112 S.Ct. 2130. Similarly, Justice Kennedy's concurrence in that case explained that "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." Id., at 580, 112 S.Ct. 2130 (opinion concurring in part and concurring in judgment).

Id.

However, the Supreme Court emphasized that "Congress's role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete

injury even in the context of a statutory violation." Id. Thus, it concluded, an allegation of a "bare procedural violation, divorced from any concrete harm," is insufficient. Id. (citing Summers v. Earth Island Institute, 555 U.S. 488, 496 (2009); Lujan, 504 U.S. at 572). Nevertheless, "the risk of real harm" can sometimes satisfy the requirement of a concrete injury. Id. By way of example, the Court pointed to victims of torts such as libel and slander per se, whose "harms may be difficult to prove or measure." Id. Similarly, "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact" such that a plaintiff "need not allege any additional harm beyond the one Congress has identified." Id. (emphasis in original) (citing Fed. Election Comm'n v. Akins, 524 U.S. 11, 20–25 (1998); Pub. Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 449 (1989)).

The Supreme Court concluded that those "general principles tell us two things": (1) that "Congress plainly sought to curb dissemination of false information by adopting procedures designed to decrease that risk"; and (2) that "Robins cannot satisfy the demands of Article III by alleging a bare procedural violation." Id. at 1550. As to the second observation, it provided two examples of "bare procedural violation[s]" that, in its view, would be insufficient. First, it observed that, even if a consumer reporting agency failed to provide notice to a user of the agency's consumer information of that user's responsibilities under the FCRA, as such agencies are required to do under 15 U.S.C. § 1681e(d)(1), "that [consumer] information regardless may be entirely accurate." Id. Second, it observed that some inaccuracies, such as an incorrect zip code, might not "work any concrete harm." Id. Ultimately, the Supreme Court took "no position as to

whether" Robins had adequately alleged an injury in fact but instead remanded to the Ninth Circuit to make that determination in the first instance. Id.

Following the principles articulated in Spokeo, this Court concludes that Prindle has alleged an injury in fact sufficient to establish Article III standing. Whatever other impact the Spokeo decision may have on the law of constitutional standing, it at least reaffirmed one fundamental principle of the concept of injury in fact that is crucial in this case: that "Congress may 'elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.'" Id. at 1549 (quoting Lujan, 504 U.S. at 578). Indeed, the majority in Spokeo cited with approval Justice Kennedy's concurrence in Lujan that "'Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.'" Id. (quoting Lujan, 504 U.S. at 580 (Kennedy, J., concurring in part and concurring in the judgment)) (emphasis added). Justice Kennedy's statement immediately following that quoted passage from Lujan provides additional clarity: "In exercising this power [to define injuries and articulate chains of causation], however, Congress must at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit." Lujan, 504 U.S. at 580. That underlying principle guides the Court's decision in this case.

Congress enacted the FDCPA with the purpose of "eliminat[ing] abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e). Among such abusive practices, Congress found, was the "use [of] any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. By prohibiting such practices and providing consumers with a right to sue for violations of

that prohibition, the FDCPA implicitly confers on consumers the right to be free from those practices when they receive debt-collection communications from debt collectors. See Palm Beach Golf Ctr.–Boca, Inc. v. John G. Sarris, D.D.S., P.A., 781 F.3d 1245, 1251–52 (11th Cir. 2015) (new legal rights created by statute "do not need to be expressly delineated in the statute, but may be inferred from conduct prohibited by it"). Through § 1692e, Congress identified an existing concrete harm (being subjected to specific abusive debt-collection practices) that, by itself, was inadequate at law to establish standing (because, as both parties recognize, a claim alleging such abusive practices required some showing of "pecuniary harm" resulting from the defendant's wrongful acts, see Plaintiff's Supp. Brief at 9; Defendant's Supp. Brief at 6 n.3) and elevated it to the status of a "legally cognizable injur[y]" (by providing consumers with a new, substantive right to be free from such abusive debt-collection practices, without regard to whether a consumer experienced a more tangible "harm"—such as economic loss—resulting from the conduct).[9]

Several earlier Supreme Court decisions support this conclusion. Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982), is perhaps the most instructive. There, in

---

[9] History also supports finding the harm of being subjected to abusive debt-collection practices to be a sufficiently concrete injury. Fraudulent and negligent misrepresentation have been recognized as legally cognizable harms under the common law since at least the publication of the First Restatement of the Law of Torts. See Restatement (1st) of Torts §§ 525, 552 (1938). Moreover, "a number of American jurisdictions" also recognize "a rule of strict liability for innocent misrepresentation of material fact," at least in the context of a sale, rental, or exchange transaction. See Restatement (2d) of Torts § 552C & Cmt. a (1977). As such, the harm of even an innocent misrepresentation made in attempting to collect a debt "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English and American courts." See Spokeo, 136 S. Ct. at 1549. That each of those torts requires some showing of pecuniary harm makes no difference because, as the Supreme Court and Eleventh Circuit have recognized, Congress may do away with the requirement of a showing of actual damages. See Havens Realty Corp. v. Coleman, 455 U.S. 363, 373–74 (1982) (violation of right to truthful information about housing is actionable even without any other showing of harm); Palm Beach Golf Ctr., 781 F.3d at 1252 (transmission of unsolicited fax in violation of Telephone Consumer Protection Act is sufficient injury even without showing of monetary loss).

evaluating standing to sue under the Fair Housing Act, the Supreme Court held that "testers"—"individuals who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful steering practices," see id. at 373—had standing to sue for violation of § 804(d) of the FHA, 42 U.S.C. § 3604(d). Id. at 374. Because § 804(d) made it unlawful for covered individuals and entities "to represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available," the Supreme Court found that "Congress ha[d] … conferred on all 'persons' a legal right to truthful information about housing." Id. at 373. It observed that "the actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing," and concluded that § 804(d), which "establishes an enforceable right to truthful information concerning the availability of housing, is such an enactment." 455 U.S. at 373 (internal quotation marks and alterations omitted). It then concluded that "[a] tester who has been the object of a misrepresentation made unlawful under § 804(d) has suffered injury in precisely the form the statute was intended to guard against." Id. As such, it made no difference to the Supreme Court's decision that "the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home," because the fact of the misrepresentation—not the recipient's deception by it or reliance on it—constituted the concrete injury. Id. at 374.

Likewise, here, through the FDCPA, Congress has conferred upon all consumers the right to be free from certain practices Congress has deemed abusive. As the object of allegedly false, deceptive, and/or misleading representations in connection with the

collection of a debt, Prindle has alleged that she "has suffered injury in precisely the form the [FDCPA] was intended to guard against." See id. She therefore "need not allege any additional harm beyond the one Congress has identified." See Spokeo, 136 S. Ct. at 1549.

The Supreme Court's decisions in Public Citizen and Akins further support this conclusion. In Public Citizen, the Supreme Court concluded that the Department of Justice's "refusal to permit appellants to scrutinize the [American Bar Association Standing Committee on Federal Judiciary's] activities to the extent [the Federal Advisory Committee Act] allows constitutes a sufficiently distinct injury to provide standing to sue." Public Citizen, 491 U.S. at 449. Similarly, in Akins, the Supreme Court found that the plaintiffs had alleged a sufficient injury in fact where the harm they alleged "consist[ed] of their inability to obtain information … that, on [their] view of the law, the statute require[d] that AIPAC make public." Akins, 524 U.S. at 21. Both of those cases stand for the proposition that the failure to provide information that a statute allegedly requires to be disclosed is sufficient on its own to constitute an injury in fact. The Supreme Court expressly recognized this in Spokeo. Spokeo, 136 S. Ct. at 1549–50.[10] Those cases, although somewhat different, are sufficiently analogous to this case. There, as here, the statutes at issue conferred a distinct legal right on certain individuals, which, when violated, created a legally cognizable injury where before no such injury existed.[11]

---

[10] In Spokeo, the Supreme Court described the rights at issue in Akins and Public Citizen as "procedural." Spokeo, 136 S. Ct. at 1549. Regardless of whether those rights were "procedural" or "substantive," the Supreme Court recognized that violation of those rights, on its own, was sufficient for standing purposes. Prindle's right arising from the FDCPA appears to be substantive in nature (in that it confers on her a right to protection from certain unlawful conduct), and thus it is even more apparent that violation of that right constitutes an injury in fact.

[11] The Eleventh Circuit's decision in Palm Beach Golf Center does not compel a different result. There, the court found that the transmission of an unsolicited fax advertisement in violation of the Telephone Consumer Protection Act ("TCPA") was an injury in fact sufficient to establish standing because the fax momentarily occupied the plaintiff's fax machine. See Palm Beach Golf Ctr., 781 F.3d at 1252–53. Carrington asserts that that case further supports the conclusion that a plaintiff alleging a statutory violation

Carrington's efforts to distinguish <u>Havens</u>, <u>Public Citizen</u>, and <u>Akins</u> are unavailing. It attempts to draw a distinction between those cases and this case based on the fact that the statutes at issue in <u>Havens</u>, <u>Public Citizen</u>, and <u>Akins</u>, in Carrington's view, sought to safeguard "fundamental rights." Defendant's Supp. Brief at 2–4, 6–7. However, nothing in those decisions suggests that the Supreme Court found standing <u>only</u> because the alleged statutory violations implicated "fundamental rights." To the contrary, if the Court were to accept Carrington's proposition—that a statutory right that did not previously exist can only be sufficient for standing purposes if it is "closely tied to the protection of a fundamental[ ] constitutional right," <u>see</u> <u>id.</u> at 6—the Court would be ignoring the Supreme Court's repeated recognition that "Congress may elevate to the status of legally cognizable injuries concrete, <u>de</u> <u>facto</u> injuries that were previously inadequate at law." <u>See</u> <u>Spokeo</u>, 136 S. Ct. at 1549. Nothing in that statement suggests that Congress's power to identify and elevate previously inadequate harms to constitutionally sufficient status is limited to safeguarding other, more fundamental rights of an individual.[12]

---

must allege some other more concrete harm to establish standing. <u>See</u> Defendant's Supp. Brief at 7. However, <u>Palm Beach Golf Center</u> is distinguishable. The court reached its conclusion based on the fact that the "occupation of [the] [p]laintiff's fax machine is among the injuries intended to be prevented by the statute." <u>Palm Beach Golf Ctr.</u>, 781 F.3d at 1252. In other words, the court found standing because the statute protected people from unwanted occupation of their fax lines, not because that occupation was some harm separate from the statutory violation itself. Through the TCPA, Congress elevated a tangible, albeit <u>de</u> <u>minimis</u>, injury to the status of a legally cognizable injury. Here, the "injur[y] intended to be prevented by the" FDCPA is intangible: the exposure to abusive debt-collection practices.

[12] Carrington's discussion of the Supreme Court's holding in <u>Havens</u> is misguided. It contends that although <u>Havens</u> recognized that the statute at issue protected a person's right to truthful information, "it was the right to fair housing free from racial discrimination that was protected by statute—not the mere right to truthful information." Defendant's Supp. Brief at 3. Although the right to truthful information was tied to the Fair Housing Act's ultimate goal of eliminating housing discrimination, there is no indication that the Court's decision had anything to do with that goal. To the contrary, the Court unequivocally found that the tester plaintiff had standing solely because the statute gave her a right to truthful information, and the defendant allegedly violated that right. <u>See</u> <u>Havens</u>, 455 U.S. at 373–74.

Moreover, the Eleventh Circuit's recent unpublished opinion in Church v. Accretive Health, Inc., — F. App'x —, No. 15-15708, 2016 WL 3611543 (11th Cir. July 6, 2016), supports the Court's conclusion that Prindle has standing. In Church, the plaintiff alleged that the defendant violated the FDCPA by failing to include certain required disclosures in a debt-collection letter it sent to her. Id. at *2. She did not allege that she suffered any actual damages. Id. After discussing Spokeo in some detail, see id. at *5–7, the court analogized the facts in that case to Havens and concluded that the plaintiff had Article III standing because she "alleged injury to her statutorily-created right to information pursuant to the FDCPA," id. at *7–8. In doing so, the court found that, "through the FDCPA, Congress has created a new right—the right to receive the required disclosures in communications governed by the FDCPA—and a new injury—not receiving such disclosures." Id. at *9. Because she alleged that the defendant violated her right to receive the disclosures, the Eleventh Circuit concluded that the plaintiff adequately alleged that she "sustained a concrete—i.e., 'real'—injury." Id. The same analysis applies to this case.[13]

While the majority opinion in Spokeo states that a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right," and notes that "Article III standing requires a concrete injury even in the context of a statutory violation," Spokeo, 136 S. Ct. at 1549, the Court does not read those statements as suggesting that a plaintiff needs to establish further concrete harm even where Congress has created a new

---

[13] The provisions at issue in Church required the defendant to do something (provide disclosures), whereas the provisions at issue in this case prohibited Carrington from doing something (using abusive debt-collection practices). However, that is a distinction without a difference. In both circumstances, standing exists because the plaintiffs alleged violation of a statutorily created private right.

private, individual right. The majority appears to intend those statements to reach only as far as the cases it cites for the proposition—Lujan and Summers—would support. Those cases dealt with procedural violations by government agencies that had nothing to do with the plaintiffs themselves. In Lujan, the plaintiffs asserted that the Endangered Species Act gave any and every person a procedural right to "file suit in federal court to challenge [an agency's] failure to" consult with the Secretary of the Interior to ensure any action by the agency would not have certain specified negative effects on endangered or threatened species or their habitats. Lujan, 504 U.S. at 572. The Court rejected that assertion because "a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." Id. at 573–74. In Summers, the plaintiffs asserted they had "suffered procedural injury" in that they were "denied the ability to file comments on some Forest Service actions and w[ould] continue to be so denied." Summers, 555 U.S. at 496. The Court rejected that assertion because the procedural right—the right to notice and comment—was, for those plaintiffs, unconnected to any concrete interest of theirs. Id. Critically, it was enough to state a concrete injury as to one challenged action that the action "threatened to impinge on their concrete plans to observe nature in that specific area." Id. at 497. Thus, in both Lujan and Summers, the "bare procedural violation[s]"—failure to consult (Lujan) and failure to provide notice and comment (Summers)—were no more connected to the plaintiffs in those cases than they were to any other citizen. The plaintiffs instead sought to "vindicate the public's nonconcrete interest in the proper administration of the laws."

See Lujan, 504 U.S. at 581 (Kennedy, J., concurring in part and concurring in the judgment). Here, by contrast, Prindle alleges that she, herself, was the object of Carrington's allegedly abusive debt-collection practices. Her alleged harm is not a "generally available grievance," see id. at 573, but rather one specific to her.

Additionally, reading those statements in Spokeo as requiring allegations of a separate, additional concrete harm whenever Congress has created a new legal right that previously was insufficient at law would put the majority opinion at odds with both Havens and itself. As previously discussed, the Court in Havens recognized that § 804(d) of the Fair Housing Act created a new standalone right to truthful information, violation of which amounted to an injury in fact regardless of whether the recipient relied on or was damaged by receipt of false information. Havens, 455 U.S. at 373–74. And the majority itself later recognized that, in some instances, violation of a statutorily granted right is sufficient on its own to establish a concrete injury such that a plaintiff "need not allege any additional harm beyond the one Congress has identified." See Spokeo, 136 S. Ct. at 1549 (emphasis in original).[14]

The FDCPA unambiguously grants recipients of debt-collection communications (such as Prindle) a right to be free from abusive collection practices. In other words,

---

[14]     Justice Thomas's concurring opinion in Spokeo sheds additional light on the apparent distinction between the rights created in the FCRA and the rights at issue in Havens, Public Citizen, Akins, and this case. As Justice Thomas observed, many of the duties the FCRA imposes on credit reporting agencies are owed to the public collectively, such that Robins could not sue for violations of those duties "absent some showing that he has suffered concrete and particular harm." Id. at 1553 (Thomas, J., concurring). The central provision at issue in Spokeo required Spokeo to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). Justice Thomas observed that, "[i]f [through that provision] Congress has created a private duty owed personally to Robins to protect his information, then the violation of the legal duty suffices for Article III injury in fact. If that provision, however, vests any and all consumers with the power to police the 'reasonable procedures' of Spokeo, without more, then Robins has no standing to sue for its violation absent an allegation that he has suffered individualized harm." Id. at 1554.

§ 1692e of the FDCPA "create[s] a private duty owed personally to" a consumer to refrain from using false, deceptive, or misleading means or representations in attempting to collect a debt. See Spokeo, 136 S. Ct. at 1554 (Thomas, J., concurring) (quoted). As such, because Prindle had a personal statutory right to be free from abusive debt-collection practices, and because she has alleged facts plausibly showing that Carrington violated that right, she "need not allege any additional harm." See id. at 1549 (emphasis omitted). In light of this conclusion, Carrington's primary argument—that Prindle failed to allege any additional concrete harm, such as economic loss, confusion, lost time, or emotional distress, see Defendant's Supp. Brief at 5–8—is unavailing.[15] Having concluded that Prindle has alleged an injury in fact that is both particularized and concrete, she has standing to bring her claims, and the Court turns to Carrington's challenges to the merits of those claims.

**B.    Actual Damages**

Carrington asserts that it is entitled to summary judgment on Prindle's claim for actual damages in this action. Motion at 24–25. Pursuant to 15 U.S.C. § 1692k(a)(1), a plaintiff is entitled to "any actual damage sustained … as a result of [failure to comply with any provision of the FDCPA]." At oral argument on May 9, 2016, Prindle's counsel conceded that Prindle made no payments to Carrington after receiving either the Loan Modification Package or the June 2013 Statement and that summary judgment as to her claim for actual damages would be appropriate. See Tr. of May 2016 Hearing at 81–83.

---

[15] To the extent Carrington contends the decision in Spokeo precludes class certification, see Defendant's Supp. Brief at 9–11, the Court will address those arguments in a separate order.

The Court therefore concludes that Carrington is entitled to summary judgment in its favor to the extent Prindle seeks to recover actual damages.

### C.     The Loan Modification Package

Carrington also argues for several reasons that it is entitled to summary judgment in its favor as to Prindle's claim related to the Loan Modification Package. First, it argues that sending the document was expressly permitted under 11 U.S.C. § 524(j) such that Prindle's claim is precluded. Motion at 11–12. Second, it contends that the Loan Modification Package was not a communication in connection with the collection of a debt because it was sent only in response to Prindle's request for a loan modification and her completion of the application, and that the "animating purpose" of the document was to offer Prindle "a voluntary foreclosure avoidance option in response to her request," which it was required to do under the HAMP once she applied and qualified for it. Id. at 17–18. Third, Carrington asserts that the Loan Modification Package was not false, deceptive, or misleading from the perspective of the least-sophisticated consumer. It contends that it used a form approved and provided by the Treasury Department for the proposed agreement accompanying the Loan Modification Package. Carrington argues that Prindle's suggestion that she did not "think there was a real possibility of a loan modification plainly ignores the signed modification offer" Carrington provided, which would have significantly reduced her principal and interest payments. It contends that the least-sophisticated consumer would not have been misled into believing that the loan was not affected by the discharge in light of the numerous bankruptcy disclaimers Prindle received during telephone conversations with Carrington's representatives, with the trial period offer, and with the proposed modification agreement. Finally, Carrington asserts

that the statements concerning waiver of late fees and other charges were not false or misleading because those fees continued to exist under the mortgage and could be enforced against the property. Id. at 20–24.

In response to Carrington's arguments, Prindle asserts that her claim with respect to the Loan Modification Package is not precluded because "a debtor may seek redress through other causes of action" once bankruptcy proceedings have concluded, and the fact that the Loan Modification Package could have had a permissible purpose does not foreclose the possibility that it also had an impermissible purpose. Response at 6–8, 11. She also contends that Carrington has abandoned any argument that its communications were not in connection with the collection of a debt. Id. at 10, 14 n.5. Prindle argues that a genuine dispute exists as to whether the Loan Modification Package was false, deceptive, or misleading from the perspective of the least-sophisticated consumer because the summary accompanying the proposed agreement did not mention her bankruptcy or assure her that she would not be personally liable on the modified loan. Id. at 14. Although she concedes that Paragraph 1.H explains that she would not be personally liable, Prindle suggests that that statement was insufficient because it did not also appear in the introductory summary or the paragraph titled "The Modification." Id. at 14–15. Prindle contends that the fact that she requested a loan modification "does not excuse [Carrington]'s misinformation," and that the Loan Modification Package was an "indirect means" of collecting on the loan. Id. at 15. She also argues that Carrington's assertion that it would not have unilaterally offered a loan modification is contradicted by her own testimony that she received unsolicited modification offers and the testimony of

Carrington's corporate representative that it sent such offers automatically at times. Id. at 16.

Upon review of the record, the Court determines that Carrington is entitled to summary judgment in its favor with respect to Prindle's claim based on the Loan Modification Package. There is no genuine dispute as to whether the Loan Modification Package constituted a communication in connection with the collection of a debt.[16] As previously discussed, courts consider a number of factors to determine whether a communication is one made "in connection with the collection of a debt," including, as relevant here, the relationship of the parties, the intent of the communication, whether there was a demand for payment, whether the communication was sent in response to an inquiry or request by the debtor, and whether it threatened consequences if the debtor failed to pay. See Bohringer, 141 F. Supp. 3d at 1240–41; Parker, 874 F. Supp. 2d at 1357. Here, Carrington has offered evidence that Prindle requested a loan modification, completed an application for a loan modification, and successfully completed a trial payment period. See 2014 Balce Decl. ¶¶ 7–10. Carrington further presented evidence that it would not have sent the Loan Modification Package absent Prindle's request for it and her completion of the trial period. See Motion at 31 (2016 declaration of Elizabeth Balce; "2016 Balce Decl."), ¶ 7. Prindle does not dispute that she requested a loan

---

[16] It is unclear why Prindle contends that Carrington abandoned the argument that its communications were not debt-collection attempts. Carrington devoted nearly five full pages of its Motion to explaining why it believes it is entitled to summary judgment on that basis. See Motion 14–18. To the extent Prindle contends that Carrington implicitly abandoned this argument when it continued to argue that § 524(j) permitted it to send the communications at issue after the Court noted that those arguments were seemingly contradictory, her contention is without merit. The fact that the Court observed that Carrington's positions may be contradictory, see Tr. of 9/25 Hearing at 28, does not mean that Carrington abandoned a particular position. Instead, it appears that Carrington continued to present those arguments in the alternative.

modification and has offered no evidence that Carrington would have sent the specific communication at issue, the Loan Modification Package, had Prindle not sought it. Although Prindle contends that her own testimony and the testimony of Carrington's corporate representative indicate otherwise, see Response at 16, the evidence she cites relates only to initial modification offers, see Doc. 121-1 (declaration of Twyla Prindle; "Prindle Decl.") ¶¶ 5–6; Doc. 107-2 (deposition of Mark Madden; "Madden Depo.") at 7. Prindle points to no evidence that, had she not expressed interest in a modification and completed the trial period payments, Carrington nevertheless would have provided her with the signed proposed agreement and accompanying documents which comprised the Loan Modification Package at issue here.

Significantly, the proposed agreement within the Loan Modification Package itself expressly states that "I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Loan Documents. Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this agreement." Doc. 58-4 at 8. Although Prindle contends that such language is ambiguous because it did not appear in the introductory summary or the section of the agreement titled "The Modification," see Response at 14–15, the summary cautioned Prindle to "read the enclosed Modification Agreement carefully and make sure that you understand it and that the statements set forth in the 'My Representations' section are true and accurate," see Doc. 58-4 at 5, and the "Modification" section indicated that the terms and provisions of the original loan documents would remain valid and binding "except as expressly modified" by the proposed agreement, see 2014 Balce Decl. at 52–53. Additionally, no portion of the Loan Modification Package demanded payment or threatened consequences if the debtor

failed to pay. The Loan Modification Package therefore made clear that its purpose was not to require payment.

The relationship of the parties also supports the conclusion that the Loan Modification Package was not a communication in connection with the collection of a debt. By the time Prindle received the Loan Modification Package in July 2013, the undisputed facts reflect that she had (1) requested a modification, see 2014 Balce Decl. ¶¶ 7–8; 2016 Balce Decl. ¶ 7; (2) completed the trial period plan, see 2014 Balce Decl. ¶¶ 9–10; and (3) talked to Carrington's representatives on the telephone about the status of her modification and received a bankruptcy disclaimer at least nine times, see Id. ¶¶ 7–8; see also id. at 8, 10–12, 14, 17–18. When viewed in the context of that relationship, the Loan Modification Package cannot be construed as a communication made in connection with the collection of a debt. Because there is no genuine dispute as to whether the Loan Modification Package was a communication in connection with the collection of a debt, Carrington is entitled to summary judgment in its favor to the extent Prindle bases her claim on that document.[17]

### D.    The June 2013 Statement

Relying on many of the same arguments, Carrington also requests entry of summary judgment in its favor with respect to Prindle's claim based on the June 2013 Statement. First, it argues that Prindle's claim is precluded because the June 2013 Statement was informational only and did not seek payment, and, even if it was a demand for payment, § 524(j) of the Bankruptcy Code expressly allowed Carrington to send a

---

[17] Because the Court finds that Carrington is entitled to summary judgment based on this issue, the Court need not address Carrington's remaining arguments.

communication to seek payment in lieu of foreclosure. Motion at 7–12. Second, Carrington asserts that the June 2013 Statement was not an attempt to collect a debt because the notice on the back of the Statement expressly disclaimed any attempt to collect personally from Prindle, and the disclaimer was in substantially the same form as language approved by the Consumer Financial Protection Bureau for use in periodic mortgage statements required under 12 C.F.R. § 1026.41(a). It asserts that the June 2013 Statement simply showed that Prindle had made all trial payments and allowed her to "determine whether to accept any future loan modification or allow the foreclosure to proceed." Id. at 14–17. Finally, Carrington argues that the June 2013 Statement was not false, deceptive, or misleading from the perspective of the least-sophisticated consumer because it is not misleading to seek payment in lieu of foreclosure; the Statement did not misrepresent the status of the account; and it is titled "Mortgage Statement," mentions only "monthly mortgage payments," and does not mention pursuing Prindle personally for payment. Id. at 19–20.

As to Carrington's preclusion argument, Prindle argues that at least one case has found language similar to that in the June 2013 Statement violated the discharge injunction, and the cases Carrington cites to support its argument that its communications were permissible are distinguishable. Response at 8–11. Prindle again contends that Carrington abandoned any argument that its communications were not in connection with the collection of a debt. Finally, Prindle argues that a genuine dispute exists as to whether the June 2013 Statement was false, deceptive, or misleading from the perspective of the least-sophisticated consumer because it has no qualifying language that payments are "due" only to the extent a person wants to avoid foreclosure; the disclaimers on the back

do not establish as a matter of law that the June 2013 Statement was not false or misleading because they are not prominent and are conditional (stating that Carrington was not attempting to recover from Prindle personally "if" her debt had been discharged); and other sections on the back of the Statement provided instructions for payment. Id. at 12–13. She asserts that "[n]othing has changed" since the Court denied Carrington's Motion to Dismiss. Id. at 14.

### 1.   Implied Repeal

"Federal statutes do no preempt other federal statutes." Ray v. Spirit Airlines, Inc., 767 F.3d 1220, 1224 (11th Cir. 2014) (emphasis omitted). Rather, in this context a court must consider the "interplay between two statutory schemes created by Congress for different reasons and at different times." Id. Repeal by implication is disfavored, so the Eleventh Circuit has imposed "a strong presumption against finding repeals by implication." Id. at 1225. Indeed, "courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intent to the contrary, to regard each as effective." Morton v. Mancari, 417 U.S. 535, 551 (1974). As such, a court "must assiduously attempt to construe statutes in harmony before concluding that one impliedly repeals the other." Ray, 767 F.3d at 1225 (internal quotation marks omitted). Nevertheless, a court may infer a "clear and manifest intent" to repeal from "the existence of an irreconcilable conflict" between statutes. Id. (internal quotation marks omitted). Statutes irreconcilably conflict when there is a "positive repugnancy between them or … they cannot mutually coexist." Radzanower v. Touche Ross & Co., 426 U.S. 148, 155 (1976).

The Court previously determined that, as alleged here, the nature of Prindle's FDCPA claim did not cause that statute to irreconcilably conflict with § 524(j) of the Bankruptcy Code. The Court observed that although § 524(j) gives a party the right to send some sort of communication in an effort to obtain payment from a discharged debtor in lieu of foreclosing on the security interest on the property, that provision nevertheless could coexist with the FDCPA because the party could "assert its right under Section 524(j) to seek and accept periodic payments without doing so in a false or misleading manner." Tr. of 9/25 Hearing at 14. In other words, the Bankruptcy Code did not impliedly repeal the FDCPA to the extent that Prindle's claim was based more narrowly on the allegedly false, deceptive, or misleading content of communications otherwise allowed under § 524(j), rather than on the sending of <u>any</u> communication, regardless of content.

In the Motion, Carrington renews its argument that the Bankruptcy Code "precludes" Prindle's FDCPA claims. Motion at 7–12. Prindle responds that the Bankruptcy Code does not preclude her FDCPA claims because, as the Court previously concluded, her claims are based on the false or misleading nature of the communications. Response at 6–7.

Contrary to Carrington's assertion, Prindle does not allege in the Second Amended Complaint, and did not indicate in her interrogatory responses, that the mere sending of the June 2013 Statement violated the FDCPA. It is true that the Court previously indicated that, if Prindle's claims "really do boil down to nothing more than a claim that by sending any statement or request, defendants have violated the FDCPA," the Court would "likely find them to be precluded." Tr. of 9/25 Hearing at 15. However, Prindle's claim continues to be—as it was then—that the June 2013 Statement violated the FDCPA because it

misleadingly suggested that Prindle remained personally liable for the payment of the mortgage debt even though her personal liability had been discharged in bankruptcy. She references the portions of the Statement listing "amount due," "current payment," and "due date" to point out that the Statement could mislead the least-sophisticated consumer into thinking she was personally obligated to pay the loan, particularly when coupled with payment instructions. See Doc. 110-1 at 3 (Prindle's interrogatory response stating that, based on receipt of the mortgage statement, "it did not seem anything had changed" since her bankruptcy, and the statements listing amounts due and due dates "were not consistent with bankruptcy eliminating [her] obligations").

In the specific context of this case, the FDCPA and § 524(j) can coexist. A secured creditor can exercise its rights under § 524(j) while also complying with the FDCPA by sending a communication seeking payment in lieu of foreclosure that does not contain language that, to the least-sophisticated consumer, would be false, deceptive, or misleading.

Carrington's assertion that the Bankruptcy Code specifically permitted it to send the communication, regardless of whether it might be false or misleading, is untenable. That assertion suggests that the Bankruptcy Code permits conduct that Congress otherwise has made unlawful. As the Court previously found, § 524(j) does not give a secured creditor "carte blanche to [seek and accept periodic payments in lieu of foreclosure] in any manner it sees fit, including by using false representations[,] such that the lienholder would be immunized from liability for violations of other federal statutes, particularly if the lienholder is engaging in practices that would subject any other debt collector to liability under such statutes." Tr. of 9/25 Hearing at 14. It would not make

sense to read the Bankruptcy Code as permitting debt-collection practices that Congress has otherwise expressly sought to curtail. Therefore, for the same reasons the Court denied Carrington's Motion to Dismiss, the Court will deny Carrington's Motion to the extent it seeks summary judgment based on the assertion that the Bankruptcy Code impliedly repealed the FDCPA in this context.

### 2.   Communication in Connection with Collection of a Debt

Although Carrington did not, as Prindle asserts, abandon its argument that the June 2013 Statement was not a communication in connection with the collection of a debt, see supra at 29 n.16, Carrington nevertheless is not entitled to summary judgment on this claim because a genuine dispute exists as to whether the June 2013 Statement was a communication in connection with the collection of a debt. The Statement lists amounts "due" and the dates they are due, provides instructions for making a payment (and a means of doing so through the detachable payment coupon) as well as instructions for setting up automatic payments for "peace of mind,"[18] and could be read to imply that penalties—such as additional late charges—will result if no payment is received. Nothing about the Statement obviously differentiates it from an ordinary mortgage statement one would receive if actually required to make a payment. Moreover, Prindle did nothing to request the June 2013 Statement. Instead, Carrington's corporate representatives testified that Carrington would send such statements automatically. See Madden Depo. at 7, 24–25; Doc. 107-3 (deposition of Stephen Brackett; "Brackett Depo.") at 54–55. Based on that testimony, a reasonable fact finder could conclude that the "animating

---

[18] One might wonder why one would need to set up automatic payments for "peace of mind" if no payment was actually due and there was no consequence for not making a payment.

purpose" of the June 2013 Statement was the same as any other automatically sent mortgage statement, that is, to seek payment.

Notably, Carrington agrees the front of the June 2013 Statement "appears to seek a payment on the surviving mortgage debt." Motion at 14. Nevertheless, it argues that the bankruptcy disclaimer on the back of the Statement, as a matter of law, precludes the Statement from being viewed as an attempt to collect a debt. Id. at 14–16. The Court disagrees. In light of the other aspects of the June 2013 Statement discussed above, a reasonable jury could find it to be a communication made in connection with the collection of a debt. See Goodin v. Bank of Am., N.A., 114 F. Supp. 3d 1197, 1206 & n.10 (M.D. Fla. 2015) (finding "statements that contained payment instructions, a payment due date, and an amount due" were attempts to collect a debt, even though they also were labeled "FOR INFORMATION PURPOSES" and stated that if debtors were currently in bankruptcy, statement should not be construed as an attempt to collect from them personally).

### 3.      False, Deceptive, or Misleading

Additionally, Carrington's Motion for summary judgment is due to be denied because a genuine dispute exists as to whether the June 2013 Statement was false, deceptive, or misleading from the perspective of the least-sophisticated consumer. At oral argument on May 9, 2016, Carrington conceded that, because the least-sophisticated-consumer standard is objective, it does not take into account the individual circumstances of a plaintiff. See Tr. of May 2016 Hearing at 69–70. Therefore, the Court must look only to the document itself to determine whether a reasonable fact finder could find it to violate the FDCPA. As previously discussed, the front of the June 2013 Statement appears to

demand payment, listing amounts due, a due date, methods of payment, and potential penalties or repercussions for nonpayment. Indeed, it looks like any other mortgage statement. Because the disclaimers on which Carrington relies are only on the back of the Statement, and because they are conditional (stating that the mortgage statement is not an attempt to collect a debt "if" the borrower has filed for bankruptcy or received a discharge), a reasonable fact finder could conclude that the June 2013 Statement as a whole would be confusing to the least-sophisticated consumer. As the Court previously concluded in denying Carrington's motion to dismiss, the disclaimers on the back of the June 2013 Statement "can be viewed as either inconsistent or at least confusing, particularly in light of the amount due on the first page, and can leave a consumer guessing as to whether or not they owe the debt." Tr. of 9/25 Hearing at 27.

Despite the potentially inconsistent information on the front and back of the June 2013 Statement, Carrington contends it was permitted under the Bankruptcy Code to send the statement in an effort to seek payment in lieu of foreclosing on its security interest on the property. It asserts that the disclaimers it used were consistent with a later regulation implemented by the Consumer Financial Protection Bureau ("CFPB") under the Truth in Lending Act, which requires inclusion of all of the information set forth on the June 2013 Statement. See Motion at 15–16 & n.9, 19 (citing 12 C.F.R. § 1026.41).[19] Regardless of whether the June 2013 Statement included categories of information now required under § 1026.41, a reasonable jury could find that the manner in which

---

[19] Carrington appears to acknowledge that the cited regulation, which became effective as of January 10, 2014, would not have applied to the June 2013 Statement. See Motion at 15 n.9; see also Bureau of Consumer Fin. Prot., Mortgage Servicing Rules Under the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 10902, 10978 (Feb. 14, 2013).

Carrington chose to present the information would be misleading to the least-sophisticated consumer.[20]

Based on the record evidence, a reasonable fact finder could conclude that the June 2013 Statement would have confused the least-sophisticated consumer. "[W]here the parties reasonably disagree on the proper inferences that can be drawn from the debt collector's [communication], resolution is for the trier of fact—not for the court on summary judgment." LeBlanc, 601 F.3d at 1197 (citing Jeter v. Credit Bureau, Inc., 760 F.2d 1168, 1176 (11th Cir. 1985)). Thus, Carrington's Motion is due to be denied to the extent Carrington seeks summary judgment in its favor as to Prindle's claim concerning the June 2013 Statement and any other similar mortgage statement Prindle might have received within the applicable statute of limitations.

## V.    Conclusion

In light of the foregoing, Carrington's Motion is due to be granted, in part, and denied, in part. Accordingly, it is hereby

**ORDERED:**

---

[20] Carrington also cites the CFPB's statement in its notice of final rulemaking that a debt collector could "include a message about the bankruptcy," such as a disclaimer, to avoid violating the FDCPA and the Bankruptcy Code. See Motion at 16 (citing CFPB, Mortgage Servicing Rules Under the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 10902, 10966 (Feb. 14, 2013). However, after providing that initial guidance, the CFPB amended § 1026.41 to exempt servicers from the requirements of that regulation for a mortgage loan while the consumer is in bankruptcy. See CFPB, Amendments to the 2013 Mortgage Rules Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 62993, 63000–02 (Oct. 23, 2013). That exemption applies to "any portion of the mortgage debt that is discharged." Id. at 63001. In providing the exemption, the CFPB recognized that the interplay between § 1026.41 and the Bankruptcy Code was more complex than it had initially contemplated. Id. at 63000–02. As such, the CFPB's initial guidance on the matter is of little assistance here. In any event, the CFPB's suggested disclaimer is different from the disclaimer in the June 2013 Statement at issue in this case, see 78 Fed. Reg. at 10966 n.125, and the CFPB did not approve the specific language Carrington used. Thus, Carrington cannot rely on the CFPB's guidance to establish that, as a matter of law, its disclaimers were sufficient to avoid violating the FDCPA.

1.   Carrington's Motion for Summary Final Judgment (Doc. 113) is **GRANTED, in part, and DENIED, in part**. The Motion is **GRANTED** to the extent that:

a.   Judgment will be entered in favor of Carrington as to Prindle's claim for actual damages under the FDCPA; and

b.   Judgment will be entered in favor of Carrington as to Prindle's claim under the FDCPA based on the Loan Modification Package.

The Motion is otherwise **DENIED.**

2.   The Court will defer entry of judgment in Carrington's favor as specified above until after resolution of Prindle's remaining claim.

**DONE AND ORDERED** in Jacksonville, Florida, on August 16, 2016.

MARCIA MORALES HOWARD
United States District Judge

lc21
Copies to counsel of record